## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

Civil Case No. __19-12484____

SERGIO VERDÚ

       Plaintiff,

   v.

THE TRUSTEES OF PRINCETON UNIVERSITY, THE BOARD OF TRUSTEES OF PRINCETON UNIVERSITY, CHRISTOPHER L. EISGRUBER, DEBORAH A. PRENTICE, REGAN CROTTY, TONI MARLENE TURANO, LISA MICHELLE SCHREYER, MICHELE MINTER, CLAIRE GMACHL, CHERI BURGESS, LYNN WILLIAM ENQUIST, SUSAN TUFTS FISKE, CAROLINA MANGONE, HARVEY S. ROSEN, and IRENE V. SMALL,

       Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff Sergio Verdú ("Plaintiff" or "Dr. Verdú"), by and through his attorneys Nesenoff & Miltenberg, LLP, as and for his complaint against Defendants The Trustees of Princeton University ("Princeton" or the "University"), the Board of Trustees of Princeton University, Christopher L. Eisgruber, Deborah A. Prentice, Regan Crotty, Toni Marlene Turano, Lisa Michelle Schreyer, Michele Minter, Claire Gmachl, Cheri Burgess, Lynn William Enquist, Susan Tufts Fiske, Carolina Mangone, Harvey S. Rosen and Irene Small (collectively the "Defendants") alleges as follows:

## THE NATURE OF THE ACTION

1.    This action arises out of Princeton's flawed and gender-biased Title IX proceedings, unremedied harassment and retaliation against Dr. Verdú and the subsequent unwarranted and flawed termination proceedings against him.

2.      Dr. Verdú, formerly Princeton's Eugene Higgins Professor of Electrical Engineering, who taught at the University for nearly 35 years, held his tenured position without incident until Spring 2017. Dr. Verdú has long been held in the highest esteem by students and colleagues alike, he has achieved the highest levels of success in his field and received numerous awards and accolades over the course of his career.

3.      Rather than make any effort to protect its highly esteemed faculty member, Princeton instead pursued the decimation of Dr. Verdú's reputation and career, and violated his right to privacy over an extramarital affair that took place years earlier so that it could exact a harsher punishment against Dr. Verdú in the wake of the #MeToo movement.

4.      In Spring 2017, Paul Cuff ("Cuff"), an Assistant Professor who held a grudge against Dr. Verdú, and blamed him for Cuff's failure to obtain tenure, reported allegations to then Dean of the Graduate School, Sanjeev Kulkarni ("Kulkarni"), that, years prior, Dr. Verdú had been involved in a consensual romantic relationship with a former female graduate student supervised by Cuff. A month earlier, the University heard the same allegation from a faculty member at Stanford University.

5.      Concerned about Cuff's motives, and the lack of any complaint from the former graduate student, "E.S."—who received her Ph.D. from Princeton over two years earlier and never made a report or complaint about Dr. Verdú—Kulkarni told Cuff that no investigation was warranted. At the time, Cuff said he was going to "watch out" for Dr. Verdú's only female advisee, twenty-five-year-old graduate student Yeohee Im ("Ms. Im").

6.      A short time later, Cuff notified the University that Dr. Verdú had allegedly acted inappropriately with Ms. Im, and, upon information and belief, encouraged Ms. Im to file a false charge of sexual harassment against Dr. Verdú with the University's Title IX Office, stemming

from two occasions on which Ms. Im and Dr. Verdú watched movies together at his home. Ms. Im also alleged—as had Cuff—that Dr. Verdú was rumored to have engaged in a consensual relationship with E.S.

7.     Having developed a close relationship with Cuff, Ms. Im willfully mischaracterized ordinary social interactions with Dr. Verdú, which she enthusiastically participated in, as sexual harassment. She claimed sexual harassment even though she admitted that Dr. Verdú acted professionally during the course of her graduate studies—both before and after the incidents she complained of.

8.     When complaining to the University, Ms. Im supplied only part of the story, and presented deliberately altered "evidence" in support of her claim of sexual harassment, including select portions of a secretly taped conversation with Dr. Verdú and excerpted emails. The full set of emails—produced by Dr. Verdú to the Title IX administrator—demonstrated that Ms. Im initiated a social relationship with Dr. Verdú and made attempts to foster a closer relationship with him. The Title IX panel, tasked with investigating Ms. Im's allegations *and* determining responsibility, relied on the altered evidence, as opposed to the exculpatory evidence provided by Dr. Verdú, to erroneously find him responsible for sexual harassment.

9.     Though the panel members admitted that Ms. Im downplayed her efforts to foster a close relationship with Dr. Verdú, they failed to consider this in weighing the evidence. The panel also ignored that Cuff—not Ms. Im—was the original source of Ms. Im's Title IX complaint and turned a blind eye to the simultaneous timing of the allegations about E.S., brought forward by Cuff and Ms. Im. The panel further ignored that, only months earlier, Ms. Im made a Title IX report against a male teaching assistant. All of these facts raised serious questions about Ms. Im's credibility and her motives.

10.     When she reported the "sexual harassment" to the University, Ms. Im embellished her story in a manner that directly contradicted the evidence, including her own email communications with Dr. Verdú. Ms. Im's story also continuously changed. The Title IX panel members ignored these contradictions. Their assessment of the case, and corresponding finding of responsibility against Dr. Verdú, revealed their sex bias because they treated Ms. Im—an adult—like a child in need of parental supervision. They also assumed that—because Dr. Verdú was male and Ms. Im female—Dr. Verdú intended a simple gesture like quickly cleaning a red wine stain off Ms. Im's sweatshirt to be a sexual advance. They ignored Dr. Verdú's consistent account of the events in question.

11.     The University ultimately found Dr. Verdú responsible for sexual harassment. As a result of this finding, he was placed on probation for one year, could not take a planned sabbatical, and was required to attend a mandatory 8-hour counseling program with an outside psychologist, whose services had been secured by Princeton exclusively to deal with student cases in the past.

12.     Dissatisfied with this sanction, Ms. Im embarked on a vicious, retaliatory campaign to destroy Dr. Verdú's career and reputation by disclosing confidential Title IX records and altered recordings to the press, making unsubstantiated comments in an article published by the *Huffington Post*, encouraging social media posts against Dr. Verdú within the construct of the #MeToo movement, filing complaints with professional associations to which Dr. Verdú belonged, and publicly accusing him of sex crimes. Ms. Im succeeded in her destructive efforts.

13.     The November 9, 2017 *Huffington Post* article, published against the backdrop of the #MeToo movement, prompted a firestorm of negative publicity at Princeton, leading to the plastering of flyers across campus with Dr. Verdú's photo, calls to the Princeton administration

for his termination, exaggerated accusations and unsubstantiated rumors which Ms. Im and Cuff fueled by publishing editorials about Dr. Verdú in *The Daily Princetonian* newspaper.

14.    The University took no steps to quell the harassment of Dr. Verdú or prohibit Ms. Im from revealing confidential information obtained through the Title IX process. On the contrary, the University encouraged retaliation against Dr. Verdú by taking a position that supported Ms. Im. Princeton had already been subjected to a number of Office for Civil Rights investigations[1] and was embroiled in a sexual harassment scandal concerning professors in the University's German Department and, in the weeks following the rebirth of the #MeToo movement, was, upon information and belief, more interested in preserving its reputation than preventing further harm to Dr. Verdú.

15.    All the while, Dr. Verdú was under a gag order, as the University warned him against disclosing any emails from and to Ms. Im or any other confidential information from the Title IX proceedings. Although Ms. Im was also subject to such confidentiality orders, the University chose not to enforce them against *her*. As a result, Dr. Verdú was unable to publicly defend himself against Ms. Im's accusations and the unsubstantiated rumors that were the subject of campus discourse, including nearly a dozen articles in *The Daily Princetonian* attacking his character. Essentially, the University barred Dr. Verdú from coming to his own defense while simultaneously allowing Ms. Im to unabashedly and publicly attack Dr. Verdú.

16.    Not only did the University encourage retaliation against Dr. Verdú, its administration opened a second investigation into the allegations originally lodged by *Ms. Im* and *Cuff* concerning a consensual relationship between Dr. Verdú and E.S.

---

[1] Indeed, its handling of sexual misconduct allegations received a score of 5/20 (letter grade D) from the *Foundation for Individual Rights in Education*.

17.     Ms. Im contacted E.S. on a number of occasions, threatened her and solicited her to file a university complaint against Dr. Verdú, because she was dissatisfied with the fact that he was not fired as a result of her, and Cuff's, sexual harassment allegation. Ms. Im's threats were unsuccessful. E.S. even met with Princeton's Title IX administrators to inform them that Dr. Verdú had not engaged in any sexual misconduct with respect to her. Regardless, Princeton administrators attempted to coerce E.S. into admitting that Dr. Verdú had an improper relationship with her that violated University policies. This was simply not the case.

18.     Despite the lack of any evidence that sexual misconduct occurred with respect to E.S. the University pressed on, seeking to bolster its reputation for failing to protect female students from sexual harassment by faculty members. Princeton also sought to correct its perceived laxity in sanctioning Dr. Verdú in Ms. Im's Title IX proceeding by resurrecting the allegations against him concerning E.S.—and opening an unwarranted investigation—at Ms. Im's insistence.

19.     Dr. Verdú was punished for his efforts to protect E.S.'s and his right to privacy and for railing against the University's unwarranted and relentless invasion of his privacy in the face of Ms. Im's and Cuff's drummed up allegations. E.S. and Dr. Verdú engaged in an extramarital affair, years earlier, which did not violate University policy. Princeton used the affair as a mechanism for terminating Dr. Verdú, in an effort to appease Ms. Im—and her angry supporters who took the *Huffington Post* article at face value—who would not rest until Dr. Verdú was fired.

20.     Princeton administrators went so far as to keep Ms. Im informed about the status of the E.S. investigation even though she was not a proper complainant or participant in the alleged events. In contrast, the administrators acted hostile, menacing and coercive towards E.S., treating her more like a criminal than an alumna. There was no policy in place that even permitted post hoc investigations concerning students who had graduated, let alone complaints lodged by third parties.

21.     Princeton breached University protocol when conducting the investigation, hiring a high-profile law firm to provide an investigator rather than the Dean of the Faculty. Though the initial investigation turned up insufficient evidence, the Provost urged Dr. Verdú to confess in order to receive a lesser punishment. Her recommendations for discipline were rife with judgment about the propriety of Dr. Verdú, an older man, being involved in a consensual relationship with a younger woman.

22.     Dissatisfied with Dr. Verdú's refusal to admit to any wrongdoing, the President of the University ordered a search of Dr. Verdú's university emails for communications with E.S., including a timeframe well beyond the date upon which E.S.'s Ph.D. was conferred. Ultimately, the investigators relied on flimsy evidence, including communications which post-dated E.S.'s departure from Princeton, to conclude that Dr. Verdú violated Princeton's policy on Consensual Relations with Students. Because Dr. Verdú defended himself, and E.S., against Princeton's unwarranted invasion of privacy, the University President also found him responsible for violating University policies involving dishonesty.

23.     In assessing and adjudicating the false allegations against Dr. Verdú, the University deprived him of a fair and impartial process. Princeton had no regard for the heightened protections that were warranted in the case of deciding allegations against a tenured professor and the significant interest he had in his professorship.

24.     Throughout both investigations, Princeton officials withheld information from Dr. Verdú, including the identities of key witnesses and the individuals who made certain allegations, as well as the fact that Ms. Im and Cuff were behind the E.S. allegations. Dr. Verdú had no right to cross-examine his accusers or question witnesses. He had no right to be represented by counsel during any appearances, nor did he receive a proper hearing.

25.     Both the outcome of the Title IX investigation and the decision to terminate Dr. Verdú resulted from an abuse of power and were the product of sex discrimination.

26.     During the relevant timeframe, Princeton was under constant, extreme pressure to repair its tarnished reputation, which resulted from: i) numerous OCR investigations; ii) public outcry over the alleged sexual harassment of a number of female students in the German Department; iii) Ms. Im's and Cuff's public vilification of the Provost for failing to terminate Dr. Verdú; and iv) the momentum of the #MeToo movement.

27.     As a result of Defendants' misconduct in violating Princeton's policies, failing to provide Dr. Verdú with a fundamentally fair process in either investigation, assisting Ms. Im's retaliatory campaign against Dr. Verdú and engaging in sex discrimination, Dr. Verdú has, among other things, suffered irreparable harm to his career and reputation, been cut off from conducting research in his field, and is unemployable. Dr. Verdú has also suffered physical illness and emotional distress as a result of the discriminatory and hostile environment created by Ms. Im's retaliatory campaign.

28.     As fully set forth below, Dr. Verdú alleges claims against Defendants for: (i) violations of Title IX of the Education Amendments of 1972; (ii) violations of Title VII of the Civil Rights Act of 1964; (iii) violations of New Jersey's Law Against Discrimination; (iii) breach of contract; (iv) breach of the implied covenant of good faith and fair dealing; (v) wrongful discipline; (vi) gross negligence; (vii) negligence; and (viii) respondeat superior.

## **THE PARTIES**

29.     Plaintiff Sergio Verdú is a natural person and a resident of New Jersey.

30.     Defendant The Trustees of Princeton University ("Princeton" or the "University") is an educational corporation incorporated in the State of New Jersey which operates Princeton University, a private university located in Princeton, New Jersey.

31.     The Board of Trustees of Princeton University ("The "Board of Trustees") is the University's governing body, responsible for adopting *Rules and Procedures of the Faculty* which govern faculty disciplinary proceedings and responsible for determining whether to dismiss tenured faculty as an outcome of said disciplinary proceedings. The Board of Trustees made the determination to dismiss Plaintiff from his position as a tenured member of Princeton's faculty.

32.     Defendant Christopher L. Eisgruber ("Eisgruber") is a natural person and, upon information and belief. a resident of New Jersey. Eisgruber is the President of Princeton University. Eisgruber recommended that the Board of Trustees dismiss Dr. Verdú.

33.     Defendant Deborah A. Prentice ("Prentice") is a natural person and, upon information and belief, a resident of New Jersey. Prentice is the Provost of Princeton University. Prentice issued the sanction at the conclusion of the University's Title IX investigation into Ms. Im's sexual harassment allegations against Plaintiff. She also recommended disciplinary measures with respect to the E.S. allegations brought forward by Ms. Im.

34.     Defendant Regan Crotty ("Crotty") is a natural person and, upon information and belief, a resident of New Jersey. Crotty is the Director of Gender Equity and Title IX Administration at Princeton University. Among other things, Crotty served on the Title IX panel which investigated Ms. Im's allegations against Dr. Verdú.

35.     Defendant Toni Marlene Turano ("Turano"), is a natural person and, upon information and belief, a resident of New Jersey. Turano is the Deputy Dean of the Faculty at

Princeton University. Among other things, Turano served on the Title IX panel which investigated Ms. Im's allegations against Dr. Verdú.

36.     Defendant Lisa Michelle Schreyer ("Schreyer") is a natural person and, upon information and belief, a resident of New Jersey. Schreyer is the Associate Dean of the Graduate School at Princeton University. Schreyer served on the Title IX panel which investigated Ms. Im's allegations against Dr. Verdú.

37.     Defendant Michele Minter ("Minter") is a natural person and, upon information and belief, a resident of New Jersey. Minter is the Vice Provost for Institutional Equity and Diversity at Princeton University. Among other things, Ms. Minter assisted the University in publicly supporting Ms. Im, and retaliating against Dr. Verdú, through statements made to the campus newspaper.

38.     Defendant Claire Gmachl ("Gmachl") is a natural person and, upon information and belief, a resident of New Jersey. Gmachl was the Acting Chair of the Department of Electrical Engineering at Princeton University for the 2017-2018 academic year and is currently, upon information and belief, the Associate Chair of the Department of Electrical Engineering at Princeton University. Ms. Gmachl retaliated against Dr. Verdú when he asked for assistance during Ms. Im's negative publicity campaign and told her that he was being subjected to a hostile environment.

39.     Defendant Cheri Burgess ("Burgess") is a natural person and, upon information and belief, a resident of New Jersey. Burgess is the Director for Institutional Equity and EEO at Princeton and is also an attorney. In Fall 2017, Burgess conducted an unauthorized, post-hoc investigation of Ms. Im's allegation that Plaintiff and E.S. were involved in a romantic relationship in Summer 2015.

10

40.     Defendant Lynn William Enquist ("Enquist") is a natural person and, upon information and belief, a resident of New Jersey. Enquist is the Henry L. Hillman Professor of Molecular Biology at Princeton University and was a member of the Committee on Conference and Faculty Appeal that denied Dr. Verdú's Title IX appeal and his appeal of Eisgruber's recommendation of dismissal.

41.     Defendant Susan Tufts Fiske ("Fiske") is a natural person and, upon information and belief, a resident of New Jersey. Fiske is a Eugene Higgins Professor of Psychology and Public Affairs at Princeton University. Fiske was a member of the Committee on Conference and Faculty Appeal that denied Dr. Verdú's appeal of Eisgruber's recommendation of dismissal.

42.     Defendant Carolina Mangone ("Mangone") is a natural person and, upon information and belief, a resident of New Jersey. Mangone is an Assistant Professor of Renaissance and Baroque Art at Princeton University. Mangone was a member of the Committee on Conference and Faculty Appeal that denied Dr. Verdú's Title IX appeal and his appeal of Eisgruber's recommendation of dismissal.

43.     Defendant Harvey S. Rosen ("Rosen") is a natural person and, upon information and belief, a resident of New Jersey. Rosen is the John L. Weinberg Professor of Economics and Business Policy at Princeton University. Rosen was a member of the Committee on Conference and Faculty Appeal that denied Dr. Verdú's Title IX appeal and his appeal of Eisgruber's recommendation of dismissal.

44.     Defendant Irene V. Small ("Small") is a natural person and, upon information and belief, a resident of New Jersey. Small is an Assistant Professor of Contemporary Art and Criticism at Princeton University. Small was a member of the Committee on Conference and Faculty Appeal

that denied Dr. Verdú's Title IX appeal and his appeal of Eisgruber's recommendation of dismissal.

## JURISDICTION AND VENUE

45.     This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331, and 28 U.S.C. § 1367 because: (i) the claims arise under statutes of the United States; and (ii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the United States Constitution.

46.     This Court has personal jurisdiction over Defendant Princeton because Princeton is located within and conducts business in this judicial district.

47.     This Court has personal jurisdiction over Defendants Eisgruber, Prentice, Crotty, Turano, Schreyer, Minter, Gmachl, Enquist, Fiske, Mangone, Rosen and Small because, upon information and belief, they are residents of New Jersey. These Defendants are also employed by Princeton University in New Jersey and committed acts injurious to Plaintiff in New Jersey.

48.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because the acts or omissions giving rise to Plaintiff's claims occurred in this judicial district, and witnesses and evidence relevant hereto are located within this judicial district.

## FACTS RELEVANT TO ALL CLAIMS

**I.      Dr. Verdú's Background**

49.     Dr. Verdú grew up in Barcelona, Spain. In 1980 he came to the United States to pursue his Ph.D. and, in 1984, he became the youngest faculty member at Princeton at that time. Dr. Verdú was employed by Princeton, including as a tenured professor since 1989, for the next 34 years.

50.     Until June 2017, or over a span of 33 years, Dr. Verdú had an unblemished disciplinary record.

51.     Over the years, Dr. Verdú received recognition for his teaching and research, including as the youngest recipient ever of the Claude Shannon Award, the top distinction in Dr. Verdú's field of study, information theory. In recognition of his research achievements, Dr. Verdú was also elected to the National Academy of Sciences and the National Academy of Engineering.

52.     Prior to his termination, and in the wake of a negative publicity campaign sparked by one of his former graduate students, as fully described below, Dr. Verdú received continuing support from former and current students and colleagues, men and women alike, who provided testimonials to Princeton in support of his character. Their support continues to the present day.

53.     Despite these words of support, Princeton caved in to pressure surrounding the #MeToo movement and criticism that it failed to protect its female students from sexual harassment, stripping Dr. Verdú of his tenured position after conducting an unauthorized, unwarranted and biased investigation, the primary purpose of which was to find a reason to terminate him.

II.    **Princeton Under Constant Investigation By the U.S. Department of Education's Office For Civil Rights**

     A.  **The 2011 Dear Colleague Letter and Related Guidance**

54.     On April 4, 2011, the Office for Civil Rights ("OCR") of the United States Department of Education ("DE") issued a guidance letter to colleges and universities in the United States in receipt of federal funding which became widely known as the "Dear Colleague Letter" (the "2011 DCL"). The 2011 DCL directed schools to "take immediate action to eliminate [sexual] harassment, prevent its recurrence and address its effects." *Id.* at p. 4.

55.     The 2011 DCL responded, in part, to a special investigative report published by National Public Radio and the Center for Public Integrity, which proclaimed a campus rape epidemic and criticized the OCR for its lax response to what the report characterized as a social problem of critical importance.[2] The report described in detail the obstacles faced by sexual assault victims in obtaining redress though college disciplinary proceedings and how victims who did engage in the college disciplinary process suffered additional trauma as a result. Much of the report focused on underreporting, re-traumatization of victims, rape myth adherence on college campuses (*e.g.* that women invite rape, that rapes are just drunk hook-ups, and that women routinely lie), and men's cultural adherence to the sex aggressor role.

56.     The 2011 DCL, further, relied on faulty statistics in sounding a "call to action" for campuses nationwide—that "about 1 in 5 women are victims of completed or attempted sexual assault while in college." 2011 DCL, at p. 2. The researchers behind this study subsequently invalidated that statistic as a misrepresentation of the conclusions of the study and warned that it was "inappropriate to use the 1-in-5 number as a baseline…when discussing our country's problem with rape and sexual assault." http://time.com/3633903/campus-rape-1-in-5-sexual-assault-setting-record-straight/. Relying on these faulty numbers, the 2011 DCL minimized due process protections for the accused by, among other things, eschewing any presumption of innocence, mandating the use of a preponderance of the evidence standard, limiting cross-examination, and forbidding certain forms of alternative dispute resolution.[3]

---

[2] *See* http://www.npr.org/templates/story/story.php?storyId=124001493.

[3] On September 22, 2017, the OCR withdrew the April 2011 Dear Colleague Letter and "Questions and Answers on Title IX and Sexual Violence," dated April 29, 2014 on the ground that the April 2011 Dear Colleague Letter placed "improper pressure upon universities" which resulted in the establishment of procedures for resolving sexual misconduct allegations that lack the most basic elements of fairness and due process [and] are overwhelmingly stacked against the accused." *See* https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf.

57.     Recent District Court decisions have held that the preponderance of the evidence standard is too low a burden of proof for evaluating university Title IX complaints given the significant disciplinary consequences that can result therefrom. *Lee v. Univ. of N. Mexico*, Case No. 1:17-cv-01239-JB-LF (Sept. 20, 2018) (Doc. No. 36), at p. 3 ("the Court concludes that preponderance of the evidence is not the proper standard for disciplinary investigations"). *See Doe v. DiStefano*, 2018 WL 2096347, at *6 (May 7, 2018) ("'[T]here is a fair question whether preponderance of the evidence is the proper standard for disciplinary investigations.'").

58.     Courts have also recently held that, in cases where credibility is at stake, precluding cross-examination in university sexual misconduct proceedings casts doubt on the accuracy of the outcome of those proceedings and deprives respondents of the right to a fundamentally fair process. *Doe v. Baum*, 903 F.3d 575, 585-586 (6th Cir. 2018); *Lee v. Univ. of N. Mexico*, Case No. 1:17-cv-01239-JB-LF (D.N.M. Sept. 20, 2018) (Doc. No. 36), at p. 3; *Doe v. Allee*, 2019 WL 101616 (Cal. Ct. App., Jan 4, 2019). As one court noted, Title IX "enforcement officials often must make a credibility judgment between a male and female, which *doubles* the possibility of gender-specific stereotypes influencing the investigation" and may be "the most likely circumstances in which gender bias, explicit or implicit, will have an effect." *Doe v. CU Boulder*, 255 F. Supp. 3d 1064,1076, 1079 (D. Colo. 2017).

59.     Despite its purported purpose as a mere guidance letter, the DE treated the DCL as a binding regulation and pressured colleges and universities to aggressively pursue sexual misconduct investigations or face the loss of federal funding.

60.     On April 29, 2014, OCR issued additional directives to colleges and universities in the form of a guidance document titled *Questions and Answers on Title IX and Sexual Violence* ("2014 Q&A") which was aimed at addressing campus sexual misconduct policies, including the

procedures colleges and universities "must" employ "to prevent sexual violence and resolve complaints" and the elements that "should be included in a school's procedures for responding to complaints of sexual violence." 2014 Q&A, at p. 12. The 2014 Q&A advised schools to adopt a trauma informed approach, advising, for example, that hearings should be "conducted in a manner that does not inflict additional trauma on the complainant." *Id.* at p. 31.

61.     With respect to the role of Title IX Coordinators, the 2014 Q&A advised that they should not have a conflict of interest, such as by also acting as members of a hearing panel "[b]ecause some complaints may raise issues as to whether or how well the school has met its Title IX obligations." 2014 Q&A at p. 12.

62.     In April 2014, the White House issued a report entitled "*Not Alone*", which—like the April 2011 Dear Colleague Letter—relied upon the faulty "1 in 5" statistic and focused on protecting women from sexual assault, "engaging men" and "if you see it happening, help her, don't blame her, speak up." *Id.* at p. 2.

63.     The report included a warning that if OCR found that a Title IX violation occurred, the "school risk[ed] losing federal funds" and that the DOJ shared authority with OCR for enforcing Title IX and may initiate an investigation or compliance review of schools. Further, if a voluntary resolution could not be reached, the DOJ could initiate litigation. The report contained no recommendation with respect to ensuring that the investigation and adjudication of sexual misconduct complaints be fair and impartial or that any resources be provided to males accused of sexual misconduct.

64.     On May 1, 2014, the DE issued a press release naming Princeton as one of the initial 55 colleges and universities being investigated for violating Title IX. The investigation was

publicized by the local press, noting that Princeton was the only New Jersey institution under investigation at that time.

65.    Then Assistant Secretary of Education Catherine Llhamon ("Llhamon") stated that the schools were being named "in an effort to bring more transparency to our enforcement work and to foster better public awareness of civil rights." Per the press release, "[r]eleasing this list advances a key goal of President Obama's White House Task Force to Prevent Students from Sexual Assault…. The Obama Administration is committed to putting an end to sexual violence— particularly on college campuses." The press release continued, "[a]ll universities…receiving federal funds must comply with Title IX. Schools that violate the law and refuse to address the problems identified by OCR can lose federal funding or be referred to the U.S. Department of Justice for further action."

**B.  OCR Launches Several Investigations At Princeton**

66.    At the time that the OCR was implementing the 2011 DCL, Princeton was under heavy fire for its alleged failure to properly respond to and redress female students' claims of sexual assault and sexual harassment by male students and/or faculty.

67.    In 2010 and 2011, three separate complaints were filed by or on behalf of female students with the OCR, accusing Princeton of insufficiently responding to their claims of sexual assault and harassment against male students and creating a hostile environment for female complainants.

68.    In response to the three complaints, OCR launched an extensive, nearly four-year investigation into Princeton's policies and practices in handling sexual misconduct claims, which included student interviews, document and file review, and on-site visits.

69.    As a result of the investigation, OCR concluded that Princeton was in violation of

Title IX for failing to adequately respond to and redress the female students' claims of sexual misconduct. Specifically, OCR found that Princeton's standard of proof for adjudicating sexual misconduct claims—a "clear and persuasive" standard—was impermissibly high, and constituted a violation of Title IX. OCR also found that the University failed to provide "prompt and equitable" responses to reports of sexual assault/violence and, with respect to one of the complainants, the University allowed for the continuation of a sexually-hostile environment that limited the female student's access to educational programs.

70.   On October 12, 2014, Princeton provided a Resolution Agreement to OCR pursuant to which it adopted a new sexual misconduct policy—applicable to students, employees and third parties—which adopted the preponderance of the evidence standard, provided both parties the right to appeal, eliminated the right of cross-examination and the right to present character witnesses. The Resolution Agreement also required Princeton to annually track and provide documentation to OCR concerning the University's responses and handling of all sexual misconduct allegations reported during the previous calendar year.

71.   In May 2016, another complaint was filed with OCR alleging that Princeton failed to adequately respond to a female student's claims of sexual harassment and sexual assault by a male. On August 11, 2016, OCR opened a new investigation against Princeton. Upon information and belief, this investigation is ongoing.

72.   On or about July 9, 2018, OCR opened an investigation of complaints filed by two male students alleging that Princeton engaged in sex discrimination by offering certain seminars to female and Rape Aggression Defense classes only to female students. Upon information and belief, this investigation is ongoing.

73.     As set forth above, since the issuance of the 2011 DCL, Princeton has been under continuous monitoring, and pressure, to better respond to female complainants alleging sexual misconduct. In response, and under threat of the loss of federal funding, Princeton stripped male respondents of basic rights in the Title IX process, including by lowering the burden of proof and eliminating cross-examination.

**III.    Princeton Is Criticized for Failing to Address the Sexual Harassment of Female Students By Male Faculty Members**

74.     On February 2, 2016, The New York Times published an article concerning a former Princeton professor who resigned from University of Chicago due to allegations that he had sexual contact with an incapacitated student. Per the article, the professor had "abruptly resigned" from Princeton in 2014. Princeton subsequently provided no information regarding the reason for the professor's departure in response to employer inquiries.[4]

75.     During the 2016-2017 academic year, three female graduate students in the German Department left Princeton abruptly, causing the administration to hold a town hall meeting, in May 2016, at which systemic and long-term sexual harassment within the Department was discussed. Allegations against a number of male professors in the Department included uncomfortable touching of female graduate students, commenting on their appearances, and cutting short female student presentations while allowing male students to present for as long as an hour. Female graduate students also reported threats and retaliation from professors in the Department for speaking up about sexual harassment.[5] The University launched a Title IX investigation into these allegations in Summer 2017 and a second investigation in Fall 2017 but, unlike Dr. Verdú's case, none of the details were publicized, including the identities of the professors involved.

---

[4] https://www.nytimes.com/2016/02/03/us/chicago-professor-resigns-amid-sexual-misconduct-investigation.html.
[5] http://www.dailyprincetonian.com/article/2017/10/u-launches-title-ix-investigation-into-german-professor-amid-student-complaints.

19

## IV.   Princeton's Title IX Proceedings Against Dr. Verdú

### A.   Princeton's 2017 Sexual Misconduct Policy

76.   The purpose of Princeton's "University-wide Regulations" is to establish "procedures for a fair hearing, including advising individuals fully of the charges against them, affording them ample opportunity to speak on their behalf, and requiring a clear explanation of their rights of appeal." Section 1.1.1.

77.   Princeton's 2017 Regulation on "Sex Discrimination and Sexual Misconduct" (the "Sexual Misconduct Policy") states that "[r]etaliation against anyone…participating in the internal disciplinary process, or opposing in a reasonable manner an act believed to constitute a violation of this policy, is prohibited and will not be tolerated." Section 1.3.1.

78.   Per the Sexual Misconduct Policy, the University's Title IX Coordinator "oversees the investigation and resolution of such alleged misconduct, directs the provision of any remedial measures, and monitors the administration of any related appeal." *Id.* Section 1.3.1.

79.   The Sexual Misconduct Policy governs the conduct of "University students, regardless of enrollment status; faculty; staff; and third parties." Section 1.3.2. It applies to conduct that occurs "off University property (i.e. off campus) …when such conduct may have a continuing adverse effect or could create a hostile environment on campus." *Id.*

80.   "In determining whether the alleged conduct violates [the Sexual Misconduct Policy], the University will consider the totality of the facts and circumstances involved in the incident, including the nature of the alleged conduct and the context in which it occurred." *Id.*

81.   The Sexual Misconduct Policy defines "Sexual Harassment" as:

[u]nwelcome verbal or physical behavior which is directed at a person based on sex…when these behaviors are sufficiently severe and/or pervasive to have the effect of unreasonably interfering with an individual's educational experience…by creating an intimidating, hostile, or offensive environment…. Sexual Harassment

20

is deemed especially serious when submission to or rejection of such conduct is made implicitly or explicitly a term or condition of instruction, employment, or participation in any University activity or benefit; or submission to or rejection of these behaviors by an individual is used as a basis for evaluation in making academic or personal decisions.

82.     The Sexual Misconduct Policy defines "Inappropriate Conduct Related to Sex, Gender Identity, or Gender Expression" as:

Unwelcome or inappropriate conduct that does not fall under other forms of sexual misconduct, but that is sexual or gender-based in nature. Examples may include public sex acts or flashing.

83.     Per the Sexual Misconduct Policy "[i]ndividuals involved in investigations or disciplinary proceedings under this policy are encouraged to exercise discretion in sharing information in order to safeguard the integrity of the process and to avoid the appearance of retaliation." Section 1.3.5.2.

84.     The Sexual Misconduct Policy has separate procedures for student respondents and faculty respondents. Sections 1.3.12-1.3.13.

85.     Graduate student complaints against faculty are investigated by a panel of three administrators, one of whom must represent the Office of the Dean of the Faculty and one of whom must represent the Office of the Dean of the Graduate School. Section 1.3.13.1.

86.     The investigation panel is responsible for "conducting an inquiry" and determining, by a preponderance of the evidence, whether a violation of the Sexual Misconduct Policy occurred. *Id.* All panelists are required to "have training in investigating and evaluating" prohibited conduct and to be "impartial and unbiased." *Id.* Each party shall be notified in writing of the charges that will be adjudicated by the panel. *Id.*

87.     There is no right to a hearing and no right of cross-examination.

88.     The case file prepared in student/faculty sexual misconduct cases is redacted of personally identifiable information before it is provided to the parties. *Id.*

21

89.     Once the panel concludes its investigation, it prepares a report, which is to include findings of fact, findings of responsibility and the panel's rationale. The report must be endorsed by all panel members. *Id.*

90.     If a faculty member is found responsible, the panel's report is forwarded to the Dean of the Faculty to determine the appropriate penalty. *Id.* "Penalties will be determined based on the seriousness of the misconduct as compared to like cases in the past, and on the individual's previous disciplinary history (if any)." *Id.* "In all cases involving sex discrimination or sexual misconduct, the case file will be archived by the Title IX Coordinator." *Id.*

91.     The range of penalties applicable to cases involving faculty members include (in accordance with employment policies governing the employee in question) counseling or training, written warning, financial penalty, unpaid leave of absence, suspension, demotion or termination in accordance with the employment policies governing the particular employee. Section 1.3.16.3.

**B.      Ms. Im's Social Interactions With Dr. Verdú**

92.     In Fall 2015, Ms. Im joined Princeton's doctoral program in Electrical Engineering.

93.      In Spring 2016, Dr. Verdú agreed to serve as Ms. Im's Ph.D. advisor.

94.     Beginning in or around December 2016, Ms. Im started bringing gifts for Dr. Verdú to their weekly meetings, such as Korean sweets and coffee.

95.     In January 2017, Ms. Im emailed Dr. Verdú an audio file of a song that she composed and performed about falling in love with someone.

96.     In January 2017, Ms. Im asked Dr. Verdú for recommendations for cocktail and wine bars in San Francisco. Dr. Verdú wrote down a few recommendations for her. She kept the handwritten note.

97.     In February 2017, Ms. Im emailed Dr. Verdú expressing her interest in learning about soccer, allegedly resulting from her brother's interest in FC Barcelona and its star player Lionel Messi (Dr. Verdú's hometown is Barcelona and this is his favorite team). A few days later, at a meeting in Dr. Verdú's office, Ms. Im told Dr. Verdú that she and her roommate were interested in watching European Champions League soccer. Dr. Verdú mentioned that the knockout phase of the competition was due to start in four days with a match between Paris St Germain and FC Barcelona and that Ms. Im *and* her roommate were welcome to join him to watch it at his house.

98.     On February 14, 2017—the day of the soccer match—Dr. Verdú and Ms. Im walked to his car after class. Dr. Verdú asked where he should pick up Ms. Im's roommate and Ms. Im informed him that her roommate was not available to watch the game, purportedly because she wanted to study for an exam scheduled to take place three months later. Ms. Im and Dr. Verdú continued on to his house and watched a video of the match which had aired earlier that day. Ms. Im later made a false statement to the Title IX panel that she asked Dr. Verdú if a colleague of his, Emmanuel Abbe, would also be watching the game. She also falsely stated that she thought that they would be watching the match in the Engineering Quad.

99.     During the match, Ms. Im and Dr. Verdú continued an earlier conversation they had in one of their meetings about foreign/art house films. Dr. Verdú showed Ms. Im the jacket of a Netflix DVD for *The Handmaiden* by Park Chan-Wook, which had been recommended to him by a former advisee. The film received wide critical acclaim as one of the finest exponents of Korean cinema. Ms. Im said she was quite familiar with both the film and its director (arguably, the most famous Korean filmmaker) and expressed a keen interest in watching it, adding that she had watched a graphic scene from the film on Youtube that had piqued her curiosity.

100.   After Ms. Im had agreed to watched the film, Dr. Verdú sent her a glowing review of the film by Anthony Lane of *The New Yorker*. In response, Ms. Im expressed that her research on the film indicated that it contained explicit content. Ms. Im recommended that she and Plaintiff watch "another Korean popular movie or anything else you like?"

101.   Dr. Verdú's response email was in its entirety: "that must be the scene you already saw in youtube. based on the reviews i am curious to see other movies by the same director but am not sure whether netflix carries them."

102.   Ms. Im next replied: "Oh then it is totally ok. Let's go for The Handmaiden!" She then recommended *Oldboy* and *Thirst*, other films by Park Chan-Wook to watch *after The Handmaiden*. Note that before this email from Ms. Im there had been no discussion about watching any film other than *The Handmaiden*." Notably, *Oldboy* and *Thirst* contain scenes depicting sexual assault, showing full frontal nudity, and other scenes that are sexual in nature.[6]

103.   On February 23, 2017, Plaintiff and Ms. Im watched *The Handmaiden* at his home. When Plaintiff asked if she would like something to drink. Ms. Im asked for red wine, as she had on February 14, the day of the soccer match. Plaintiff had a headache, and had work to do right after the film. He did not want to open a bottle of wine so he suggested that Ms. Im select whatever she like from his liquor cabinet. After the film concluded, Dr. Verdú drove Ms. Im back to the Engineering Quad on campus.

104.   On the same day, Dr. Verdú learned that Eisgruber had denied tenure to his colleague, Cuff. Dr. Verdú was a strong supporter of Cuff during the tenure process, including

---

[6] Dr. Verdú's email to Ms. Im was misconstrued by not only the Title IX panel but President Eisgruber as somehow coercing Ms. Im into watching *The Handmaiden*. However, the full email exchange between the two shows Ms. Im's enthusiasm for not only watching this film but also that she recommended that they watch two other films containing sexual content.

testifying before the President's tenure committee. He told Ms. Im that he was upset with the negative outcome.

105.    On February 24, 2017, Dr. Verdú met with Cuff about the denial of his tenure and expressed his disappointment over the President's decision. Cuff later told colleagues that he was doubtful that Dr. Verdú had done his best to support him during the tenure process. After he was denied tenure, Cuff also told a graduate student who was an advisee of Dr. Verdú that Cuff and Dr. Verdú had never been on good terms but he couldn't say anything about it because he felt that he was under Verdú's thumb.

106.    In February 2017, Minter received an anonymous email from a professor—later identified as Cuff—who alleged that Dr. Verdú had a sexual relationship with a graduate student over whom he occupied a position of power.

107.    On March 2, 2017, Cuff complained to Kulkarni, who was then Dean of the Graduate School, about Dr. Verdú's alleged relationship with E.S. E.S. was Cuff's former advisee. Her Ph.D. was conferred in Fall 2015.

108.    Kulkarni elected not to initiate an investigation because there was no written complaint from E.S. and she had already graduated. Kulkarni also had concerns about Cuff's allegations coming across as a bitter response to the University's denial of his tenure. According to a later interview Cuff gave to the *Daily Princetonian*, he told Kulkarni that he would "watch out" for Ms. Im, who was Dr. Verdú's only female graduate student advisee at the time.

109.    Six days later, on March 8, 2017, Plaintiff and Ms. Im emailed back and forth about Barcelona's win 6-1 over Paris-St. Germain in the return soccer match earlier that day. In particular, Ms. Im emailed Dr. Verdú: "Oh my god!! you must be almost crying. I should've asked you to watch this game together not the last game. This is literally unbelievable." Plaintiff also let

Ms. Im know that the movie *Oldboy*—which Ms. Im had recommended—was on its way. Ms. Im enthusiastically replied "YES it is!"

110.    On March 10, 2017, at around 2 p.m., Plaintiff and Ms. Im watched *Oldboy* at his house. When asked if she would like something to drink, Ms. Im again requested red wine. During the film, Ms. Im and Plaintiff sat on the same couch. Plaintiff's arm rested on the back of the couch at times. At one point he reached across Ms. Im to grab the bottle of wine (with his left hand) that was on a side table on her side, incidentally touching her knee with his right hand.

111.    Ms. Im later falsely claimed that at that point she got up to go the bathroom because she was uncomfortable. After she returned from the bathroom, Ms. Im returned to the same spot on the couch. She could have sat on an adjacent couch, which also had a full view of the television screen. During the investigation, the Title IX panel did not question why Ms. Im returned to the same spot rather than sitting on the other couch, which allowed a full view of the screen.

112.    At some point during the movie, Ms. Im spilled a drop of wine on her sweatshirt, to which Plaintiff applied stain remover, while holding the sweatshirt at an angle away from her body. At no point in time did Ms. Im seem uncomfortable with these interactions. Though she later went on to falsely claim that, unbeknownst to her, Dr. Verdú may have been responsible for the wine spill on her sweatshirt.

113.    After watching *Oldboy*, Plaintiff drove Ms. Im back to the Engineering Quad. Per Ms. Im's statement to the Title IX panel, she and Dr. Verdú engaged in "lighthearted" conversation during the ride. Ms. Im suggested that she and Plaintiff watch yet another Korean movie in the future. At 5:45 p.m. on the same day, Ms. Im emailed Plaintiff the Wikipedia link for her next, suggested film.

### C.     Ms. Im Secretly Records A Meeting With Dr. Verdú

114.    On March 11, 2017, Ms. Im emailed Plaintiff and told him that she was uncomfortable with him "touching [her] leg. I consider our relationship solely as advisor and student and would appreciate if you do. I think it would be nice to set some boundaries." During the Title IX investigation, she falsely claimed that a fellow graduate student helped her draft this email. The graduate student identified by Ms. Im, "Graduate Student 7" denied any knowledge of the email or helping Ms. Im draft it.

115.    On the same day, Plaintiff replied "I totally agree about the boundaries" and the two agreed to meet to discuss the matter further.

116.    On March 13, 2017, Ms. Im met with Plaintiff in his office and secretly recorded their conversation.[7] During the meeting, Plaintiff told Ms. Im that he did not think that anything inappropriate happened between them during the *Oldboy* movie viewing, but that her perception was what was important. He also told Ms. Im that he was grateful that she was forthright in bringing up anything that could have made her uncomfortable. Curiously, during the meeting, Ms. Im asked Plaintiff about the source of funding for her research assistantship. The meeting ended on a cordial note.

117.    Per Ms. Im's account to the Title IX panel, and as corroborated by the several, professional email communications exchanged between Ms. Im and Dr. Verdú after their March 13th meeting, Ms. Im's professional relationship with Dr. Verdú was "going smoothly" and he was congratulatory when a paper that she authored was accepted for presentation at an upcoming conference.

---

[7] As discussed *infra* Ms. Im provided only a select portion of this recording to the Title IX panel and the *Huffington Post*. She deliberately erased portions of the recording and could not, or chose not to, produce the whole recording upon the request of the Title IX panel. In any event, the recording did not contradict Dr. Verdú's account of the events in question.

### D. **The Title IX Investigation**

118.    In April 2017, Ms. Im reported to the Title IX office that Dr. Verdú had allegedly engaged in a consensual, romantic relationship with E.S. who received her Ph.D. from Princeton in 2015. During the Title IX investigation, Dr. Verdú was not informed that this allegation was made by Ms. Im (nor was he informed that it had also been alleged by Cuff). The omission of this information—which impeached Ms. Im's credibility—violated Dr. Verdú's right to a fair process because he did not receive full notice with respect to this allegation, impeding his defense. Despite the seriousness of the sanctions faced by Dr. Verdú, and the significant interests at stake, the Title IX investigation proceeded with a lack of rigor and without any procedural safeguards.

119.    At around the same time, Ms. Im made allegations of sexual harassment against Dr. Verdú to the Title IX Office.

120.    Upon information and belief, this was Ms. Im's second report of sexual harassment to the Title IX office. In 2016, Ms. Im made a claim against a male teaching assistant who worked for Dr. Verdú and was in charge of grading a course in which Ms. Im did not receive the top grade.

121.    On April 13, 2017, Dr. Verdú received a no-communication order from Crotty, the Title IX administrator, which advised him "You must…refrain from any form of harassment, retaliation, or intimidating behavior." Upon information and belief, Ms. Im received the same warning. The no-communication order permitted Dr. Verdú and Ms. Im to communicate via email with respect to a paper she was working on, so long as a designated third party was copied on the email. Verdú and Ms. Im were also permitted to meet about edits to the paper with a third party present. At this point in time, no specific allegations were provided to Dr. Verdú.

122.    On April 13, 2017, Cuff became Ms. Im's advisor and her research assistantship was funded through his research accounts.

123.   On the same day, Crotty interviewed E.S. by phone about the allegations that she had engaged in a consensual, romantic relationship with Dr. Verdú. Notably, E.S. was not an advisee of Dr. Verdú's during the time in which she attended Princeton. E.S. denied that anything inappropriate or violative of any policies had occurred. E.S. also denied having a romantic relationship with Dr. Verdú. Crotty asked E. S. if there might be any pictures of her and Dr. Verdú taken in a Hong Kong bar in 2015, which she denied. Crotty had heard about these pictures from Ms. Im, who in the course of her subsequent harassment of E.S. told her that Ms. Im's friends were willing to provide statements to the University that E.S. had been seen with Dr. Verdú in a Hong Kong bar.

124.   After her interview, E.S. called Dr. Verdú and asked him not to disclose that he and E.S. had been involved in an extramarital affair. She went on to say that if this information was made public her husband "might kill him." Unconcerned about policy violations—as the relationship had not violated any policy—but about the harm that could result from any disclosure of the relationship, Plaintiff also denied the relationship when interviewed on April 18, 2017.

125.   On April 17, 2017, Ms. Im was interviewed by the Title IX panel convened to investigate her allegations, comprised of Crotty, Schreyer and Turano (the "Panel").

126.   Before Dr. Verdú was given any notice of the charges against him, he was called to meet with the Panel and did so on April 18, 2017. A "summary" of the interview was not finalized until several days letter. Though Schreyer read a summary of her notes to Dr. Verdú at the end of his interview, the final memo contained inaccuracies that were inconsistent with what Dr. Verdú told the Panel.

127.   During the April 18th interview, Dr. Verdú voluntarily provided the Panel with complete copies of all of his email correspondence with Ms. Im. In contrast, Ms. Im—who was

interviewed the day before—provided only excerpted copies of her email communications with Dr. Verdú, leaving out, for instance, the love song that she sent to him as well as other emails that showed her enthusiasm for the movies that they watched together and suggesting that they watch other films. Ms. Im also failed—and was not asked—to provide any email communications with Cuff which might have shown a coordination of efforts to damage Dr. Verdú's career and reputation.

128.   Crotty opened the April 18th interview with Dr. Verdú by informing him that it was not Ms. Im's idea to file a complaint against him. Crotty did not disclose to Dr. Verdú the identity of the individual who prompted the report. It was almost a year later that Dr. Verdú learned that Cuff was behind Ms. Im's report, through Graduate Student 7, who was told by Cuff in an email: "I was the unnamed professor [in the Huffington Post article] who reported this to the university."

129.   During the April 18th interview, Dr. Verdú was adamant that he made no sexual advances towards Ms. Im, that he only wanted the best for Ms. Im and had done nothing to exceed the bounds of the adviser/advisee relationship. Dr. Verdú was surprised to learn that Ms. Im had significantly departed from the conversation that the two had on March 13, 2017 and reported a number of unfounded allegations against him.

130.   During the April 18th interview, Crotty questioned Dr. Verdú about E.S. Dr. Verdú was never informed that the report about E.S. was received simultaneously with Ms. Im's sexual harassment complaint or that Ms. Im made the report. He was not told that Cuff had also made allegations against him concerning his consensual relationship with E.S. Although Kulkarni knew this directly from Cuff, he chose not to disclose it to Plaintiff when he asked him about it.

131.   On April 19, 2017, alarmed by the false allegations he was asked about the day before, Dr. Verdú asked for a second meeting, which was held in Turano's office on the same day.

Present at the meeting were Crotty and Turano—Schreyer did not attend. This violated the Sexual Misconduct Policy which required that all Panel members be present at such meetings. *See* Section 1.3.13.1.

132.    At the April 19th meeting, Dr. Verdú asked "Is this a setup?" particularly in view of Ms. Im's efforts to befriend him in the weeks prior, which now looked sinister given that her testimony was, as he told Crotty and Turano, "so far from anything that actually happened."

133.    When he questioned Ms. Im's motives to give such a distorted version of events, Plaintiff was told by Crotty that she saw no reason why that would be the case since, she claimed, the sexual harassment allegation had not been Ms. Im's idea. After the meeting, the Panel took no steps to investigate whether or not Ms. Im's allegations—encouraged by Cuff—were a set up. On the contrary, they avoided questioning her credibility.

134.    On April 20, 2017, Crotty asked Dr. Verdú to provide photographs of his TV room, including its sofas and TV screen. He obliged without objection.

135.    Crotty also notified Dr. Verdú that Princeton had "secured alternate funding" for Ms. Im's trip to present her paper in Germany and that he would not have to use his research funds as previously offered. Crotty did not tell Dr. Verdú that Cuff was funding Ms. Im's research assistantship and her trip to Germany. Nor did Crotty question this even though Dr. Verdú previously told the Panel that Ms. Im's allegations were not adding up.

136.    On April 26, 2017, Crotty finally notified Dr. Verdú of the specific charges against him: "Sexual Harassment and/or Inappropriate Conduct Related to Sex, Gender Identity, or Gender Expression." These charges concerned the occasions on which Plaintiff and Ms. Im watched *The Handmaiden*, deemed a "sexually explicit" film by the Panel, and *Oldboy*, at his home. Plaintiff was accused of making a sexual joke about *Oldboy* and also putting his arm around Ms. Im,

touching her thigh and cleaning wine off Ms. Im's shirt. It had been Ms. Im's suggestion that the two watch *Oldboy* and *Thirst* (also by Park Wan-Chook) after they watched *The Handmaiden*. While both of the movies she suggested contain nudity, violence and scenes of a sexual nature, Ms. Im told the Title IX Panel: "She mentioned about other movies of the same director in the email, because she did not want to watch sexual movie with him." and "Since the movie "oldboy" is not about lesbians but about retaliation, I expressed that I want to watch that movie."

137.    Crotty's April 26th charge letter erroneously stated that "the panel will determine, by a majority decision using the preponderance of the evidence standard, whether to hold you responsible." Per the Sexual Misconduct Policy, the "majority decision" requirement applied in cases involving student respondents. Faculty decisions required a unanimous panel decision, and endorsement of the final investigation report by all three panel members.

138.    Accompanying Crotty's April 26th letter were electronic copies of the documents comprising the investigation file. Included in the investigation file were printouts from the website "IMDb ***Parents'*** Guide," a repository of user reviews that provides information regarding sexual content, violent content, profanity and scenes depicting drug and alcohol use in films so parents can determine whether or not a particular film is appropriate for viewing by *children*.

139.    There is no question that all parties viewing *The Handmaiden* were adults. The Panel's consideration of the "IMDB Parents' Guide" suggests that the Panel improperly viewed Ms. Im as a child in need of parental supervision rather than a twenty-five-year-old adult who expressly consented to viewing the film with Dr. Verdú. Moreover, although Ms. Im suggested that she and Dr. Verdú watch *Oldboy* and *Thirst* together—both of which contained graphic and sexual content, the Panel made no effort to find out more information about those films, let alone

consulting the IMDb website as they had done for *The Handmaiden*. Ms. Im's recommendation of these films belied her alleged qualms about the nature of *The Handmaiden*.

140.   Missing from the investigation file was a copy of Ms. Im's recording of her meeting with Dr. Verdú. Dr. Verdú was never provided a copy of this recording. What was purported to be a partial transcript was provided, which lent no support to Ms. Im's sexual harassment allegations.

141.   Crotty redacted from a text exchange found in the investigation file, between Ms. Im and another graduate student, the student's statement that "[Dr. Verdú] really isn't that kind of person. He is just interested in cultural stuff trying to make the best out of his students."

142.   In contrast, Crotty failed to redact statements from the memo purportedly summarizing Dr. Verdú's April 18, 2017 interview that related to Dr. Verdú's testimony before the President's Advisory Committee that dealt with Cuff's tenure. This information was provided to Ms. Im who, upon information and belief, shared it with Cuff.

143.   The only persons interviewed by the Panel with respect to Ms. Im's allegations were Ms. Im and Dr. Verdú. Crotty did not see fit to corroborate the veracity of Ms. Im's claims with any of the people mentioned by Ms Im (such as her roommate, or Graduate Student 7 who she falsely claimed helped her drafting her March 11, 2017 email).

144.   The Panel also failed to question the authorship of Ms. Im's written statement in response to Dr. Verdú's interview, which was written in a manner that differed significantly from Ms. Im's writing style and was similar to Cuff's style of writing. There were no eyewitnesses to the alleged incidents and the Panel's decision was, accordingly, based on its assessment of each party's credibility.

E.  **The Erroneous Finding**

145.    On May 24, 2017, the Panel issued an 11-page report in which they found Plaintiff responsible for Sexual Harassment.[8] The report noted that Plaintiff was not charged with any violations concerning any consensual relationship with students, as there was "insufficient information."

146.    As part of the evidence "against" Plaintiff, the Panel relied on Ms. Im's recording of her conversation with Plaintiff which the Panel acknowledged was of "poor quality" and "not entirely clear." The report made no mention of the fact that Ms. Im admittedly erased portions of the recording prior to turning it over as "evidence." Regardless, the recording contained no admission or evidence of wrongdoing by Dr. Verdú. On the contrary, it reinforced both parties' assertions that Dr. Verdú and Ms. Im continued to have a positive, professional relationship after Ms. Im disclosed her alleged discomfort.

147.    The Panel relied on the fact that Ms. Im "sought to change advisors" as part of the "aftermath" of Verdú's alleged wrongdoing. In fact, Ms. Im changed advisors when the no-contact order was issued by the Title IX office at the start of the investigation. *Supra* ¶ 122. Cuff conveniently, and immediately, stepped in. The report did not mention that Cuff was Ms. Im's new advisor nor that he was supporting her financially. His support from his research accounts continued well after he had left Princeton as a result of his denial of tenure.

148.    The Panel erroneously concluded that Ms. Im was credible because, allegedly, her account did not vary. This ignored that it was not until Ms. Im reported Dr. Verdú to the Title IX office that allegations other than him touching her leg were added to her story. Evidence presented

---

[8] The Panel determined that Ms. Im's allegations should be assessed as Sexual Harassment rather than Inappropriate Conduct Related to Sex.

to the Panel, which post-dated the alleged occurrence, confirmed that this was Ms. Im's only issue, which she directly addressed with Plaintiff and which Plaintiff thought they had resolved.

149.    In addition, the email correspondence that Dr. Verdú provided to the Panel supported his account that Ms. Im encouraged a more social relationship with him. The correspondence also flatly contradicted Ms. Im's statement to the Panel that "I did not want to spend time alone with him outside of work." The emails further showed that Ms. Im enthusiastically agreed to watch the film, *The Handmaiden*, that she later claimed made her uncomfortable. She even recommended the second film that they watched, *Oldboy*, and emailed Dr. Verdú joyfully "YES, it is!" when she was told the DVD was on its way.

150.    The Panel also ignored that Ms. Im sought to hide the evidence of her personal interest in Dr. Verdú, including the email attaching the love song she composed. While the evidence showed that Ms. Im was continuously pursuing a social relationship with Dr. Verdú, the Panel glossed over Ms. Im's failure to present the full picture as merely "downplaying" her efforts to foster a close relationship with Plaintiff, and went on to state that "the panel agreed that it is not unusual for an advisee to seek to develop a close relationship with their adviser." Although the Panel was fully aware that, during the investigation, Ms. Im had concealed her efforts to befriend the Plaintiff, they wrote: "The panel found the complainant very credible."

151.    The Panel made findings which suggested that they viewed Ms. Im to be a child rather than an adult. These findings are indicative of bias on the part of the Panel members, all female, who were incapable of believing that twenty-five-year-old Ms. Im was a consenting adult capable of asking to drink wine in the afternoon and watching "explicit" films:

   a.       The Panel found it suspect that Plaintiff provided alcohol to Ms. Im in the "middle of the afternoon." Yet there was no allegation that Ms. Im found this to be inappropriate or that she was incapacitated on the two occasions on which she willingly watched the films with Plaintiff. On the contrary, when asked what she

wanted to drink, each time she replied "red wine," which Plaintiff obliged, except at the viewing of *The Handmaiden* when he told her he did not want to uncork a bottle. This finding is clearly a value judgment on the part of the Panel members to add suspicion to what Plaintiff consistently asserted were innocuous circumstances. The Panel also assumed that Ms. Im could not have agreed to drink alcohol during daylight hours even though Ms. Im acknowledged that she drank alcohol on the occasions which she watched the films with Dr. Verdú.

b.      The Panel also deemed *The Handmaiden* to be sexually explicit, relying on the IMDb Parents' Guide, a website consisting of users posts rather than authoritative reviews, the sole purpose of which is to warn parents about films that might not be suitable for children. Plaintiff provided a DVD copy of the film to the Panel but only Crotty actually watched the film. Yet the Panel report states "the panel agreed that the film was very sexually explicit." The Panel seemed unable to believe—despite written evidence—that Ms. Im, an adult, conveyed to Dr. Verdú her willingness to watch the highly acclaimed movie *The Handmaiden* (the most successful film in Korean history) on two different occasions, orally and in writing, and enthusiastically suggested—and agreed to watch—*Oldboy*. There is no evidence that Ms. Im was pressured to watch, or continue watching, either film or that Dr. Verdú would not have turned off either film if she had expressed discomfort with the subject matter. On the contrary, Ms. Im enthusiastically watched *The Handmaiden* with Dr. Verdú, informing him of dialectic changes between Korean and Japanese as the film progressed. *Oldboy* was Ms. Im's—not Dr. Verdú's—recommendation. Both films are critically acclaimed and by the same director. The Panel also portrayed Dr. Verdú as trying to mislead the Panel about the nature of *The Handmaiden*, ignoring that he provided a copy of the DVD to the Panel to decide for themselves.

152.    Despite obvious signs to the contrary, such as Ms. Im's secret recording and the explicit warning by Dr. Verdú that the allegations had all the hallmarks of a hoax, the Panel erroneously credited Ms. Im's portrayal of herself as a "reluctant" complainant as demonstrating that she had no "ulterior or improper motives" in bringing forward her allegations. While Ms. Im told the Panel that there were reasons not to come forward because Plaintiff was "the biggest name in the field," there was no evidence that Plaintiff took, or would have taken, any actions against Ms. Im had she not engaged in social activities with him.

153.    On the contrary, both Ms. Im and Plaintiff agreed that their professional relationship remained that way at all times. Ms. Im's allegations of feeling pressure to go along with the social activities not only had no factual basis but were plainly contradicted by her own emails. The Panel

concluded that the film viewings had "no educational motivation," inadvertently supporting that there was no connection between Dr. Verdú's and Ms. Im's social interactions and the professionalism within their advisor/advisee relationship. The Panel's reasoning that sexual harassment occurred because the social activities engaged in were not educational in nature was spurious.

154.    The Panel not only refrained from questioning Cuff, but Crotty deliberately concealed his involvement from Dr. Verdú[9] despite knowing that: i) Cuff made the allegations against Plaintiff about both Ms. Im and E.S., ii) Ms. Im also made an allegation about E.S. and Plaintiff, iii) Cuff said he would "watch out" for Ms. Im eight days *before* the viewing of *Oldboy,* iv) Cuff had just been denied tenure, v) Crotty admitted that the Title IX investigation was not Ms. Im's idea; and vi) Cuff immediately stepped in to financially support Ms. Im even though funding was still available through Dr. Verdú.

155.    Crotty steered scrupulously clear of investigating Cuff's role and any potential motives for his actions, including his relationship with Ms. Im, whether he encouraged her to pursue a social relationship with Plaintiff, and any role he might have had in drafting Ms. Im's March 11, 2017 email to Dr. Verdú and written statement to the Panel. Ms. Im's actions prior to reporting the allegations to the Title IX office dispel any assertion that she was "a reluctant party to this matter, [who] in fact had not intended to report this matter at all." A person who is hesitant to report misconduct against a person would not secretly record a conversation with him for use at a later time. This activity, alone, evidences calculation on Ms. Im's part.

---

[9] Unaware of Cuff's role, Plaintiff was cordial with him throughout the time he was at Princeton, even selecting the farewell gift Cuff received before departing Princeton. Cuff's role, and the animosity he harbored against Plaintiff only came to light nine months after the Title IX investigation as a result of Cuff's own public statements in the press.

156. Ms. Im's actions subsequent to the finding also defy her assertion that she reluctantly came forward—as discussed *infra* Paragraphs 177-226, Ms. Im embarked on a campaign to destroy Dr. Verdú because she was purportedly dissatisfied with the outcome of the Title IX proceedings. She could have appealed the decision but instead chose the more destructive, public path.

157. The Panel also overlooked, and failed to question, statements made by Ms. Im that were incompatible with the evidence, including:

a. Ms. Im offered contradictory accounts of whether or not she asked Plaintiff if her roommate could join them to watch the soccer match. Ms. Im told Plaintiff at the last minute that her roommate could not attend because she was studying for an exam that was three months away. This raised the question, later asked by Plaintiff, whether Ms. Im asked her roommate to watch the match at all or if she believed she had a better chance of getting an invitation for two people. Ms. Im later texted a friend and confirmed that another person was supposed to attend the soccer match viewing but cancelled, which supported Plaintiff's account of what happened. In the account she gave to the *Huffington Post*, Ms. Im claimed that another person cancelled but refrained from saying that it was her roommate. Ms. Im falsely stated to the Panel that she had asked Plaintiff on their way to his house whether Professor Abbe would be joining them to watch the soccer match. Ms. Im's claim was demonstrably false, as Plaintiff informed the Panel, because Professor Abbe had no interest in soccer and had never been to Plaintiff's house to watch a game. The Panel failed to question Ms. Im's account, or interview either her roommate or Professor Abbe, simply accepting her conflicting accounts as credible.

b. Ms. Im claimed to be uncomfortable with *The Handmaiden* but suggested that she and Dr. Verdú watch other films containing graphic/sexual content by the same director. Incredibly, the Panel found no contradiction between Ms. Im's statement that she "did not want to spend time with him outside work" and the considerable email evidence to the contrary, in which Ms. Im pursued a social relationship with Plaintiff, including her email on February 20, 2017 stating "How about we watch another Korean popular movie or anything else you like?" and two weeks after *The Handmaiden*, "I should've asked you to watch this game together not the last game;" or her reply when told that the *Oldboy* DVD is on its way: "YES it is!" Also disregarded by the Panel was Ms. Im's failure to turn over this email correspondence.

c. When Ms. Im suggested that they watch "another Korean popular movie or anything else you like" she and Plaintiff had only talked about watching *The Handmaiden*, not any other film. Plaintiff replied "based on the reviews i am curious to see other movies by the same director but am not sure whether netflix carries them." Ms. Im's replied "Oh then it's totally OK. Let's go for The Handmaiden!" and went on to suggest watching *Oldboy* and *Thirst* by Park, and

also the films of another Korean director Joon-ho Bong. The Panel failed to question the patent contradiction between this email interchange and her assertion that she agreed to watch *The Handmaiden* because she "couldn't resist anymore."

d.      With respect to her allegation that Plaintiff put his arm around her, Ms. Im told the Panel that she was unsure whether it was sexual in nature.[10] This was consistent with Plaintiff's assertion that his arm was resting on the back of the couch due to an elbow injury and that he did not have physical contact with Ms. Im.

e.      Ms. Im falsely stated that a fellow graduate student assisted her in writing the March 11, 2017 email to Dr. Verdú about her alleged discomfort with him touching her leg. The graduate student named by Ms. Im denied assisting her with any email or even knowing about the Title IX allegations until months later.

f.      Ms. Im gave inconsistent accounts of how red wine spilled on her shirt and how the stain was removed. She also embellished the manner in which Plaintiff attempted to remove the stain. Plaintiff was consistent in his account of what occurred—that he retrieved a damp cloth and Resolve stain remover and sprayed it on Ms. Im's white sweatshirt, holding it away at an angle and that the stain disappeared within a few seconds.

g.      Ms. Im told the Panel that Plaintiff's "hand was on her thigh for a long time, maybe more than one minute, until she stood up. She said she wanted to use the restroom…She came back and they kept watching the movie. She sat on the couch again." The Panel failed to question why, if Ms. Im was uncomfortable, did she not sit on the other available couch from which the television was clearly visible? They did not think it odd that Ms. Im returned to the same seat after going to the restroom.

158.    The Panel found that even if Plaintiff did not intend his conduct to be sexual in nature that his intent was irrelevant because "behavior is judged by its impact on the person directly affected." Yet the definition of Sexual Harassment in the Sexual Misconduct Policy requires that unwelcome behavior be "*directed at* a person based on *sex*." Plaintiff consistently denied that this was the case. Neither the incidental covered-leg contact nor the cleaning of the wine drop can be reasonably viewed as sex-based.

159.    The Panel's report reflects the gender-biased presumption that Plaintiff's conduct was sexual in nature simply because Plaintiff is male and Ms. Im is female. The acts of cleaning a

---

[10] She later told a local reporter "He put his arm around my shoulders, but at that time I couldn't find anything sexual."
https://www.njtvonline.org/news/video/incident-princeton-spotlights-sexual-harassment-nj/

stain off of someone's shirt, brushing someone's leg while reaching across them while seated, and placing one's arm on the back of a couch are benign and neutral on their face, yet the Panel found them to constitute sexual harassment.

160.    The Panel was in possession of evidence from other graduate students, and Dr. Verdú's own statements, that Dr. Verdú regularly socialized with them, including watching soccer games with individual students and movies with groups of students. The Panel elected not to interview other students about Dr. Verdú's demeanor during these social activities. Instead, the Panel members elected to transmogrify benign, gender-neutral conduct into sexual harassment.

161.    Upon information and belief, unlike Dr. Verdú, female professors accused of sexually harassing male students, and reported to Title IX administrators, have not been formally investigated, have not been found responsible for sexual harassment and/or have not received probation as a result of a finding of responsibility. The University does not publish this level of Title IX data and, accordingly, Plaintiff did not have the ability to confirm these facts at the pleading stage.

162.    Upon information and belief, the University has information in its possession demonstrating that only male professors have been formally investigated, and sanctioned, for sexual harassment since April 2011, when OCR issued the Dear Colleague Letter, despite reports of harassment by female professors.

163.    Upon information and belief, the University has not pursued reports of sexual misconduct against female professors or, when it did so, imposed far less severe sanctions than against male professors.

164.    In response to criticism that the University failed to protect its female students from sexual harassment by male professors, the University erroneously found Dr. Verdú responsible for

sexual harassment and imposed an unduly severe penalty on Dr. Verdú in particular in order to make an example of him in the midst of the #MeToo movement.

## F.   The Unwarranted Sanction

165.   On June 9, 2017, then Dean of the Faculty, [11] Prentice, issued a letter to Dr. Verdú which informed him that he was being sanctioned for violating the Sexual Misconduct Policy. Prentice was responsible for determining the sanction, or disciplinary measures, to be imposed on Dr. Verdú.

166.   Putting aside that no sanction was warranted, in determining the appropriate sanction against Dr. Verdú Prentice was required to consider "the seriousness of the misconduct as compared to like cases in the past, and on the individual's previous disciplinary history (if any)." Sexual Misconduct Policy, Section 1.3.13.2. This she did not do. Prentice's letter to Dr. Verdú made no mention of how his sanction compared to other cases nor that Dr. Verdú had no history of disciplinary issues in his more than thirty years of teaching at Princeton.

167.   Prentice determined that "discipline [was] warranted" based on her review of the Panel memo. She placed Dr. Verdú on probation for one year and required him to participate in a "Community Integrity Program" administered by an outside clinical psychologist "designed to help [him] take concrete steps that [he] can take to avoid further incidents of this kind."

168.   Under Princeton's *Rules and Procedures of the Faculty* probation is defined as:

> *a more serious admonition* assigned for a definite amount of time, typically one to five years in length. It implies any subsequent violation, of whatever kind, especially but not exclusively during that time, may be grounds for…in especially serious cases, dismissal from the University…. Disciplinary probation becomes part of an individual's permanent record at the University and may be disclosed by the Office of the Dean of Faculty in response to requests for which the faculty member or academic professional has given permission or as otherwise permitted by University policy and applicable law. (emphasis added).

---

[11] Prentice became Provost on July 1, 2017.

169.   Prentice's letter warned that any further violation of the *Sexual Misconduct Policy* during the probationary period could result in dismissal. A copy of the Panel's report and her letter would be maintained in Dr. Verdú's "permanent record."

170.   During the probationary period Dr. Verdú was ineligible for leave.

171.   The letter warned Dr. Verdú against "attempts to retaliate against those who brought their concerns to the Title IX Office." Notably, Crotty had not disclosed to Dr. Verdú the identities of the person(s) who made the report(s) to the Title IX office with regard to Ms. Im, only that it had not been Ms. Im's idea.

172.   Prentice's letter informed Dr. Verdú that he had a right to appeal. However, Turano—a Panel member—and Kulkarni counseled him ***not to*** file an appeal. They were each aware that, throughout the Title IX process, Dr. Verdú had waived his right to representation. Turano advised Dr. Verdú to write a letter to Prentice in lieu of an appeal to be included in his permanent file—which he did. Kulkarni supported that course of action, even though he believed that, as he put it to Plaintiff, the Panel "made a case out of nothing."

173.   Turano also assured Plaintiff that Ms. Im was bound to respect the confidentiality of the proceedings and its documents, in particular the Panel report, the pages of which were each marked, in red, "Confidential: Title IX Case File Shared with Parties and Advisers for Purposes of Title IX Review." During a conversation with Turano, Plaintiff mentioned that he knew Kulkarni—who would shortly become the Dean of the Faculty and Turano's supervisor—well as they had "co-advised students and co-authored papers." A short time after this conversation, Kulkarni told a colleague that as Dean of the Faculty he was asked to recuse himself from matters regarding Dr. Verdú because "he has co-authored papers with him." At that point there was no open investigation concerning Plaintiff.

174.   On June 15, 2017, Plaintiff met with Kulkarni. Kulkarni mentioned that he met with Crotty and Ms. Im during the Title IX investigation. Crotty withheld this information from Plaintiff and there was no provision for such a meeting in the Sexual Misconduct Policy. The Sexual Misconduct Policy required the entire Panel to be present for any meeting with either the Complainant or Respondent. It further required that notes be taken and a summary of the meeting be included in the investigation file provided to both parties for review. Sexual Misconduct Policy, Section 1.3.13.1. None of this occurred. Had Kulkarni not mentioned the meeting, Plaintiff would have been unaware that it even occurred.

175.   On June 16, 2017, Dr. Verdú submitted a letter to Prentice in which he acknowledged exercising poor judgment in inviting Ms. Im to his home to watch television together on three occasions. He further apologized for any discomfort caused to Ms. Im as a result of his contact with her leg while reaching across her, noting "even if the contact…was totally incidental and devoid of any ulterior motives whatsoever, if this, as she claimed the following day, made her uncomfortable it is her opinion that prevails as I told both the complainant and the panel, and, for that, I am genuinely sorry…However, I cannot take responsibility for actions that I have not committed…as I said…there was never in any of my interactions with the complainant anything remotely related to advances of a sexual nature." In addition to disputing the Panel report, Plaintiff stated "The panel goes on to assert that they see no motivation for the complainant to lie. I hope the panel is right."

176.   After new information surfaced in the public, defamatory campaign waged by Ms. Im, which is fully detailed below, Dr. Verdú submitted a fifty-five (55) page appeal (including 82 attachments) to Princeton's Committee on Conference and Faculty Appeal ("CCFA") arguing that the outcome of the Title IX proceeding should be reversed. The appeal provided a detailed

chronology of the case, an analysis of the many inconsistencies in Ms. Im's statements, and a detailed list of errors, due process violations and indicators of bias throughout the investigation. Five weeks later, the chair of the CCFA emailed Plaintiff one sentence, "The CCFA has decided not to accept your appeal because we found no evidence of improper procedure on the part of the Title IX panel that heard your case."

### G.  **The Relentless Campaign of Retaliation Against Dr. Verdú**

177.    By letter dated June 9, 2017, Michele Minter notified Ms. Im that Dr. Verdú was found responsible for violating the Sexual Misconduct Policy. Dr. Verdú was not copied on this correspondence.[12] The letter stated "While the Respondent continues in his current capacity, the University is implementing appropriate measures to ensure that such conduct does not recur." Upon information and belief, University administrators did not provide Ms. Im with the full details of the sanction issued against Plaintiff or, if she was later informed, Ms. Im elected to publicly mischaracterize the sanctions and this was never corrected by University administrators.

178.    Ms. Im had the option to appeal the finding and/or sanction. She did not file an appeal.

179.    Dissatisfied with Dr. Verdú's punishment, on June 13, 2017, Ms. Im emailed Princeton graduate alumna, E.S., and told her that Dr. Verdú had been found "guilty" of sexually harassing Ms. Im but had not been fired. Ms. Im told E.S. that she was investigating other cases so that Princeton would fire him.

180.    At some point in early to mid-June 2017, Cuff met with Prentice and questioned the "mildness of the punishment" to Dr. Verdú. In a February 22, 2018 article in *The Daily*

---

[12]    Alanna Vagianos, of the *Huffington Post* uploaded the letter to a public website. https://www.scribd.com/document/364003261/Yeohee-Im-Outcome-Letter. Dr. Verdú only learned of the contents of the letter when Ms. Im provided the Title IX documents to the Institute of Electrical Engineers in support of a complaint against Dr. Verdú.

*Princetonian* Cuff described Prentice as "squirmishly" justifying the punishment, which she disclosed to Cuff even though he was not a party to the Title IX proceedings.

181.   On June 16, 2017, Ms. Im met with Prentice and Crotty and secretly recorded the meeting. Upon information and belief, Prentice stated to Ms. Im at the meeting that the University had looked at a broader set of allegations against Dr. Verdú but that no one came forward in support of the allegations.

182.   On June 17, 2017, Ms. Im emailed Crotty allegations made by her "friends," allegedly witnesses of Dr. Verdú kissing "a former Princeton graduate student who was subject to his academic supervision."

183.   In late June, 2017, while presenting her paper at the *IEEE International Symposium on Information Theory* in Germany, Ms. Im approached a female professor who was a former visiting scholar at Princeton in the Department of Electrical Engineering, and asked her for incriminating information about Dr. Verdú. The professor approached by Ms. Im later called Dr. Verdú and told him she believed that Ms. Im was secretly recording the conversation, which is a crime in the Federal Republic of Germany.

184.   On July 12, 2017, Ms. Im emailed Professor Weissman of Stanford University, asking for gossip about Dr. Verdú activities during his last sabbatical at Stanford.

185.   Over the course of the Summer 2017, Ms. Im met with various faculty in the Department of Electrical Engineering, Operations Research and Financial Engineering and Computer Science under the guise of looking for a new advisor. She told them that Dr. Verdú was found responsible for sexual harassment and asked at least one professor—who had served as co-advisor to E.S.—for any sexual misconduct allegations he may have against Dr. Verdú.

186.    On August 8, 2017, Ms. Im sent a threatening email to E.S. informing E.S. that her friends were willing to provide statements to the Title IX office that, in 2015, they saw E.S. kissing Dr. Verdú at a bar in Hong Kong. Ms. Im attempted a number of times afterward to have a Skype call with E.S., which E.S. refused. E.S. later wrote to Prentice that she felt that Ms. Im had framed Dr. Verdú and was next out to harm E.S.'s reputation.

187.    On September 20, 2017, Cuff emailed one of Dr. Verdú's advisees and attacked Dr. Verdú's research and reputation. Cuff harshly criticized Dr. Verdú as the reason why Cuff was undervalued by the University.

## H.  The *Huffington Post* Article and Its Aftermath

188.    In *The Daily Princetonian's* "Notable Moments From the 2017-2018 Year" the publication noted:

> With the backdrop of the MeToo movement this past year, the 'Prince' revealed allegations against a professor in the German department, as well as the department's alleged culture of gender discrimination. In the Department of Electrical Engineering, the 'Prince' also reported on the Title IX investigation into Professor Sergio Verdú, who was eventually found responsible for sexual harassment.

189.    In mid-October 2017, the #MeToo movement re-emerged nationwide as a women's movement against sexual harassment and sexual violence, the primary purpose of which was not only to vocalize women's experiences but to publicly identify alleged male perpetrators to be dealt with in the court of public opinion. The #MeToo movement caused the public downfall of a number of men in high profile jobs and positions of power—sometimes without due process or a process of any kind. The public outcry of the movement does not always include any sense of proportionality

to the punishments called for against alleged male perpetrators, making no distinction between acts considered offensive or improper versus violent assaults.[13]

190.    One year after the emergence of #MeToo, *The New York Times* reported "at least 200 prominent men have lost their jobs after public allegations of sexual harassment. A few… face criminal charges…. And nearly half of the men who have been replaced were succeeded by women."[14]

191.    On October 28, 2017, Cuff—who was no longer employed by Princeton—had a private meeting with Ms. Im.

192.    On November 9, 2017, Alanna Vagianos of *The Huffington* Post contacted Plaintiff about an article she was writing concerning Ms. Im's allegations. Plaintiff inquired about whether he could provide his email communications with Ms. Im to the reporter. He was advised by Daniel Day, Princeton's Assistant Vice President for Communications, that Plaintiff was forbidden from disclosing any email communications between him and Ms. Im to the media. At the same time, the University was unable or unwilling to enforce the confidentiality of any Title IX materials that Ms. Im chose to publicly disclose.

193.    On November 9, 2017, the *Huffington Post* published an article about Ms. Im, "Grad Student Says Princeton Prof Who Sexually Harassed Her Was Given Slap On the Wrist," in which Ms. Im disclosed documents from the Title IX investigation to Ms. Vagianos. Ms. Im also provided portions of emails and text messages which presented a skewed account of what happened. She further provided the secret recording of her meeting with Prentice about the investigation. It is

---

[13] *See, e.g.,* Stephens, B., *When #MeToo Goes Too Far, at* https://www.nytimes.com/2017/12/20/opinion/metoo-damon-too-far.html. *See also* Merkin, D., *Publicly We Say MeToo, Privately We Have Misgivings*, *at* https://www.nytimes.com/2018/01/05/opinion/golden-globes-metoo.html.

[14] Carlsen, A. et al., *#MeToo Brought Down Nearly 201 Powerful Men. Nearly Half of Their Replacements are Women,* at https://www.nytimes.com/interactive/2018/10/23/us/metoo-replacements.html?nl=top-stories&nlid=72995439ries&ref=cta.

revealing to compare Ms. Im's account to the *Huffington Post* with the full email record (which she hid from the journalist) and with the version of events she provided to the University during the Title IX investigation.

194. Ms. Im went so far as to suggest that Dr. Verdú was interested in her because Ms. Im was a similar age to his daughter. A lawyer quoted by the *Huffington Post* accused Dr. Verdú of "grooming behavior" ignoring that Ms. Im was a twenty-five-year old woman at the time. Suddenly, Ms. Im reported feelings of being in danger and expressed a view of herself as a protector of other students from future harm.

195. In the Title IX investigation, Ms. Im expressed no such feelings and, in fact, affirmed that Dr. Verdú was at all times professional. Ms. Im and Dr. Verdú had communicated normally by email about the research they had been working on for months after the alleged incident, including after the Title IX investigation concluded.

196. The same lawyer was quoted in the *Huffington Post* article as follows:

I think Princeton is exposing itself to a major, major potential exposure and financial consequences if this guy does this again…. Because the message to him is we're going to slap you on the wrist and we're going to keep it quiet. You're not going to lose your job. We're not going to have a big public hearing. His behavior is extremely alarming and Princeton's actions against him, to me, are woefully insufficient.

197. In the *Huffington Post* article, Ms. Im falsely stated that Dr. Verdú received only eight hours of training as punishment. It became clear that Ms. Im was feeding off of her #MeToo moment in the spotlight and would not rest until Dr. Verdú was terminated and his reputation destroyed.

198. As a result of Ms. Im's interview with the *Huffington Post*, and the impetus of #MeToo, a firestorm of hate erupted against Dr. Verdú on Princeton's campus, calling for his termination and worse.

199.   As a result, Dr. Verdú feared not only for the loss of his reputation and career but also his safety and the impact on his family—Ms. Im had no reason to reference Dr. Verdú's daughter in her interview with the *Huffington Post*.

200.   Princeton took no action against Ms. Im for providing confidential investigation documents to the media. Nor did it take any action against Ms. Im for retaliation or intimidating behavior, which was prohibited by the no-communication order issued by the University. Rather, Princeton continued its "investigation" of allegations that Dr. Verdú had engaged in a consensual relationship with E.S. in order to find a reason to terminate him, appease Ms. Im and quell the firestorm she had ignited on campus.

201.   On November 10, 2017, Cuff emailed the *Huffington Post* article to Dr. Verdú's advisee, noting "[T]his should give you a bit of understanding of how deep my differences with Sergio go. I'm the unnamed professor who reported this to the university."

202.   On November 13, 2017, the Chronicle of Higher Education published an article about the impact of the #MeToo movement on higher education:

> The galvanizing momentum of the #metoo campaign has forced many industries to confront widespread sexual harassment and assault in their midsts. Academe is no exception. Propelled by admiration for those who have spoken out, fear that what happened to them could happen to others, and anger at how long abusers have gone unpunished, women have come forward in droves to report instances of sexual assault….Campus officials have struggled to determine how to punish abusive employees….But the new wave of revelations and accusations has raised the stakes, and the fury of the #metoo movement has tapped into could have a longstanding impact on higher education.[15]

---

[15] *See* Gluckman N., Read, B., Mangan, K., and Quilantan, B., *Sexual Assault in Higher Ed*, at https://www.chronicle.com/article/Sexual-HarassmentAssault/241757.

203.   The Chronicle article referred to Princeton as a university prompted by the #MeToo movement to answer questions about alleged professorial misconduct, specifically referencing Dr. Verdú as "given only a minor punishment…for sexually harassing a graduate student."

204.   The article also discussed allegations against an emeritus Professor of Philosophy at Princeton who was alleged to have "petted and touched" a female graduate student on a daily basis.

205.   On November 13, 2017, Princeton's "Men's Allied Voices for a Respectful and Inclusive Community" published a letter in *The Daily Princetonian*, noting that "women from every walk of life are bravely saying yes, #MeToo." The article further discussed how "men use their power and privilege to make unwelcome advances on women…it happens right here at Princeton, too. Just last week, the Huffington Post reported that Princeton's Title IX office has found Prof. Sergio Verdú responsible for sexually harassing one of his graduate students."[16]

206.   On November 14, 2017, a female professor at Indiana University, Bloomington, came forward publicly to discuss the sexual harassment allegations she suffered as a graduate student in Princeton's Philosophy Department in the 1980s, including unwelcome sexual touching on a daily basis, for a period of four years, at the hands of her professor.[17]

207.   Princeton was either silent in the face of these events or offered statements which suggested that the University supported Ms. Im. Dr. Verdú —now a victim of Ms. Im's retaliation and campus-wide harassment—was offered no assistance. These events included:

   a.     On November 15, 2017, *The Daily Princetonian* published a letter to the editor in which Professor Andrew Houck of the Electrical Engineering Department called for Dr. Verdú's termination, advocating for "a zero-tolerance policy, where violation equals termination." Houck added "Following the news in recent weeks, we can see that the world is rife with unreported or unpunished sexual misconduct

---

[16] http://www.dailyprincetonian.com/article/2017/11/what-does-harvey-weinstein-have-to-teach-us.
[17] http://dailynous.com/2017/11/14/womans-graduate-school-experience-princeton-philosophy-80s/.

where one person has the power to act as gatekeeper, like Hollywood, Congress and, sadly, academia."[18]

b.      On November 15-16, 2017, a number of professors and graduate students in the Electrical Engineering Department engaged in a group email exchange in which they endeavored to take further action against Dr. Verdú so that he would endure harsher punishment than one year of probation. Many expressed outrage at Dr. Verdú's lack of repentance despite his "guilt." Kulkarni, now Dean of the Faculty, was copied on these emails. The Vice Dean of Princeton's School of Engineering praised Ms. Im for breaking confidentiality and publicizing the Title IX allegations against Dr. Verdú.

c.      On November 16, 2017, Ryan Born, a columnist for *The Daily Princetonian* published an article calling for Dr. Verdú's termination in part because he was "unrepentant."[19]

d.      On or about November 20, 2017, a petition from students, alumni, faculty and staff was presented to President Eisgruber which urged the University to "deliver a punishment that is proportionate to the damage Dr. Verdú's victim has endured."[20] The petition made direct reference to Princeton's marred past with the Office for Civil Rights, stating "[t]he University's decision in Professor Verdú's case, combined with the knowledge that as recently as 2014, the U.S. Department of Education concluded that Princeton 'failed to provide a[n]…equitable response to complaints of sexual harassment,' profoundly erodes this trust." *Id.* Referencing #MeToo, the petition further stated "[t]here has never been a more important time for Princeton to categorically condemn sexual harassment and abuse, particularly when these acts are committed by exceptionally powerful men." *Id.*

e.      In response to the petition, the University's Vice Provost for Equity and Diversity, Minter, published a letter in the *Daily Princetonian* which began "I am responding on behalf of all the recipients. Like the signatories to the petition, the University recognizes the power imbalance inherent in the relationship between faculty and students and is committed to providing an environment free from discrimination."[21]

f.      On November 21, 2017, Alanna Vagianos, author of the *Huffington Post* article, emailed various former female students of Dr. Verdú looking for stories about inappropriate behavior on the part of Dr. Verdú while teaching or advising them. This resulted in several alumna of Princeton sending letters to the Provost *in support* of Dr. Verdú. Vagianos never published a second article about Dr. Verdú.

---

[18] http://www.dailyprincetonian.com/article/2017/11/sexual-harrassment-in-electrical-engineering.

[19] http://www.dailyprincetonian.com/article/2017/11/terminate-the-professor-who-committed-sexual-harassment

[20] http://www.dailyprincetonian.com/article/2017/11/petition-to-princeton-university-administration-regarding-the-verdu-sexual-harassment-case.

[21] http://www.dailyprincetonian.com/article/2017/11/letter-to-the-editor-title-ix-office-response-to-petition.

g.      On November 24, 2017, Princeton's Undergraduate Student Government passed a resolution calling for harsher punishment of Dr. Verdú.

h.      On November 24, 2017, flyers with a photograph of Dr. Verdú, titled *U. Title IX Investigation Finds Verdú Guilty of Sexual Harassment*, were plastered across multiple locations in the University's Engineering Quadrangle.

i.      On November 27, 2017, *The Daily Princetonian* published a letter from 19 professors from Princeton's Electrical Engineering Faculty condemning Dr. Verdú's "behavior."

208.   On November 27, 2017, the University held a "town hall" meeting "in response to widespread outrage at the actions of…Sergio Verdú." Ms. Im attended the meeting and asked the speaker panel, including Vice Provost Minter and Crotty, who served on Dr. Verdú's Title IX panel, "what kind of behavior, if not that of Verdú's hypothetical counterpart, merited suspension or termination or other, visible punishments." Ms. Im reportedly used hypotheticals to "circumvent[] Title IX privacy rules" according to an article published in *The Daily Princetonian*.[22]

209.   On November 30, 2017, Plaintiff complained to the Acting Chair of the Engineering Department, Gmachl, that he was suffering from chest pains and high blood pressure as a result of the hostile work environment he was being subjected to as a result of Ms. Im's actions and the University's lack of response. He pointed to the additional stress caused by the decision of 19 professors in the Department to publish a letter in *The Daily Princetonian* which condemned him.

210.   Plaintiff told Gmachl that he was being treated unfairly. He was barred from speaking about the Title IX proceedings and defending himself against Ms. Im's mischaracterizations. In contrast, Ms. Im was commended and supported for violating confidentiality.

---

[22] http://www.dailyprincetonian.com/article/2017/11/sexual-misconduct-town-hall.

211.   In response, Gmachl had no concern for Plaintiff, instead telling him that she was one of the signatories to the letter condemning him and insisting that he step down from his position as co-director of an upcoming scientific conference he had organized. Upon information and belief, Gmachl notified the Office of the Dean of the Faculty and/or the Provost who took no action to address Plaintiff's complaint. Ms. Im's campaign continued.

212.   On December 1, 2017, a former professor turned blogger published an open source spreadsheet "Sexual Harassment in the Academy," upon which anonymous posters could list instances of alleged sexual harassment at universities. This was described by local media as "a viral #MeToo list." Several entries on the list concerned Princeton professors.[23] This information was publicized by the local media, including a statement by the creator of the spreadsheet that she "hopes that growing list is making university officials and men in academia uncomfortable" and that she was "proud to be one of the many exposing the scourge of sexual predation in the academy." Local media also noted that "Princeton was recently criticized…for allowing a top engineering professor to keep his job after a university investigation allegedly concluded he was guilty of inappropriately touching a graduate student."[24]

213.   On December 11, 2017, Ms. Im emailed 205 graduate students and postdoctoral fellows asking them to sign a petition to remove Dr. Verdú as the co-director of the *2018 Conference on Information Sciences and Systems*. This was the same conference that Gmachl had asked Dr. Verdú to step down from.

---

[23]A December 7, 2017 entry on the spreadsheet noted that certain professors in the German department were protected from disclosure of Title IX cases against them "in comparison to the Princeton Engineering professor who was found guilty…and was not able to hide behind confidentiality." *See* https://docs.google.com/spreadsheets/d/1S9KShDLvU7C-KkgEevYTHXr3F6InTenrBsS9yk-8C5M/edit#gid=1530077352.

[24] https://www.nj.com/education/2018/01/metoo_list_detailing_2k_sexual_harassment_allegati.html.

214.  On December 12, 2017, *The Daily Princetonian* published an article about the "Sexual Harassment in the Academy" crowdsourcing survey, noting "[w]hile the University has been embroiled in outrage and controversy over Title IX cases in the German department…and pertaining to electrical engineering professor Sergio Verdú…it seems that the Orange Bubble has had further incidents of sexual harassment in other departments."[25]

215.  On December 21, 2017, Plaintiff had his attorney notify the University's General Counsel that the one-sided publicity concerning the Title IX finding against Plaintiff, including in University publications, created a hostile working environment for Plaintiff. The communication noted that the University took no efforts to ameliorate the environment by defending or even explaining the sanctions imposed on Plaintiff.

216.  On January 2, 2018, Ms. Im was interviewed by NJTV news for a segment "spotlighting" sexual harassment and grouping Dr. Verdú with public figures accused of sexually assaulting women. In an interview with a news reporter, Ms. Im once again embellished and mischaracterized her allegations against Dr. Verdú and presented an account that was inconsistent with what she reported to the Title IX office.

217.  On January 10, 2018, *Princeton Alumni Weekly* published an article about Ms. Im's allegations and Princeton's plan to revise its sexual misconduct policies. The article quoted Vice Provost Minter as stating "All across the country, everyone is looking at what [the] norms were and saying, 'Those norms are not acceptable anymore.'" Minter further stated that there have been cases "'where faculty members are separated from the University based on a single [sexual misconduct] case.'"[26]

---

[25] http://www.dailyprincetonian.com/article/2017/12/u-appears-on-sexual-harassment-crowdsourcing-survey.
[26] https://paw.princeton.edu/article/sexual-harassment-case-complaint-citing-faculty-adviser-sparks-outcry-campus.

218.   On February 22, 2018, Cuff—who was no longer employed by Princeton—was published in *The Daily Princetonian* calling for a response to campus activism and Ms. Im's "bravery" to appropriately punish Dr. Verdú. He further harshly criticized Prentice for, allegedly, not taking the situation with Dr. Verdú seriously and "letting it slide." Cuff's editorial also falsely asserted that Ms. Im lost her funding for reporting sexual harassment when, as stated *supra* Paragraphs 122 and 135, Dr. Verdú had agreed to maintain Ms. Im's funding and Cuff took it over without his knowledge. Cuff further noted "[l]ast fall lawyers were jumping up and down to file a lawsuit on [Im's] behalf against the University, with the expectation of winning a lot of money."

219.   On February 25, 2018, *The Daily Princetonian* published a Letter to the Editor by Ms. Im (which, upon information and belief, was drafted with or by Cuff), asking "What is consensual?" In the letter, Ms. Im publicly revealed the confidential details of a second investigation—forced by Ms. Im—into allegations concerning Dr. Verdú's consensual relationship with E.S., as well as confidential information discussed with Ms. Im during the Title IX investigation. At the time of this "editorial," and as detailed *infra*, the second investigation was ongoing.

220.   In Ms. Im's editorial, she criticized Crotty for failing to open a Title IX investigation into the allegations concerning E.S., falsely stating "[Crotty] referred to the incident as consensual without any Title IX inquiry on the information I submitted or conversation with the informants." Ms. Im then referred to her allegations against Dr. Verdú.[27] Princeton took no action with respect to yet another instance in which Ms. Im continued to threaten, harass and retaliate against Dr. Verdú, including by revealing confidential details of allegations unrelated to her Title IX case which concerned a consensual relationship that occurred years before.

---

[27] http://www.dailyprincetonian.com/article/2018/02/what-is-consensual.

221. Rather than taking action to quell Ms. Im's retaliatory public harassment campaign against Dr. Verdú, a highly esteemed and laureate member of the faculty, Princeton condoned her misconduct by suggesting, through Minter's comments to *The Daily Princetonian* and *Princeton Alumni Weekly* that the discipline imposed on Dr. Verdú was not severe enough. Upon information and belief, had the campaign, described *supra* Paragraphs 177-220, been directed at a female member of the faculty, Princeton would have taken steps to stop the campus frenzy and to, at the very least, admonish the student complainant for disclosing confidential information to the public. Instead, Princeton took no steps to stop the frenzy. Princeton disregarded the letters it received from academics and former collaborators of Dr. Verdú's, vouching for his integrity. One of the letters, signed by over 40 academics from around the world stated "We call upon Princeton University to carefully reconsider any decision or action that has wrongfully tarnished his reputation and honor."

222. Because the negative publicity about Dr. Verdú coincided with the revival of the #MeToo movement he became the male scapegoat who would bear the punishment for all of Princeton's previous perceived failings to protect female students from sexual harassment.

223. Because Princeton had already been heavily criticized for failing to protect its female students from alleged sexual harassment by male faculty members, the University actively participated in the decimation of Dr. Verdú's reputation and career by opening an investigation into the allegations concerning Verdú's consensual relationship with E.S. years earlier.

224. On May 10, 2018, Princeton's Faculty-Student Committee on Sexual Misconduct issued 2017-2018 Recommendations, which stated that:

    a. during town hall meetings in Fall 2017, "many of the concerns raised pertained specifically to sexual harassment that involved power differentials, particularly situations involving faculty members engaging in harassing and/or inappropriate conduct toward graduate students."

b.     "the disproportionate impact of sexual harassment on women subverts Princeton's efforts to diversify the academy."

c.     "We Speak data and national data indicate that Princeton's environment resembles national trends regarding sexual harassment, and that these outcomes are unacceptably undermining the well-being of our community."

d.     "[S]ome community members questioned whether the determination of faculty penalties is overly reliant on historical precedents. Although there is recognition that precedents play an important role in creating consistency and fairness, societal views of sexual misconduct have evolved over time to account for the significant harm and impact on individuals and organizations."

e.     "[O]ur obligation to be fair and to provide due process to all members of our community also requires attention to the respondents. Except in the most extraordinary of circumstances, making public comments or disclosing details about matters under investigation would raise questions about the fairness and integrity of the University's sexual misconduct proceedings and adjudications. Even after cases are adjudicated, the appropriateness of specific disclosures must be carefully evaluated…For example, in cases that do not result in permanent separation from the University, respondents found responsible continue to be members of campus community, and publication of all aspects of penalties could impede their ability to remediate and/or continue as productive members of the community."

f.     "[T]he current approach relative to the disclosure of penalties had led to a misconception that the University does not penalize with appropriate severity."

g.     "[F]aculty, staff, and graduate students currently have the right to consensually define the nature of their relationships, even though a power differential may be involved."

225.     On April 1, 2019, the Dean of the Graduate School announced a new University policy that "prohibits all faculty from initiating or engaging in romantic or sexual relationships with graduate students. Previously faculty were only prohibited from initiating or engaging in romantic or sexual relationships with graduate students over whom they had advising, instruction or supervisory responsibilities…this prohibition, and therefore any disciplinary consequences, fall entirely on the faculty." The new policy does not prohibit relationships "between a faculty member

and another member of the University community" that pre-date the adoption of the policy "except when such relationship creates an actual conflict of interest."

## V.   **Princeton's Unwarranted Second Investigation Against Dr. Verdú**

226.   Ms. Im's efforts at retribution against Dr. Verdú, and to exact a harsher punishment against him, were successful as, over Summer 2017, Ms. Im drummed up enough "evidence" to prompt the University to pursue an investigation into whether Dr. Verdú and E.S. had a "romantic relationship" more than two years prior to Ms. Im reporting the allegation.

227.   In fact, Ms. Im solicited various individuals to provide statements to University officials that, in Summer 2015, Dr. Verdú and E.S. were seen kissing at a bar in Hong Kong, during an IEEE Conference. An anonymous individual also supplied photographs of a man and woman purportedly kissing, allegedly E.S. and Dr. Verdú.

228.   In actuality, the photographs provided to the University did not show the woman's face and it was not clear from the photographs that the individuals were kissing. The University did not question who took the photographs or why they were taken. The photographer was never interviewed. The University also failed to question why the photos were of such grave concern after sitting in someone's file for over two years.

### A.   The *Rules and Procedures of the Faculty*

229.   The 2015 version of the *Rules and Procedures of the Faculty* stated as follows with respect to consensual relationships between faculty and graduate students:

> Whenever a faculty member has a professional responsibility for a student or could reasonably expect to have professional responsibility for the student during the student's time at Princeton, a consensual sexual or romantic relationship between the faculty member and the student raises a serious question of violation of this provision. A faculty member has a professional responsibility for a student when he or she has direct or indirect administrative, teaching or supervisory responsibility for that student.

When a sexual or romantic relationship involves individuals in a teacher-student relationship (e.g. being directly or indirectly taught, supervised or evaluated) … it is a clear and most serious violation of both University and professional standards, as well as a potential violation of state and federal anti-discrimination statutes. Any sexual or romantic relationship between teacher and student is bound to impinge upon the teacher student relationship, not only with regard to the student involved but also in relationship to his or her peers, who may perceive favoritism or unequal treatment by the faculty member.

230.    The 2017 *Rules and Procedures of the Faculty* stated:

Without either limiting or abrogating any of the powers, duties, and privileges granted by the Charter to the Board of Trustees, the Board of Trustees wishes to affirm its long-standing policy of upholding academic freedom and security of academic tenure, and to declare that: A member of the Faculty may be suspended, dismissed, or be subjected to reduction of salary or other workplace restrictions for cause only on the basis of (a) substantial and manifest incompetence, (b) substantial and manifest neglect of duty, or (c) substantial and material misrepresentations in dealings with University officials, including during the appointment process, (d) conduct which is shown to violate the University rules and procedures applicable to a member of the Faculty, or (e) conduct which is shown to substantially impair the individual's performance of the full range of his or her responsibilities as a member of the Faculty. Section IV.N.1.

231.    The 2017 *Rules and Procedures of the Faculty* further stated "[i]t is also the intention of the Board in these matters that a range of penalties be made available so that the nature of the penalty may be commensurate with the nature of the offense."

232.    With respect to dismissal, the 2017 *Rules and Procedures of the Faculty* stated:

Without either limiting or abrogating any of the powers, duties, or privileges granted by the Charter to the Board of Trustees, or intending to make any change in the policy which it has followed for many years of upholding the security of academic tenure, the Board of Trustees hereby declares that it is its intention, in case a proposal is brought before it to dismiss from the University a Professor, to proceed as follows:

Should the Dean of the Faculty determine it is necessary to review the conduct of a Faculty member under this section, the Dean will schedule an initial meeting with the Faculty member to apprise the Faculty member of the circumstances and to offer the Faculty member the opportunity to be heard and to provide additional information. If, at the conclusion of the Dean of Faculty's review, s/he is considering recommending to the President that the Faculty member be dismissed, prior to submitting such written recommendation the Dean of the Faculty will again meet with the Faculty member to provide the Faculty member an opportunity to be

heard. After receiving the recommendation from the Dean of the Faculty, the President will request a meeting with the Faculty member. Following the meeting (or if the Faculty member declines the meeting), if the President accepts the recommendation of the Dean of the Faculty, the Faculty member shall receive a written statement from the President giving the reasons for the proposed dismissal. Upon receiving the statement of reasons, the Faculty member shall be entitled, if the Faculty member requests it within a reasonably prompt time, to a hearing before the Committee on Conference and Faculty Appeal (CCFA), at which time the Faculty member shall have a right to appear and be heard. The CCFA, after considering the case, shall report its opinion, with a statement of the reasons, to the President. If the President decides to continue with the dismissal, the President shall report that decision to a committee of the Board appointed to consider the proposed dismissal, with a copy of the statement of reasons provided to the CCFA. Before final action is taken by the Board, a committee of the Board shall meet with the CCFA to discuss the report, at which meeting the Faculty member shall have a right to appear and be heard.

233.    The CCFA Rules state:

> The Committee on Faculty Appeal is elected by the faculty, and its obligation is to protect the rights and privileges of individual members of the faculty on behalf of the entire faculty.
>
> ....
>
> The Committee on Faculty Appeal serves as a safeguard against unfair treatment of individual faculty members. When a member of the faculty appeals…the committee conducts an inquiry to determine the fairness of the procedures followed, the appropriateness of the criteria used, and the reasonableness of the decision reached.

234.    Per the CCFA Rules, a faculty member who appears before the Committee may be accompanied by an "advisor" who may only be a member of Princeton's faculty. During the CCFA proceedings the appealing faculty member's legal counsel may not be present.

**B.    Dr. Verdú and E.S.**

235.    Dr. Verdú and E.S. commenced a relationship in Spring 2014. At the time, Dr. Verdú had no teacher-student relationship with E.S., he was neither her advisor nor her teacher. She had taken courses from him *three years* before the relationship began. At no point during the course of their relationship was E.S. under Dr. Verdú's supervision.

236.    In Fall 2015, Dr. Verdú served as a reader of E.S.'s dissertation but this role was not dispositive as to whether she would get her Ph. D. E.S.'s two advisors wrote glowing reports and the main results from her thesis were published in the top journal in the field.

237.    The rules of the Princeton University Graduate School state: "When the dissertation has been formally presented the department takes action on the positive recommendation of at least two principal readers to request that the dissertation advance to the final public oral (FPO) examination." Leaving aside the fact that at Princeton it is exceedingly rare for a dissertation to be found unacceptable by a reader, E.S. certainly did not need Plaintiff's report to get her Ph.D.

### C.   The Unwarranted University Investigation Concerning Dr. Verdú and E.S.

238.    On September 19, 2017, Crotty emailed Ms. Im and requested a meeting with her. She informed Ms. Im that the University had received enough information to start a new investigation into Ms. Im's allegation that Plaintiff and E.S. potentially engaged in a consensual, romantic relationship.

239.    On September 25, 2017, Prentice—who had determined Dr. Verdú's sanction in the Title IX proceedings and was now the Provost—emailed a letter to Dr. Verdú informing him that "the Office of the Dean of the Faculty has received a report that you may have engaged in conduct with a now former graduate student that violated University policy." The letter further informed Dr. Verdú that a review of the report would be conducted pursuant to the *Rules and Procedures of the Faculty*. Senior Associate Dean of the Faculty Turano—who had served on Ms. Im's Title IX Panel—would lead the review and work with Cheri Burgess, the Director of Institutional Equity and EEO, who is also an employment attorney. The letter noted that the Dean of the Faculty, Kulkarni had recused himself "due to his personal and professional relationship with" Dr. Verdú.[28]

---

[28] In his February 2018 editorial in *The Daily Princetonian*, Cuff stated "as soon as Princeton's general counsel got word that Dean Kulkarni had received reports of violations prior to Yeohee's incident, he recused himself from the

240.   The assignment of Turano and Burgess to investigate the previously dismissed allegations against Dr. Verdú, violated Princeton's Section IV.N of the 2017 *Rules and Procedures of the Faculty*, which mandated that the Dean of the Faculty investigate charges of misconduct against faculty members. This Section of the *Rules and Procedures of the Faculty* did not provide a right of recusal, or mechanism through which the Dean of the Faculty could recuse himself.

241.   As part of his/her duties, the Dean of the Faculty has to make (or advise the President about) important decisions regarding all faculty—including former departmental colleagues—including tenure, promotions, salaries, award nominations, and disciplinary matters. The only exceptions are cases of family or preexisting relationships. *See* Section V.B. Nothing in the University rules precludes the Dean of the Faculty from participating in disciplinary proceedings or investigations concerning professors in their own departments. For example, Kulkarni had a similar relationship with Cuff as he did with Dr. Verdú, having co-supervised and co-authored papers with him, yet Kulkarni did not recuse himself from participating in the deliberations of the President's committee that considered Cuff's tenure.

242.   Upon information and belief, the University forced Kulkarni's recusal because he had already determined, in April 2017, that an investigation into any purported relationship between E.S. and Dr. Verdú was unwarranted. The University then placed someone in position who was likely to find Dr. Verdú responsible for violating the *Rules and Procedures of the Faculty*—a member of the previous Title IX Panel. Dr. Verdú was given no opportunity to challenge the University's decision.

243.   Prentice's September 25th letter noted "[t]he review will be conducted as confidentially as possible in order to maintain the integrity of the review and to protect the

---

investigation." http://www.dailyprincetonian.com/article/2018/02/princetons-malfunction-with-the-recent-sexual-misconduct.

reputations of those involved." Regarding Prentice's pledge of confidentiality, it is notable that six

days before she sent her letter to Dr. Verdú, Ms. Im had already been notified of the investigation.

Prentice once again warned Dr. Verdú "it is critical that you do not engage in any conduct that

could be perceived a retaliatory or harassing in nature. Such conduct on its own could be the basis

for significant disciplinary action."

244.    The letter did not mention that the University was, in fact, reopening the report about

E.S. that was made by Ms. Im and Cuff months prior and which Kulkarni and the Title IX panel

elected not to pursue.

245.    The University further gave no explanation or justification for its investigation of a

report concerning a student who had already moved on from Princeton and which the student

herself did not initiate.

246.    On September 26, 2017, Crotty—who had not been named as an investigator—and

Turano called E.S. Crotty told E.S. that she was confident that E.S. and Dr. Verdú had a

relationship and that she only wanted to know whether it was consensual. Crotty, who had spoken

with E.S. during the Title IX proceedings, told E.S. that "concerned" individuals had come

forward—two years later—to report that E.S. was allegedly seen kissing Dr. Verdú at a bar in

Hong Kong. Crotty asked E.S. for photos of herself during the conference, which E.S. provided.

She also asked E.S. if she had heard of any other rumors concerning Dr. Verdú. E.S. shared with

Crotty and Turano her distress about Ms. Im's campaign to damage E.S.'s reputation. The

University took no action in this regard.

247.    Shortly after Dr. Verdú received Prentice's letter, the University again violated

Section IV.N of the *Rules and Procedures of the Faculty* when Prentice removed Turano from the

case and hired an outside law firm to conduct the investigation alongside Burgess. While the

University employed an outside attorney, Olabisi Okubadejo ("Okubadejo"), to conduct the investigation, Dr. Verdú was not permitted to have an attorney present at any investigative meetings. For one meeting, Dr. Verdú's attorney could listen in by telephone but could not participate.

248.   The University's reliance on Okubadejo to investigate the E.S. allegations is troubling and potentially biased the investigation. Prior to working for law firm Ballard Spahr, Ms. Okubadejo spent six years working as an attorney at OCR, between 2007 to 2013, which included the timeframe in which OCR issued the 2011 DCL and initiated an investigation into Princeton's failure to adequately respond to female students' Title IX complaints. *See supra* ¶¶ 66-71.

At the time of the investigation into the E.S. allegations, Okubadejo's investigative techniques were criticized in a lawsuit in which a male student at Marymount University alleged that Okubadejo, who served as a Title IX investigator for Marymount, was biased against male respondents because she made public statements which demonstrated her belief that the majority of Title IX complainants tell the truth and, consequently, respondents' accounts of what occurred are not credible. These allegations were, along with others, found to plausibly support a claim that the University was gender-biased against male respondents. The allegations survived the University's motion to dismiss. *See Doe v. Marymount U.*, 297 F. Supp. 3d 573, 587 (E.D. Va. 2018). A few months later the case was settled.

249.   Dr. Verdú, as well as his counsel, asked Burgess, and other University officials, why Turano had been replaced by an outside attorney. At no point was this question answered.

250.   On October 25, 2017, Burgess and Okubadejo met with E.S. in person to conduct an interview. In later correspondence to the University, E.S. complained that she was led to believe that the purpose of the meeting was to address her concerns, rather than investigating Dr. Verdú,

and that she was kept for three hours, into the late evening, without being offered a dinner break. At the meeting, E.S. was shown the photos taken by the anonymous photographer. She said did not believe the woman in the photographs was her. E.S. also denied having a romantic relationship with Dr. Verdú.

251.   On October 26, 2017, Burgess and Okubadejo interviewed Dr. Verdú about the general allegation that he was involved in a consensual, romantic relationship with E.S. in Summer 2015. Contradicting the September 25, 2017 letter from Provost Prentice (which confirmed that this matter falls under the purview of the Dean of the Faculty), Burgess told Dr. Verdú that a matter of this kind is usually handled by her office.

252.   On November 7, 2017, Burgess and Okubadejo interviewed Dr. Verdú for a second time, showing him photographs they said were taken in Hong Kong in *Summer 2015*. Certain of the photos showed a man and woman in close proximity to one another, with their heads close together. Neither individual's face was fully visible. The investigators presumed the two people were kissing. Dr. Verdú did not deny at any point that the individual in the picture was him, but had no recollection of the scene in those photographs.

253.   On November 21, 2017, Dr. Verdú was interviewed for a third time about a report that was called in after the publication of the *Huffington Post* article that Dr. Verdú and E.S. were seen together at Penn Station, two and a half years earlier, in April 2015. Dr. Verdú had no recollection about this but told the investigators he believed the new allegations were part of an orchestrated campaign against him. No actions were taken to determine whether there was, in fact, a campaign against Dr. Verdú. During the course of the investigation, the investigators failed to disclose the names of the purported witnesses, and failed to identify the photographer in Hong

Kong. They also failed to question the motives, and credibility, of the individuals involved in producing the "evidence" over two years later.

254.   Dr. Verdú had no right to cross-examine his accusers.

255.   On December 20, 2017, Burgess and Okubadejo issued an investigation report. The University did not provide it to Dr. Verdú until over one month later, on January 23, 2018. Prentice met with Dr. Verdú and mandated that Dr. Verdú execute a non-disclosure agreement in order to review the report. Upon information and belief, the University kept Ms. Im apprised of the details of the investigation as it progressed and did not require her to abide by the terms of any non-disclosure agreement—even though Ms. Im was not a party to the allegations made against Dr. Verdú.

256.   Notably, the "Background" section of the report referenced the November 9, 2017 *Huffington Post* article and the articles published in the *Daily Princetonian* regarding Ms. Im.

257.   The "Procedural Overview" section contained a prejudicial footnote reference to "hearsay examples of Professor Verdu's alleged interactions with other female students, but there was not enough information for the investigators to pursue those leads. In contrast, the report made no reference to the letters in support of Dr. Verdú that female graduate students submitted to the University after the *Huffington Post* article was published.

258.   The report included an appendix with key dates which demonstrated that Ms. Im "and others" were responsible for making the allegations concerning E.S. and Plaintiff at the time Ms. Im made her Title IX accusation. Interestingly, this appendix was removed when the report was later forwarded to President Eisgruber.

259.   On January 23, 2018, Prentice placed Dr. Verdú on administrative leave. The administrative leave precluded Dr. Verdú from teaching and from attending or organizing

conferences (including the upcoming March conference at Princeton from which Ms. Im had campaigned to have Dr. Verdú removed). The details were publicized in *The Daily Princetonian*, which noted that Ms. Im told the newspaper that Crotty and Turano met with her in September 2017 to let her know they had enough information to open a second investigation. The article noted that Cuff brought up the same allegations to Kulkarni in March 2017 and to Prentice in June 2017.[29]

260.    The 2017 *Rules and Procedures of the Faculty*  did not mandate a burden of proof that should be applied in cases in which violations of the policy on Consensual Relations with Students were alleged. Burgess and Okubadejo applied the "preponderance of the evidence" standard even though Dr. Verdú, a tenured faculty member, faced termination and the allegations were not investigated under Title IX.

261.    As a result of the investigation, it was erroneously determined that Dr. Verdú violated the policy on Consensual Relations with Students because Dr. Verdú served as a reader on E.S.'s dissertation. This determination was made based on the 2015 Hong Kong photographs and the Penn Station report in April 2015—at these times Dr. Verdú was not a reader on E.S.'s dissertation. Even if Dr. Verdú had been a reader at the time, in that role he had no professional responsibility for E.S. Notably, Cuff and another professor (not Dr. Verdú) served as E.S.'s research supervisors while she was at Princeton.

262.    The investigators mischaracterized the facts of the previous Title IX investigation to drum up charges of dishonesty against Dr. Verdú for failing to disclose the extramarital affair by avoiding the violation of his and E.S.'s privacy. During the Title IX investigation, the Title IX Panel chose not to conduct a thorough investigation of the E.S. allegations which, in any event,

---

[29] http://www.dailyprincetonian.com/article/2018/02/verdu-placed-on-administrative-leave. As discussed *supra* Paragraph 29, Cuff's involvement was not disclosed to Dr. Verdú during the Title IX investigation.

were brought forward by Ms. Im and Cuff—not E.S. The allegations also bore no relationship to Title IX and Kulkarni had already deemed them unworthy of investigation.

263.    The investigators also found the inconsistent statements of unidentified "witnesses," purportedly in Hong Kong when the photos were taken, to be credible, including by crediting the speculative statement of "Individual 14" that Dr. Verdú and E.S. were involved, even though this person had not seen the two kissing, and had inaccurately described the contents of the photos in question.

264.    When Dr. Verdú was unable to remember all the details of his trip to Hong Kong nearly two and a half years later, the investigators found him to lack credibility, even though he acknowledged that the person in the photos looked like him, and acknowledged that he owned clothing like that shown in the photographs. Indeed, when Okubadejo asked whether he "continued to deny" being the person in the photos, Dr. Verdú responded "Excuse me, but I have never denied that."

265.    The investigators erroneously concluded that Dr. Verdú made "substantial and material misrepresentations in dealing with University officials" simply because he could not account for every detail of what occurred in Hong Kong two years earlier. This suggests that they were striving to find grounds upon which to terminate Dr. Verdu even though none existed.

266.    The investigators also improperly considered that E.S. took two courses with Dr. Verdú in *2011* as evidence of a policy violation for alleged activities that occurred in Summer *2015*, when E.S. and Dr. Verdú had no working relationship. They erroneously concluded that Dr. Verdú engaged in "consensual sexual or romantic interactions" with E.S. that violated the policy on Consensual Relations with Students.

267.   The investigators also added a charge against Dr. Verdú, for violating the policy on Honesty and Cooperation in University Matters, which states:

> Members of the University community are expected to be honest and straightforward in their official dealings with University process, activities and personnel. This obligation includes honoring contracts and agreements and providing accurate information on official forms and documents as well as to official University personnel, offices, and committees. Deliberate violations of this provision will be considered serious offenses; subsequent violations, or systematic violations in the first instance, will be considered extremely serious.

268.   At some point shortly after the investigators issued their report, Prentice requested further investigation into "grading." Yet there was no allegation that Dr. Verdú had treated E.S. more favorably than his other students based on their alleged relationship. Moreover, E.S. took classes with Dr. Verdú in 2011, not 2015. Burgess was tasked with reporting back to Prentice in regard to this issue. With respect to grading, Burgess analyzed graduate student transcripts for the Fall 2007-Spring 2017 time period and evaluated whether Dr. Verdú "graded [E.S.] and other female students in his courses undeservedly high." Astoundingly, Burgess' "analysis" was grounded in the implicit assumption that male graduate students would be expected to get higher grades than females. Burgess concluded that there was "insufficient information…to draw any conclusion that Professor Verdu disparately issued course grades to students because of gender or any inappropriate basis."

269.   Prentice requested a second report as to when Dr. Verdú served as a reader of E.S.'s dissertation. Burgess was also tasked with investigating this issue. The information Burgess collected from the University showed that Dr. Verdú's name was submitted in September 2015 and that he provided his reader's report that same month. E.S.'s co-advisors were named earlier in the process, during Summer 2015. While Burgess concluded that there was no way for her to specify when Dr. Verdú received E.S.'s final dissertation, the information gathered from the University

indicated that in July 2015, Cuff emailed graduate administration to inform them that E.S. would not likely be finished with her dissertation in August 2015, the suggested completion date. There is no indication that Burgess followed up on this communication.

270.    On February 14, 2018, Dr. Verdú submitted a written response to Prentice which detailed the errors and bias in the December 20, 2017 investigation report. Dr Verdú noted that despite the significant interests at stake—namely his tenured faculty position which he had held for decades—he was denied a hearing before a fair tribunal and denied due process. Prentice and the Eisgruber, were the primary arbiters of how Dr. Verdú's future would be decided.

### D.   The Provost's Recommendation to President Eisgruber

271.    On March 2, 2018, Prentice issued a recommendation to President Eisgruber that Dr. Verdú be dismissed or, in the alternative, suspended for two years. According to the recommendation, the discipline should be determined by whether Dr. Verdú admitted to having an affair with E.S.

272.    In the recommendation, Prentice stated that the investigation was commenced when:

> new information led the Dean of the Faculty to launch a review, with Dr. Toni Turano from the DOF and Ms. Cheri Burgess from the Office of Institutional Equity serving as the investigators. When it became clear that a full investigation was warranted, Dean of the Faculty Sanj Kulkarni recused himself and his office from the case due to his close personal and professional relationship with Professor Verdú. I stepped into Dean's Kulkarni's role and we engaged Olabisi Okubadejo, an external investigator from the law firm of Ballard Spahr LLP into Dr. Turano's role. I notified Professor Verdú of the investigation under our Consensual Relations with Students policy on September 25, 2017.

273.    This statement contains several misrepresentations: i) Prentice, not Kulkarni, appointed Turano to lead the investigation; ii) after being asked to do so, Kulkarni had already recused himself (or had been asked to recuse himself) months before; iii) Kulkarni did not order the investigation, on the contrary, when asked to do so he said there was no basis; iv) if at the point

Kulkarni recused himself, he had also recused the entire office of the Dean of the Faculty, Prentice would not have appointed Turano to lead the investigation; v) as her September 25 letter to Plaintiff indicated, when Prentice "stepped into Dean's Kulkarni's role" she appointed Turano, not Olabisi Okubadejo; vi) Prentice implied that Turano was appointed before "it became clear that a full investigation was warranted;" and vii) the outside investigator was engaged after Prentice notified Plaintiff of the investigation and that she was appointing Turano to carry it out, with Burgess' assistance.

274.    Prentice's recommendation stated that Ms. Im's Title IX proceeding was "not the subject of this letter" yet noted that Dr. Verdú was found responsible for sexual harassment in that proceeding and went on to "lay out the context" of the E.S. allegations, which were raised during the Title IX proceeding. Prentice did not relay to Eisgruber that the allegation that Dr. Verdú and E.S. engaged in a consensual relationship was brought forward by Cuff and Ms. Im. Or that Ms. Im was the source of the Hong Kong photos from the very beginning of the Title IX investigation.

275.    Prentice justified the Title IX investigators' preliminary inquiry into the allegations because they arose in the context of an ongoing sexual misconduct case. However, under the Sexual Misconduct Policy, the Title IX Coordinator was supposed to refer the allegations concerning E.S. to the office of the Dean of the Faculty because they were "outside the scope" of the Sexual Misconduct Policy. *See* Sexual Misconduct Policy, Section 1.3.10.2.

276.    Prentice's willful disregard of Dr. Verdú's protestations that Ms. Im's and Cuff's Title IX allegations were a hoax, failure to reference Ms. Im and Cuff's role in bringing forth the E.S. allegations, and omission of Ms. Im's role in pressing for the further investigation and termination of Dr. Verdú, mischaracterized the context in which the investigation of the E.S. allegations arose.

277.     Moreover, Prentice—whom Ms. Im had secretly recorded and was a subject of the *Huffington Post* article—should not have been tasked with determining the outcome of the investigation into the E.S. allegations. Heavily criticized and publicly maligned by both Ms. Im and Cuff for failing to adequately reprimand Dr. Verdu in the Title IX proceedings, Prentice's ability to remain impartial should have been questioned by the University. Indeed, only days prior to the issuance of her recommendation to Eisgruber, Cuff wrote the following in an editorial for *The Daily Princetonian*:

> In my opinion, much of the blame for the University's inaction falls on Deborah Prentice. Her decisions have substantially reduced the likelihood that future victims will come forward in the event of sexual misconduct. Who would want to report such occurrences knowing that even after enduring all of the collateral damage that occurs for coming forth with this information (loss of advisor and funding, to start with), and even after the Title IX office investigates and finds the accusations to be truthful and the violations severe, the dean of the faculty, who was Deborah Prentice at the time, does not take the situation seriously and essentially lets it slide. She knew at the time all of the information that has now become public.

278.     Prentice rightfully concluded that if Dr. Verdú and E.S. had been engaged in a consensual, romantic relationship at the time of the Hong Kong conference, there was *no violation* of the policy on Consensual Relations with Students, stating:

> Regarding the question of whether a romantic relationship between Professor Verdu and [E.S.] that occurred solely at the ISIT Conference would have violated the Policy on Consensual Relationships with Students the answer appears to be no. When I spoke with Professor Verdu on February 15, 2018, he asserted, as he had to the investigators in the past, that [E.S.] was not under his supervision at the time of the ISIT Conference in June 2015. I followed up to ask when he was assigned as a reader of her dissertation. He said that he was not assigned until her Final Public Oral Examination was scheduled early in the Fall of 2015. Information subsequently obtained from the graduate administrator in the Department of Electrical Engineering and Graduate School supported his description of the timing. I cannot therefore conclude that Professor Verdu was an official reader of [E.S.'s] dissertation in June 2015, at the time of the ISIT Conference. Of course, he was still a senior member of the faculty in the same subfield of the Electrical Engineering Department as [E.S.] and therefore had informal professional responsibility for her. But the evidence available to me at this point suggests that even if he had a romantic

relationship with [E.S.] during the conference it would not have constituted a clear violation of the Policy on Consensual Relationships with Students.

279.    Despite Prentice finding that Dr. Verdú had not violated the Policy on Consensual Relationships with Students, Prentice criticized Dr. Verdú for exercising "poor judgment" for "talking, flirting and kissing" at a public bar with a "young woman" in Hong Kong. Yet the conference in Hong Kong was not an event organized by Princeton, nor, upon information and belief, was the bar in question located at the premises where the conference took place. Regardless, Prentice concluded that Dr. Verdú was unprofessional.

280.    While Prentice acknowledged Dr. Verdú's reputation as a "generous and able mentor to men and women alike" her recommendation dredged up Ms. Im's Title IX allegations (despite her prior assertion that the cases were unrelated) to further admonish him and as a "more concerning example" of conduct that is "clearly harmful and unacceptable under University policy." The inclusion of these statements in Prentice's recommendation demonstrates bias against Dr. Verdú on the basis of his age and gender—bias that was also apparent in the Title IX proceedings—pursuant to which adult females are equated with children in need of adult supervision and Dr. Verdú portrayed as a predator, despite clear evidence to the contrary.

281.    Indeed, Prentice's recommendation noted that E.S. consistently denied that she was the woman in the Hong Kong photos or that she had a romantic relationship with Dr. Verdú. Prentice credited E.S.'s account as more credible than the purported eyewitnesses because, according to Prentice, "[i]f the #MeToo movement has emphasized anything, it is the importance of *taking women at their word* when it comes to their interactions and relationships with men in positions of power." (emphasis added).

282.    Though Prentice took E.S. at "her word," which supported that *no policy violation* occurred, she found that, regarding the same allegations, Plaintiff was not credible and forced him

to choose between admitting wrongdoing (which had not occurred) or face termination. Indeed, Prentice was infuriated that Plaintiff did not admit that he had a consensual relationship with E.S., ignoring that the University was invading Plaintiff's and E.S.'s privacy by conducting an unauthorized, *post hoc* investigation into their relationship.

283.     Prentice's reasoning also showed that when faced with an infuriated, and public, #MeToo accuser (Ms. Im) over a female supporter of a male accused (E.S.), that she believed the accuser even where, as here, Ms. Im was a third-party with no personal knowledge of whether Plaintiff and E.S. engaged in a consensual relationship. In this respect, it is also noteworthy that Prentice had received letters supportive of Plaintiff from various women who had worked under his supervision over the years.

284.     Prentice recommended that Dr. Verdú be disciplined simply because she had a hunch that he knew "more about the conduct shown in the photographs taken…in June of 2015 and the context surrounding that conduct than he has told us." Prentice was further infuriated by the perceived "lack of respect for University policies" that Dr. Verdú purportedly exhibited, even though he had not denied that he was the person in the photographs that were the subject of the investigation. Curiously, Prentice found that perceived omissions constituted "material and substantial misrepresentations," that were actionable under the 2017 *Rules and Procedures of the Faculty*.

285.     Simply put, Prentice was infuriated that Dr. Verdú elected to defend himself against Prentice's further unwarranted intrusion into events that occurred years ago, and were unrelated to the Hong Kong conference, or assist Prentice in pushing for his termination. Per Prentice, dismissal was warranted if Dr. Verdú "continue[d] to deflect questions about his conduct and to deny allegations without explanation."

286.    Upon information and belief, Princeton is in possession of records concerning other cases in which other members of the faculty were accused of dishonesty and were not sanctioned or far less severe sanctions were recommended. Here, Prentice chose to make an example of Dr. Verdú in the wake of #MeToo, at the same time falsely asserting that her decision was unrelated to Ms. Im's Title IX proceeding and its ensuing campus outrage.

287.    On March 23, 2018, Dr. Verdú submitted a response to Prentice's recommendation letter to President Eisgruber.

288.    On March 9, 2018, Turano notified Dr. Verdú that the Office of the Dean of the Faculty had extended the mutual no contact order issued on April 13, 2017 between Dr. Verdú and Ms. Im until August 31, 2020. Turano gave no reason for the change of terms.

**E.   Eisgruber Orders Covert Search of Dr. Verdú's Emails**

289.    In September 2017, at the commencement of the investigation into the E.S. allegations, the University's Office of Information Technology copied a "snapshot" of Dr. Verdú's Princeton mailbox—inbox, outbox and deleted items. Dr. Verdú was not notified of this action which, upon information and belief, was executed at Eisgruber's direction.

290.    Subsequently, in February 2018, a "legal hold" was placed on Dr. Verdú's mailbox. Again, this occurred without Dr. Verdú's knowledge. There was no basis for a "legal hold" since Dr. Verdú and Princeton were not embroiled in litigation.

291.    Upon information and belief, neither the copying of Dr. Verdú's mailbox in September 2017 nor the subsequent "legal hold" was authorized by the technology policy in place at the time. Nor was the meaning or purpose of the "legal hold" ever explained to Dr. Verdú.

292.    Upon information and belief, Eisgruber, Prentice and/or the investigators reviewed the contents of Dr. Verdú's mailbox when the snapshot was taken in or around September 2017.

Aware that such a search was outside the scope of the allegations at issue, concerning a conference in June 2015, they waited until Prentice issued her recommendation to create a pretext of dishonesty which would justify searching through Dr. Verdú's emails. Further aware that Dr. Verdú's and E.S.'s relationship did not violate University policy, Eisgruber, Prentice and/or the investigators had to find another reason to justify terminating Dr. Verdú—Ms. Im's dissatisfaction with the outcome of the Title IX proceedings was not a sufficient reason to do so.

293.    On April 11, 2018, President Eisgruber ordered investigators Burgess and Okubadejo to undertake a search of Dr. Verdú's Princeton email account.

294.    According to Eisgruber, the purpose of the email search was to "shed light" on Dr. Verdú's alleged relationship with E.S.

295.    Dr. Verdú was not given notice of the email search until April 27, 2018.

296.    On May 2, 2018, Dr. Verdú objected to the search on the grounds that it violated University rules. Dr. Verdú further objected to the staffing of the investigation, its lack of impartiality and the credibility of the anonymous witnesses.

297.    The investigators reviewed emails dating back to October 2011 and through May 2017. Notably, E.S. graduated from Princeton in November 2015. The email communications showed that Dr. Verdú and E.S. had been involved in a consensual relationship, which the investigators concluded began "sometime in April 2014."

298.    On May 8, 2018, the investigators issued a report of their findings:

  a.    The investigators erroneously found that the relationship between E.S. and Dr. Verdú violated the 2015 policy on Consensual Relationships. They based their finding on: i) Dr. Verdú serving as a reader of E.S. dissertation; and ii) that he sent "written recommendations" regarding E.S. to his professional contacts in September 2, 2015 and **after E.S. graduated** on January 17, 2016.

b. The investigators erroneously concluded that, as a reader of E.S.'s dissertation, Dr. Verdú had supervisory responsibility for E.S. Straining to find a policy violation, the investigators likened this role to an unofficial "advisor" to E.S. This is untrue. At the time, E.S.'s co-advisors were Cuff and Professor H. Vincent Poor. Two reports finding the dissertation acceptable are required to get a PhD at Princeton. As in the immense majority of cases, both Cuff and Poor found E.S.'s dissertation acceptable. The approval of E.S.'s dissertation was unanimous and its major results were published in a leading journal.

c. In yet another strained attempt to find a policy violation, the investigators found that E.S. and Dr. Verdú had a "teacher/student" relationship because he discussed professional opportunities with her and sent an email on her behalf to a former student of Dr. Verdú's with whom E.S. had a job interview in the private sector.

d. The definition of teacher-student relationship in the policy on Consensual Relations with Students, did not include giving a student general career advice or reaching out to contacts who may be interviewing said student. In fact, E.S. took only two courses with Dr. Verdú—three years prior to the commencement of any relationship.

e. The investigators further mischaracterized Dr. Verdú's two emails to his contacts (one of which post-dated E.S.'s graduation as noted *supra*) as "written recommendations." The emails were hardly as formal as described.

f. The investigators also found that Dr. Verdú violated the policy on Honesty and Cooperation in University matters. In making this determination, the investigators relied in large part on email communications between E.S. and Dr. Verdú during the time period after E.S.'s degree was conferred. Events that occurred after E.S. left Princeton were irrelevant to the charge that E.S. and Dr. Verdú engaged in a consensual relationship *while she was a graduate student*. Such "evidence" should have been excluded from consideration.

g. Equally troubling was the investigators' assumptions that Dr. Verdú was at all times dishonest when he spoke with Princeton administrators three years after a number of the events in question. For example, it was no secret, nor did Dr. Verdú deny, that he served as a reader of E.S.'s dissertation. Yet the investigators concluded that he made a material misrepresentation about when he agreed to become a reader.

h. Given that Dr. Verdú had been in a relationship with E.S. for almost a year at the time in which the investigators found, based on email correspondence, that he agreed to serve as a reader, Dr. Verdú had no motive to be dishonest. Whether he agreed in February 2015 or September 2015, his role was the same. It is possible that Dr. Verdú did not recall the email exchange that took

place years earlier. Yet the investigators simply assumed that any fact not remembered and volunteered by Dr. Verdú, about events that took place years before he was questioned, signaled dishonesty. Moreover, when Dr. Verdú merely agreed to serve as a reader was irrelevant to whether doing so in September 2015 violated the policy on Consensual Relationships with Students. As set forth *supra* at Paragraphs 107-108, 235-237, 252, 261, 264, 266, 268 and 278, it did not. This is yet another example of the investigators grasping at straws to find a policy violation.

299.    In their May 2018 report, the investigators referenced Ms. Im's Title IX proceedings. Like Prentice, they purposely left out the source of the E.S. allegations—Cuff and Ms. Im. The investigators also failed to consider that when Dr. Verdú and E.S. each denied their relationship they were less concerned with Princeton's policies (which they had not violated) than the complete and utter havoc that would be wrought on their personal lives—an outcome which, upon information and belief, Cuff and Ms. Im desired.

300.    The investigators also failed to consider whether it was proper to investigate allegations concerning events that occurred years earlier. They pointed to no policy provision which allowed *post hoc* investigations, particularly when neither party to the alleged relationship had come forward and raised concerns. Neither Prentice nor Eisgruber questioned the propriety of the investigation either.

301.    The above-referenced copying of Dr. Verdú's mailbox, "legal hold," searches and review of Dr. Verdú's emails without notice and consent not only violated, upon information and belief, the technology policy in place at the time, but was contrary to the procedures recommended by the American Association of University Professors ("AAUP").

302.    The AAUP has stated that electronic communications can "be used to investigate individuals in ways that were impossible just a decade ago." The AAUP recognizes that "faculty members have a reasonable expectation of privacy in their electronic communications and traffic data" and that a university should not "examine or disclose the contents of electronic

communications and traffic data without the *consent* of the individual participating in the communication except in *rare and clearly defined cases.*" (emphasis added). Moreover, "all parties to the communications should be notified in ample time for them to pursue protective measures."[30]

303.    Eisgruber followed no such protocols when directing the copying, search and of Dr. Verdú's mailbox for personal communications with E.S.

### F.  The Eisgruber Recommendation

304.    On May 21, 2018, President Eisgruber issued a recommendation memo to the Board of Trustees that Dr. Verdú be dismissed from Princeton. In this memo, Eisgruber made a number of misrepresentations and statements that were not supported by the evidence and/or did not support finding a policy violation, including:

   a.   *[E.S.] was under Verdú's supervision*. This is false. The 2015 *Rules and Procedures of the Faculty* define "Academic supervision" as including teaching, advising, supervising research, supervising teaching or grading, and serving as Departmental Representative or Director Graduate Studies of the student's academic program." At no time during their relationship did Plaintiff play any of those roles with respect to E.S. His role was to serve as one of the three readers of her dissertation.[31] Elsewhere Eisgruber stated: "Dr. Verdú… told me, as he had the Provost, that [E.S.] was not under his supervision at the time of the ISIT conference." This was, and remains, the truth. Per her March 2018 recommendation, Prentice found that, even if Dr. Verdú and E.S. had been in a romantic relationship at the time of the conference this would not have violated the policy on Consensual Relationships with Students. Tellingly, Eisgruber's assertion that E.S. was under Dr. Verdú's supervision echoed the claims made by both Ms. Im and Cuff in their *Daily Princetonian* articles.

   b.   *Dr. Verdú and [E.S.] were engaged in a sexual or romantic relationship while they were also in a teacher-student relationship, as defined by the University's policy on Consensual Relations with Students.* This statement, repeated throughout Eisgruber's memo, is false. E.S. took two courses from Dr. Verdú, in Spring 2011 and Fall 2011, and their relationship started in 2014.

---

[30] Academic Freedom and Electronic Communications, *available at* https://www.aaup.org/report/academic-freedom-and-electronic-communications-2014. *See also* https://www.aaup.org/issues/academic-freedom/professors-and-institutions.

[31] Notably, Princeton recently revised its Rules and Procedures of the Faculty to include "serving as a dissertation reader" and "providing letters of reference" in its definition of academic supervision. See Point V.C.2. *available at* https://dof.princeton.edu/rules-and-procedures-faculty-princeton-university-and-other-provisions-concern-faculty/chapter-v-2

c.   *Dr. Verdú's dishonesty harmed [E.S.]. If Dr. Verdú had forthrightly acknowledged his relationship with [E.S.], we might have been able to resolve the case without her.* This is false. E.S. was interviewed by Crotty on April 13, 2017, and denied the extramarital relationship, before Plaintiff was even asked anything about E.S. At that time, E.S. had asked Plaintiff not to acknowledge a relationship between them. Effectively, Eisgruber claimed that if Dr. Verdú had told Crotty that E.S. was lying when she denied the relationship, he would have avoided harming E.S. The spin Eisgruber put on the harm inflicted on E.S. is all the more egregious since, prior to issuing his recommendation, he received a letter from her in which she was unequivocal about who was to blame for the harm done to her, the invasion of her privacy and the degrading treatment she received—Eisgruber, Crotty, Cuff, Burgess and Okubadejo. Eisgruber elected not to disclose this letter to the Board of Trustees even though Prentice had included it in the document file she provided to him. Eisgruber knew that Princeton had harmed E.S. by pursuing stale allegations made by a disgruntled former colleague of Dr. Verdú, about events that took place years prior, and which Kulkarni found no grounds for pursuing in Spring 2017. In her March 2, 2018 recommendation to Eisgruber, Prentice acknowledged *"the significant collateral damage to Dr. [E.S.] (who remains the subject of unresolved allegations and the target of unwanted public attention)."* Furthermore, it is incredible that Eisgruber would not realize that, with his unprecedented actions and the inevitable public airing of the circumstances of Plaintiff's dismissal, he was undermining the legitimacy of E.S.'s doctoral degree in addition to breaching her right to privacy.

d.   Eisgruber referred to Dr. Verdú's *"2015 romantic liaison with a graduate student whose dissertation [he was] evaluating."* Eisgruber ignored that Dr. Verdú and E.S. commenced their relationship in Spring 2014 when, by Princeton's own evidence, he had no professional relationship with E.S. The policy on Consensual Relationships with Students contemplated the commencement of a relationship at a time when two persons had a teacher/student relationship. Eisgruber's use of the word "liaison" further demonstrates that his decision was tainted by personal bias about the fact that E.S. and Dr. Verdú had engaged in an extramarital affair. Eisgruber took into account that E.S. was a student in Dr. Verdú's "department" when finding that he violated the policy on Consensual Relationships with Students—this was not the proper standard or a relevant consideration.

e.   Eisgruber erroneously concluded that Dr. Verdú deliberately misrepresented the timeframe in which he was designated as a reader of E.S.'s thesis, which, in Eisgruber's opinion, impacted Prentice's finding that "even if he had a romantic relationship with [E.S.] during the conference, it would not have constituted a clear violation of the policy on Consensual Relations with Students." Yet Prentice's conclusion on this issue turned on when Dr. Verdú served as an "official reader." Prentice directed Burgess to conduct further investigation, which led Prentice to acknowledge that Dr. Verdú was not an official reader until Fall 2015. Dr. Verdú never denied this role. The May 2018 investigation report also pinpointed

September 2015 as the time in which Dr. Verdú reviewed E.S.'s dissertation and "signed off" on it. However, based on a single email exchange, the report concluded that Dr. Verdú *agreed* to serve as a reader in February 2015. Eisgruber transformed Dr. Verdú's failure to recall when he agreed to read E.S.'s thesis into one of the "substantial and material misrepresentations" upon which Eisgruber based his recommendation of dismissal.

f.   By his own admission, Eisgruber demonstrated that he does not believe that the members of the University community can expect any right to privacy in their personal communications. Eisgruber falsely asserted that he ordered a "*narrowly-tailored search*" of Dr. Verdú's emails, hiding the fact that a large portion of the purported "evidence" against Dr. Verdú post-dated the conferral of E.S.'s degree. In fact, "the appropriately narrow time period" turned out to be the whole body of their emails, from the time she took courses from him in 2011 until 2017, well after E.S. left the university. Upon information and belief, the search violated the technology policy in place at the time. In contrast, Eisgruber ordered no "legal hold" in order to search Ms. Im's or Cuff's email accounts, including their deleted emails, even though there was evidence that Ms. Im had not been forthcoming with the initial emails she provided to the Title IX Panel and that Cuff was behind the initial Title IX complaints—with respect to Ms. Im and E.S.

g.   Eisgruber's memo stated "*If students or faculty members acknowledge misconduct and take responsibility for it, we can work with them to avoid recurrences of the problem and to restore the community's trust in them.*" Eisgruber went on to say: "*In her recommendation, Provost Prentice observed that Dr. Verdú could mitigate the harm from these violations by "respond[ing] more fully and openly." In the event that Dr. Verdú availed himself of this opportunity, she recommended that he be suspended for a period of two years.*" Eisgruber did not identify the members of the community who lost trust in E.S. and Dr. Verdú because they engaged in a consensual relationship that did not violate any existing policy. Eisgruber also failed to identify who had been harmed by the relationship. Indeed, Prentice's investigation revealed no evidence of favoritism towards E.S. and no evidence of a policy violation. Yet Prentice and Eisgruber each sought to penalize Dr. Verdú for defending himself against an unauthorized post hoc invasion of privacy initiated by Ms. Im and Cuff, attempting to coerce a confession from him despite a lack of evidence of wrongdoing. Eisgruber did not explain to the Board of Trustees that the extraordinarily severe penalty of a two-year suspension in exchange for Dr. Verdú's acknowledgment of a consensual relationship with E.S. was proposed by Prentice without any attempt to find a single University rule which would support it, let alone that she proposed the disciplinary measure after concluding that there was insufficient evidence of a policy violation.

h.   Eisgruber mischaracterized Dr. Verdú's email to a friend as a formal letter of reference for E.S., noting "*Their relationship was ongoing …on September 2, 2015, when he recommended her for employment.*" On the contrary, Plaintiff informally emailed one of his former Ph.D. students on the day E.S. was interviewing at his

company to put in a good word for her. This information had not been solicited by E.S.'s potential employer. Such informal communications with former graduate students or other contacts in their industry are routinely sent by faculty on behalf of graduate students with whom they are acquainted. Eisgruber's reliance on this email as evidence of Plaintiff's dishonesty as to whether he wrote letters of reference for E.S. is yet another example of the flimsy evidence relied upon by Eisgruber in recommending Dr. Verdú's dismissal—particularly since Eisgruber could not pinpoint this routine email as the cause of any harm to the University or to other graduate students. As Burgess pointed out in her report to Prentice, Dr. Verdú's grades were consistently fair.

i.   Eisgruber justified his unprecedented breach of Dr. Verdú's privacy by referring to the "gravity of his apparent misconduct." However, he did not explain or argue why serving as a reader on E.S.'s thesis was such a grave offense. Eisgruber did not— because he could not—suggest that E.S. would not have gotten her degree had Dr. Verdú not served as a reader of her dissertation. Upon information and belief, Eisgruber trumped up the purported gravity of what occurred in order to draw attention away from the fact that the investigation into the E.S. allegations was launched in order to appease Ms. Im and to find a reason to exact harsher punishment on Dr. Verdú amidst the campus backlash created by Ms. Im and Cuff.

j.   Regarding the Hong Kong photographs, Eisgruber acknowledged that Dr. Verdú told him that "it looked like him, that he did not deny it was him…that he did not allege [the photographs] were photo-shopped, [and] that he did not dispute the eyewitness identification of him." In fact, Dr. Verdú had even told the investigators that he owned clothing like that shown in the photographs. Yet, Eisgruber concluded that Dr. Verdú was untruthful because he did not recall the bar in the photographs.

k.   Eisgruber did not cite a single University investigation of a consensual relationship between a faculty member and a graduate student who had graduated and left Princeton years prior, let alone one triggered by accusations brought by third parties whose motivations were highly suspect. Eisgruber did not cite to any precedent of any tenured faculty being expelled from the Faculty (even in cases of faculty who had been accused of criminal sexual activity). Eisgruber was only able to cite the case of a faculty member who resigned and joined another University in 2013 after, according to Eisgruber, "lying to University officials about past interactions with students."[32]

l.   Eisgruber incorrectly concluded—despite Dr. Verdú's unblemished record over a 34-year period—that his desire to protect E.S. by not disclosing their relationship equaled dishonesty in all aspects of Dr. Verdú's career. Adding insult to injury, Eisgruber wrote *"We must be able to trust that faculty members are expressing*

---

[32] Notably, in February 2016, Princeton was featured by *The New York Times* for failing to notify future employers about this professor's alleged sexual harassment. https://www.nytimes.com/2016/02/03/us/chicago-professor-resigns-amid-sexual-misconduct-investigation.html.

*honest and impartial judgments when they assess students, participate in personnel processes, review scholarship, or account for contributions to work sponsored by grant-making agencies."* Naturally, Eisgruber did not—and could not—cite a single instance in Dr. Verdú's 34-year career at Princeton in which Dr. Verdú was dishonest or partial when judging a student, participating in personnel processes, reviewing scholarship, or accounting for research contributions to funding agencies. That President Eisgruber felt compelled to invoke this dismal innuendo epitomized the unfairness of his recommendation to the Board of Trustees.

m.  Eisgruber likened Dr. Verdú to a criminal who was beyond "rehabilitation" yet Dr. Verdú had an unblemished prior record, and consensual relationships and social interactions are neither criminal nor do they necessitate rehabilitation. Moreover, Dr. Verdú was deprived of due process in all aspects of the investigation and determination of its outcome, even though his tenure was at stake. There was no hearing, he had no right to confront his accusers, evidence was withheld from him and the charges against him were continuously modified, evidencing the University's intent to punish him in the wake of the Im uproar.

n.  Eisgruber seemed to rejoice in Ms. Im's and Cuff's negative campaign of retaliation against Dr. Verdú, causing Eisgruber to overlook the relevance of Cuff's role. "*There is no doubt that Dr. Cuff and Ms. Im have conducted a vigorous campaign against Dr. Verdú…Animus toward Dr. Verdú might bias Dr. Cuff's own testimony, but neither this case nor the previous one turned on Dr. Cuff's recollections or on any other evidence that he personally provided.*" In accordance with this reasoning, Ms. Im's allegations concerning E.S. should have been disregarded and deemed unworthy of investigation because the case should have turned on whether *E.S.* filed a complaint—she did not—and E.S.'s recollection. Prentice acknowledged this when noting in her recommendation that she felt bound to support E.S. over the anonymous witnesses whom she found lacking in credibility. Eisgruber's statement further suggests that Cuff provided evidence to the University during the investigation. Yet Plaintiff received no "evidence" (let alone "recollections" or "testimony") provided by Cuff during the course of the Title IX investigation or otherwise. Considering the many other omissions and breaches of due process in the investigation—including that Plaintiff was unable to review any evidence against him during the second investigation—it is quite possible that Eisgruber was not misspeaking.

o.  In his disingenuous attempt to disassociate both cases, Eisgruber hid from the Board of Trustees that Cuff and Ms. Im were the sources of the allegations against E.S. and Dr. Verdú, instead attributing them to *"rumors"* from unnamed sources. Unlike Kulkarni, Eisgruber embraced the view that any individual may trigger an investigation of a faculty members for violation of the consensual relationship policy—even in cases where the student has graduated. Yet this position is unsupported by any University policy. Eisgruber omitted from his memo that termination was the goal of Ms. Im's and Cuff's negative publicity campaign against Dr. Verdú.

p.  Though Eisgruber repeatedly asserted that the Title IX proceedings were irrelevant to his decision, he admonished Dr. Verdú for watching a movie with Ms. Im. Eisgruber ignored *Ms. Im*'s solicitation of a closer social relationship, as well as her suggestion that they watch films more explicit than *The Handmaiden*, including up to the time she claimed discomfort at Dr. Verdú allegedly touching her leg. Upon information and belief, Eisgruber's only interest was to parse the Title IX record in a manner that suited his goal of supporting Ms. Im and to find a basis for Plaintiff's termination. Indeed, on March 13, 2018, Plaintiff informed Eisgruber that the Title IX allegation was a hoax fabricated by Cuff and Ms. Im, and that they were the individuals responsible for bringing the accusations about E.S. to the attention of the University. This was not pursued. At a meeting on May 14, 2018 Eisgruber admitted to Plaintiff that he had not even read his appeal of the Title IX ruling, submitted over a month earlier. Days after that meeting, the chair of CCFA wrote to Plaintiff to inform him that the committee "did not accept your appeal." At this point and despite an abundance of evidence, and unwilling to entertain the notion that Plaintiff had been wrongly found responsible for sexual harassment, Eisgruber's goal was, upon information and belief, to quell the firestorm ignited by Ms. Im by terminating Dr. Verdú.

q.  Instead of quoting the emails produced by Dr. Verdú during the Title IX investigation, Eisgruber misrepresented them to the Board of Trustees, blaming Dr. Verdú for the Title IX investigation and "publicity that followed." He also described Dr. Verdú's defense of himself against the Title IX charge and negative publicity campaign as "shameful" and accused him of "blam[ing] his victim."

r.  Despite Eisgruber's statement to Dr. Verdú that the Title IX proceeding had nothing to do with the second investigation concerning E.S., Eisgruber relied upon the sanction issued in the Title IX proceeding to call for Dr. Verdú's dismissal: *"Dr. Verdú's dishonesty occurred while he was on disciplinary probation as a result of a spring 2017 University investigation that found him responsible for sexually harassing a female graduate student who was then his advisee."* Eisgruber's invocation of the probation penalty was another misrepresentation to the Board of Trustees. The June 9, 2017 letter from the Provost states: "you are being placed on probation for one year, effective immediately, with the understanding that any further violation of this policy or attempts to retaliate against those who brought their concerns to the Title IX office will result in more serious disciplinary action." "This policy" refers only to the University's Sexual Misconduct Policy. Thus, relying on the Title IX sanction to dismiss Dr. Verdú was not justified.

305.  On May 29, 2018, Prentice "revised" Dr. Verdú's administrative leave *during the pendency of Dr. Verdú's right to appeal* to the CCFA. The revised leave: i) included transitioning all of his graduate students and postdoctoral researchers to another academic advisor; ii) mandated

that after September 1, 2018, Dr. Verdú would not advise, support or supervise students; iii) beginning on May 29, 2018 effectively banned Dr. Verdú from campus except for the purpose of helping the students in his group find new advisors; iv) required Dr. Verdú to vacate his office by August 31, 2018; and v) prohibited Dr. Verdú from representing Princeton at any conferences. The following day, the University's counsel took it upon himself to add to the restrictions by banning Dr. Verdú from attending commencement. He emailed Dr. Verdú's counsel "[t]here is a firm expectation that Professor Verdú will not be present at Commencement related events next week."

306.    These conditions were imposed before Dr. Verdú filed his appeal and before the CCFA and the Board of Trustees made any determination about Dr. Verdú's future. Prentice effectively terminated Dr. Verdú through the guise of revised administrative leave, demonstrating that the administration expected the CCFA appeal and Board of Trustees process to be merely a pro-forma, sham exercise aimed only at giving the appearance of following the letter of the rules. The process was anything but fair.

307.    The campus ban that resulted from this "revised" leave—even though no final determination had been made as to Dr. Verdú's employment—precluded Dr. Verdú from fulfilling his duties to the National Science Foundation, pursuant to which he served as Principal Investigator and supervised students conducting research over the summer.

### G.  The CCFA Appeal

308.    On June 29, 2018, Dr. Verdú submitted a detailed appeal from Eisgruber's recommendation, which identified its various misstatements and misrepresentations, and requested the opportunity to appear before the CCFA, with counsel, and to present witnesses to a CCFA panel.

309.    The CCFA denied Dr. Verdú's request to have counsel present at any meetings with the CCFA Chair or at the "hearing."

310.    Prior to Dr. Verdú appearing before the panel, the Committee Chair, Professor Richard Register ("Register"), advised him that the panel would not consider any issues related to the Title IX investigation of Ms. Im's allegations. Dr. Verdú was further advised to exclude references to the Title IX proceedings when addressing the CCFA panel.

311.    Prior to the panel convening, the Chair provided Dr. Verdú with a copy of "guidelines" for the CCFA process which he emphasized were not rules. They dated back to 1982.

312.    Dr. Verdú was further advised that the CCFA did not intend to call witnesses at the hearing and whether or not to hear any of his witnesses was a matter within the CCFA's discretion.

313.    On August 14, 2018, Register, informed Dr. Verdú that the format of the hearing would be an oral summary by Dr. Verdú (not allowed to be aided by legal counsel), followed by questions, followed by an executive session to agree on a "decision." Register added that the whole process should take no more than 30 minutes.

314.    The panel assigned to Dr. Verdú's appeal was comprised of Defendants Enquist, Fiske, Mangone, Rosen and Small. Register presided over the "hearing" but had no voting rights with respect to the appeal.

315.    The purported "hearing" before the CCFA panel took place on August 28, 2018 and consisted of Dr. Verdú providing an oral summary of his arguments on appeal. Not one member of the panel asked him a question. None of Dr. Verdú's accusers were present, nor was Eisgruber available for questioning.

316.    As with every investigative and adjudicative process employed against Dr. Verdú, the CCFA panel meeting was not a true hearing and lacked the fundamental fairness that is required in cases involving tenured faculty members facing termination.

317.    The pro-forma nature of the CCFA appeal was evidenced by the panel's two-page report, issued on September 7, 2018. The CCFA abdicated its responsibility to exercise independent judgment on behalf of the Faculty.

318.    In his presentation, Dr. Verdú reminded the panel that, per the CCFA Rules, its task was not to issue a "decision" but to write an independent report. The report, issued 48 hours later, had all the appearances of having been written by the Office of Legal Counsel to bolster Eisgruber's report, rather than to accord the independent examination that the seriousness of the penalty warranted and that the *Rules and Procedures of the Faculty* demanded. In rendering its decision, the CCFA panel:

    a.  Failed to address any of the numerous misrepresentations and unsupported statements made in Eisgruber's recommendation memo, which were detailed in Plaintiff's appeal.

    b.  Applied the wrong technology policy when evaluating the propriety of the University reviewing Dr. Verdú's emails and ignored that the overly broad scope of the search included two years beyond E.S.'s graduation from the University.

    c.  Considered the two years after E.S.'s degree was conferred as relevant to their analysis.

    d.  Overstated Dr. Verdú's role as reader of E.S.'s dissertation in September 2015 and erroneously concluded that Dr. Verdú's relationship violated the Policy on Consensual Relations with Students.

    e.  Improperly relied upon Dr. Verdú's denial of his relationship with E.S. as an aggravating factor warranting termination.

    f.  Wrongly concluded that there were no procedural violations that occurred throughout the investigation process.

g. Refused to acknowledge the indisputable fact that the second investigation would not have occurred but for the desire of the University administration to quell the campus unrest caused by a fabricated accusation and unjust and erroneous finding of sexual harassment. To call the Title IX investigation a "prior unrelated matter," as the CCFA report did, was simply willful blindness.

h. Advanced the theory that Prentice misled Dr. Verdú in her description of what "probation" meant in her June 9, 2017 letter. Then went on to erroneously agree that termination was warranted because Dr. Verdú was on probation as a result of the Title IX proceedings. This confirmed that, despite Prentice's and Eisgruber's assertions that the Title IX proceeding was not relevant to the E.S. allegations, the wrongful outcome of that proceeding was inextricably tied to Dr. Verdú's termination.

319.    On or about September 7, 2018, the CCFA report was submitted to President Eisgruber and an ad-hoc subcommittee of six members of the Board of Trustees.

320.    On September 11, 2018, Eisgruber reaffirmed his decision to terminate Dr. Verdú, forwarding, without change, his May 21, 2018 memorandum to the Board of Trustees, despite the numerous misstatements and misrepresentations that Plaintiff had pointed out.

321.    On September 17, 2018, Dr. Verdú submitted a letter to the ad hoc committee of the Board of Trustees charged with reviewing his case.

322.    On September 18, 2018, Dr. Verdú was notified that an ad hoc committee of the Board of Trustees would meet on September 20, 2018 for one hour, during which the committee chair would make opening remarks, hear from CCFA panel members and then hear from Dr. Verdú. Dr. Verdú was not permitted to be in the room at the same time as the CCFA panel members or to hear their testimony.

323.    The meeting went forward on September 20, 2018. One of the six members of the ad hoc committee was absent from the meeting. The committee spent 10 minutes speaking with the CCFA Chair and two panel members. Dr. Verdú spoke for 15-20 minutes and was asked no questions. Kathryn Hall, the ad hoc committee chair, indicated that the committee's role was only

to make sure procedures had been followed and whether the penalty was commensurate with the alleged misconduct.

324.    On September 24, 2018, Dr. Verdú was notified that the Board of Trustees had terminated his employment, effective as of September 24, 2018.

325.    On the same day, Princeton issued a memorandum to all faculty informing them that, going forward, "the presumptive minimum penalty in any case of sexual harassment must be a one-year unpaid suspension from the faculty." The memorandum, directed to the Faculty from Eisgruber and Kulkarni, noted "Institutions throughout society, including those in higher education, have for too long underestimated the prevalence of sexual harassment and the harm that it does. We have also been too optimistic about the power of good will or relatively light penalties to cure the problem."

326.    In stark contrast to its earlier refusal to provide details concerning the manner in which Plaintiff was disciplined as a result of the Title IX investigation, after Dr. Verdú's termination, the University made a public statement detailing the reasons for its decision.

327.    On September 28, 2018 Ms. Im—who, again, was not a party to the E.S. investigation—made a public statement regarding Dr. Verdú's termination, stating that the University "finally made a decent decision on Verdu's case . . . thanks to students' courageous voices."

328.    As a result of Defendants' above-described acts and omissions, Plaintiff has suffered tremendous damages: including physical pain and suffering, emotional and psychological harm, emotional distress, irreparable harm to his reputation, irreparable harm to his career and his scientific legacy, significant economic losses and consequential damages. Plaintiff's fundamental right to privacy has also been grossly violated.

329.    After 34 years of loyal and distinguished teaching, research and service to Princeton, Plaintiff is unemployed and unemployable. He is unable to collect unemployment benefits because his termination was, allegedly, for cause. Princeton University Press has reneged on their contract to publish "Information Theory" by Plaintiff, a multivolume book manuscript, of which he had already written over 1600 pages.[33] He has no access to a library with which to conduct his research. He cannot fund any research collaborations or attend professional events. His ongoing research with his Princeton collaborators came to a sudden halt after his termination. His appearance in, and co-producer credit for, a documentary feature film he spearheaded were cut from the film.

330.    The University also ordered Plaintiff to pay $376,985.50 in reimbursement for the University's share of equity in his residence, or otherwise sell the home, where he and his family have lived since 1990. He made the payment five weeks after his termination.

331.    The fallacious and erroneous Title IX finding and the details of the biased second investigation have not only been publicized, with Princeton's cooperation, but remain part of Plaintiff's personnel file. Despite the patent malfeasance of the Title IX office, which Plaintiff brought to the attention of Prentice, Eisgruber and the Board of Trustees, Crotty has not been disciplined.

## COUNT I
### Violation of Title IX of the Education Amendments of 1972
### (Erroneous Outcome/Selective Enforcement- Title IX Proceedings)
### (Against The Trustees of Princeton University)

332.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

---

[33] This is presently the subject of a lawsuit captioned *Sergio Verdú v. Princeton University Press*, Docket No. C-10-19, Superior Court of New Jersey, Chancery Division, Mercer County.

333.    Title IX of the Education Amendments of 1972 ("Title IX") provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

334.    Title IX applies to all public and private educational institutions that receive federal funding, which includes Princeton. According to Princeton's Consolidated Financial Statements for the period ending June 30, 2018 and 2017, Princeton received more than $290 million in government grants and contracts. In addition, Princeton receives additional federal assistance in the form of tax breaks, student loans, and Pell grants.

335.    Title IX prohibits sex discrimination against employees of universities that receive federal funding—its protections are not limited to students. Employees, as well as students, have a private right of action under Title IX. *Doe v. Mercy Catholic Medical Center*, 850 F.3d 545, 562 (3d Cir. 2017).

336.    The "prompt and equitable" procedures that a school must implement include, at a minimum: "[n]otice . . . of the procedure, including where complaints may be filed; [a]pplication of the procedure to complaints alleging harassment; . . . [a]dequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence; . . . [and] [d]esignated and reasonably prompt timeframes for the major stages of the complaint process."  Dep't of Ed., *Office for Civ. Rights, Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX* (Jan. 19, 2001), at 20 ("2001 Guidance"); 2011 DCL at p. 9.

91

337.   Title IX Coordinators should not have a conflict of interest. "For example, serving as Title IX coordinator and a disciplinary hearing board member may create a conflict of interest." 2011 DCL at 7; August 2015 Dear Colleague Letter at 2-3.

338.   Title IX may be violated by a school's imposition of university discipline where gender is a motivating factor in the decision to discipline.

339.   Challenges to the outcome of university disciplinary proceedings can fall into two categories: (1) "erroneous outcome" cases, in which the claim is that plaintiff was innocent and wrongly found to have committed an offense and gender bias was a motivating factor behind the erroneous findings; and (2) "selective enforcement" cases, in which the claim asserts that, regardless of the respondent's guilt or innocence, the severity of the penalty and/or decision to initiate the proceeding was affected by the respondent's gender.

340.   To succeed on an erroneous outcome claim under Title IX, a plaintiff must demonstrate: (1) a flawed proceeding, which (2) led to an erroneous outcome; and (3) gender was a motivating factor in the decision to discipline.

341.   An erroneous outcome occurred in this case because Plaintiff was subjected to a blatantly flawed proceeding and erroneously found to be responsible for violating Princeton's Sexual Misconduct Policy, and gender was a motivating factor behind this erroneous outcome.

342.   Plaintiff was deprived of a fair and impartial process with regard to Ms. Im's sexual harassment complaint because without limitation:

   a. Crotty, the Title IX Administrator, had a conflict of interest because she was responsible for Title IX compliance and, as a Panel member, was responsible for deciding Dr. Verdú's case.

   b. The Sexual Misconduct Policy did not provide for Crotty's participation on the Title IX Panel.

   c. Crotty's lack of impartiality was abundantly exhibited during the proceedings, when i) she violated the Sexual Misconduct Policy by meeting with Ms. Im in

the absence of the other Panel members and without informing them or Plaintiff; and ii) when she leaked the news to Ms. Im of a confidential investigation regarding Plaintiff, to which Ms. Im was not a party, and which was not under the purview of Crotty's office.

d. Crotty did not provide Plaintiff with notice of the specific allegations against him until after he was interviewed twice.

e. Crotty withheld evidence from Dr. Verdú, including: i) the date the Title IX complaint was filed; ii) that his disgruntled colleague, Cuff, was behind Ms. Im's filing of the sexual harassment complaint; iii) that the report about Dr. Verdú's consensual relationship with E.S. came from Cuff, Ms. Im and a Stanford University professor, in the same time frame as the Title IX complaint; iv) that Ms. Im informed Crotty that there were pictures of E.S. and Dr. Verdú taken in Hong Kong; v) Ms. Im's secret, altered recording of her conversation with Dr. Verdú; vi) the fact that Cuff became financially responsible for Ms. Im's research assistantship and her travel to a conference in Germany to deliver a paper co-authored with Dr. Verdú; and vii) Crotty's meetings with Ms. Im, in the absence of other members of the Panel, including one in Kulkarni's office. Crotty also redacted laudatory comments about Dr. Verdú from a text exchange to Ms. Im from a fellow graduate student.

f. A "summary" of the Panel's April 18, 2017 interview with Dr. Verdú was prepared several days afterwards and was inconsistent with the notes that Schreyer read to Dr. Verdú at the conclusion of his interview.

g. Only two of the three Panel members were present for Dr. Verdú's second interview, on April 19, 2017. Crotty acted as scribe and wrote a very short summary of the meeting three days later.

h. The Panel did not question Ms. Im's delivery of excerpted email communications with Dr. Verdú or her decision to delete portions of her recorded conversation with him. On the contrary, prejudging the relevance of the evidence collected and then hidden by Ms. Im, Crotty wrote to her "I realize that much of it may be focused on academic issues." The Panel also explained away Ms. Im's omission of email communications which supported Dr. Verdú's account of what happened as an attempt by Ms. Im to downplay her efforts to foster a relationship with Dr. Verdú.

i. The Panel did not question Ms. Im about Cuff, or seek copies of email communications between Ms. Im and Cuff concerning Dr. Verdú.

j. The Panel did not question Cuff. In particular, they made no inquiry about the simultaneity of the accusations made by him, Ms. Im and the Stanford professor, nor about the fact that these accusations and the Title IX complaint occurred right after Cuff's tenure denial.

k. The Panel did not question why Ms. Im was concerned about Dr. Verdú's consensual relationship with E.S., or her motive for bringing forth those allegations.

l. The Panel knew, and concealed from Dr. Verdú, that Ms. Im made the allegation about his relationship with E.S. The Sexual Misconduct Policy required that all information provided by the complainant be provided to the respondent, and vice versa.

m. The Panel did not question why Ms. Im changed her account from Plaintiff brushing against her thigh while they watched a movie, to alleging that he placed his hand on her upper thigh for a prolonged period of time. Nor did they question that she complained to Plaintiff about the single instance in which Plaintiff brushed against her leg, yet lodged a number of new allegations against Plaintiff concerning a number of instances in which she purportedly felt uncomfortable.

n. The Panel dismissed abundant evidence that called Ms. Im's credibility into question, including: i) the inconsistency of her accounts, which varied with time; ii) her accusations regarding E.S., a former graduate student she had not even met; iii) her enthusiastic agreement to watching *The Handmaiden;* iv) her suggestion that she and Dr. Verdú watch *Oldboy* and *Thirst* together after *The Handmaiden,* followed by her false claims of being uncomfortable watching *The Handmaiden,* and that she did not want to spend time with Dr. Verdú outside of work; v) after watching *Oldboy* Ms. Im emailed Dr. Verdú yet another movie suggestion; vi) the absence of any expressions of discomfort to Dr. Verdú other than the brief contact with her leg, as expressed in her March 11, 2017 email and at their subsequent, in-person meeting; vii) Ms. Im's secret recording of Dr. Verdú which contradicted the Panel's subsequent, portrayal of Ms. Im as a reluctant witness who "had not intended to report this matter at all;" viii) her destruction of part of the recording (remarkably, the Panel bolstered her credibility citing that her oral testimony weeks later was consistent with the recording); ix) Ms. Im's selective disclosure of emails to/from Dr. Verdú, and the contradictions between the emails she did not disclose and her account of what happened; x) Ms. Im's effort to conceal that she knew she would be alone with Dr. Verdú to watch the soccer match; xi) Ms. Im's misrepresentations about Dr. Verdú offering her alcohol, when she asked for red wine during each social interaction; xii) Ms. Im's strained account of the cleaning of the wine stain on her shirt and her allegation that it may have been Dr. Verdú, who, unbeknownst to her, was responsible for the stain; xiii) her misrepresentation that "Graduate Student 7" assisted her with her March 11, 2017 email to Dr. Verdú; and xiv) Ms. Im's email to Dr. Verdú, after watching *The Handmaiden*, bemoaning that Dr. Verdú did not invite her to watch the return Champions League soccer match.

o.  The Panel failed to investigate Dr. Verdú's allegation that he believed he was being set up and that this had all the hallmarks of a hoax. Unlike Dr. Verdú, who was completely unaware of Cuff's role, the Panel knew that Cuff was the individual who initiated the Title IX complaint right after his tenure denial. The Panel also knew that Ms. Im had tried to hide her efforts to establish a close relationship with Dr. Verdú, that she had accused Dr. Verdú of having a relationship with E.S. and that she secretly recorded him.

p.  The Panel interviewed no witnesses other than Dr. Verdú and Ms. Im.

q.  Even though a credibility determination was required in these circumstances, no hearing was held and Dr. Verdú had no right to cross-examine Ms. Im.

r.  The individuals responsible for investigating Ms. Im's allegations were responsible for determining whether Dr. Verdú violated the Sexual Misconduct Policy.

s.  Crotty's April 26, 2017 letter incorrectly stated that a "majority decision" would be required for a finding of responsibility when, in proceedings against faculty, a unanimous decision was required.

t.  The Panel impeached Dr. Verdú's credibility by accusing him of trying to mislead the Panel about the nature of *The Handmaiden.* Yet, he bought and provided a DVD of the film to the Panel for its consideration. Two of the Panel members, Turano and Schreyer, declined to watch the film yet the Panel "agreed that the film was very explicit."

u.  The Panel misconstrued the definition of Sexual Harassment, finding that even if Plaintiff did not intend his conduct to be sexual in nature, his behavior was to be judged "by its impact on the person directly affected." The definition of Sexual Harassment required that unwelcome behavior be "*directed at* a person based on sex." With respect to certain of Ms. Im's allegations, she told the Panel that she was unsure whether the alleged conduct was sexual in nature.

v.  By Ms. Im's own account, her professional relationship with Plaintiff was "going smoothly" when she made the Title IX report. It remained professional during the Title IX investigation.

w.  Dean of the Graduate School Kulkarni told Plaintiff on June 15, 2017 that the Title IX Panel "made a case out of nothing."

x.  Turano, one of the three Panel members, advised Plaintiff that he was not going to get far with an appeal of the Title IX finding. Both Turano and Kulkarni advised that, instead of appealing, a preferable course of action was to submit a letter to Prentice to be included in Plaintiff's personnel file.

y.  Turano was proven right in her assessment of Dr. Verdú's chances on appeal. Plaintiff's 55-page, 82-attachment, appeal was dispatched with one sentence by CCFA without even holding a hearing. According to the 2011 Dear Colleague Letter, the 2014 Q&A and the 2001 Guidance, the persons responsible for investigating and determining the outcome of Ms. Im's Title IX complaint and considering Plaintiff's appeal had to be trained in handling sexual harassment complaints as well as Princeton's Sexual Misconduct Policy and procedures for handling student sexual harassment complaints against faculty. *See* 2011 DCL at p. 12; 2014 Q&A at p. 40; 2001 Guidance, at p. 21. Upon information and belief, the CCFA members had no such training.

343.   Apart from the allegations set forth *supra* Paragraph 342, the Panel's report shows that gender bias was a motivating factor behind their erroneous finding that Plaintiff violated the Sexual Misconduct Policy:

a.  The Panel credited Ms. Im's portrayal as a "reluctant" complainant because Plaintiff was "the biggest name in the field" yet by all accounts her professional relationship with Plaintiff was not affected by the alleged harassment, nor did Plaintiff ever pressure Ms. Im to socialize with him or threaten her in any way.

b.  The Panel relied upon the IMDb *Parents*' Guide to determine whether the content contained in *The Handmaiden* was appropriate for a twenty-five-year-old woman, suggesting that they viewed Ms. Im as a child in need of adult supervision and incapable of making her own decisions.

c.  The Panel repeatedly criticized Plaintiff for serving alcohol to Ms. Im in the "middle of the afternoon" ignoring not only that Ms. Im requested red wine on each and every occasion but that she was well beyond the legal drinking age. There were, further, no allegations that either Plaintiff or Ms. Im was incapacitated.

d.  The Panel ignored that Ms. Im suggested that she and Plaintiff watch *Oldboy* and *Thirst* after *The Handmaiden*. These films contain scenes depicting sexual assault, showing full frontal nudity, and other scenes that are sexual in nature. The Panel failed to consider the IMDB *Parents*' Guide entries for those films.

e.  The Panel's report reflected the gender-biased assumption that Plaintiff's actions, such as: agreeing to watch one of the most successful films from Korea; agreeing to watch a second film that Ms. Im suggested (by the same director); resting one's arm on the back of a couch (which Ms. Im said did not seem sexual); inadvertently brushing a person's leg while reaching for a wine bottle; and quickly removing a red wine stain from someone's shirt were sexual in nature simply because Plaintiff is male and Ms. Im is female.

f. The Panel's conclusion that Plaintiff's actions "were sufficiently severe to have the effect of unreasonably interfering with [Ms. Im's] educational experience by creating a hostile or offensive environment," could only be reached by distorting the available evidence (including the email record, which demonstrated that this was not the case) to conclude that Plaintiff had a sexual interest in Ms. Im. This conclusion was, further, unsupported because Ms. Im acknowledged that her relationship with Plaintiff remained professional and was "going smoothly" after they met to discuss her alleged discomfort.

344.   Additional circumstances suggesting that gender bias was a motivating factor, because Princeton was under continuous and severe public pressure for allegedly failing to protect female students from sexual harassment are, without limitation:

a. Since 2014, Princeton was under constant OCR scrutiny, and threat of rescission of federal funds, after the University was found to be in violation of Title IX for using a burden of proof (clear and persuasive evidence) that was too demanding, and for creating a hostile environment for female students. Princeton was required to submit annual reports to OCR, for an indefinite period of time, as a result of these violations. Crotty, a Panel member, was appointed to the position of Title IX Administrator in the wake of Princeton entering into the Resolution Agreement with OCR. Upon information and belief, Princeton has also entered into a number of financial settlements with female OCR complainants.

b. On February 2, 2016, *The New York Times* published an article concerning a former Princeton professor who resigned from University of Chicago due to alleged sexual misconduct with a student who was incapacitated. The article noted that the professor had abruptly resigned from Princeton and that the University had failed to provide information about the professor in response to employer inquiries.

c. In May 2016, a female student filed a complaint with OCR, and an investigation was later opened, into allegations of sexual harassment and sexual assault by a male student or faculty member.

d. During the 2016-2017 academic year, three female graduate students in the German Department left Princeton abruptly, prompting a town hall meeting to address systemic and long-term sexual harassment within the Department. A Title IX investigation was launched in Summer 2017.

345.   Upon information and belief, Princeton has engaged in a pattern of unfair investigations and adjudications resulting in unduly severe sanctions being imposed on males

accused of sexual harassment while not making comparable efforts with respect to allegations of sexual harassment against non-males.

346.    Upon information and belief, Princeton engaged in selective enforcement because, unlike Dr. Verdú, female professors accused of sexual harassment have not been investigated by Title IX administrators, have not been found responsible for sexual harassment and/or have not received probation as a result of a finding of responsibility. The University does not publish this level of detail in its Title IX data[34] and, accordingly, Plaintiff did not have the ability to confirm these facts at the pleading stage. However, annual student surveys published by Princeton indicate that both male and female students have experienced sexual harassment.[35]

347.    Upon information and belief, the University has information in its possession demonstrating that only male professors have been formally investigated, and sanctioned, for sexual harassment since April 2011, when OCR issued the Dear Colleague Letter.

348.    Upon information and belief, the University has not pursued reports of sexual misconduct against female professors or, when it did so, imposed far less severe sanctions than against male professors.

349.    Plaintiff was subjected to a sex-biased, prejudiced and unfair process in violation of Title IX.

350.    The wrongful outcome in the Title IX proceedings further resulted in subsequent, adverse actions by the University, including the second investigation into the E.S. allegations at Ms. Im's prompting and, ultimately, Plaintiff's termination. Among other things, Eisgruber improperly relied on the Title IX sanction to argue to the Board of Trustees that Plaintiff should

---

[34] *See* https://sexualmisconduct.princeton.edu/reports
[35] *See* https://sexualmisconduct.princeton.edu/reports

be more severely disciplined and used it to justify recommending Plaintiff's dismissal. *See supra* ¶ 304, p, r.

351.    This unlawful discrimination in violation of Title IX caused Plaintiff to sustain substantial injury, damage, and loss, including, but not limited to, physical illness, emotional distress, reputational damages, loss of his career, economic injuries and other direct and consequential damages.

352.    As a result, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Princeton to: i) reverse the outcome and findings regarding Ms. Im's complaint; ii) remove all documents and information concerning the Title IX investigation from Plaintiff's personnel records; iii) issue a public apology to Plaintiff for the University's negligent mishandling of the Title IX proceedings and failing protect the confidentiality of the Title IX Panel report; and iv) reinstate Plaintiff to his position as a tenured member of the Faculty.

## COUNT II
### Violation of Title IX of the Education Amendments of 1972
### (Sex Discrimination-Retaliation)
### (Against The Trustees of Princeton University)

353.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

354.    Title IX of the Education Amendments of 1972 ("Title IX") provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

355.    Title IX applies to all public and private educational institutions that receive federal funding, which includes Princeton. According to Princeton's Consolidated Financial Statements

for the period ending June 30, 2018 and 2017, Princeton received more than $290 million in government grants and contracts. In addition, Princeton receives additional federal assistance in the form of tax breaks, student loans, and Pell grants.

356.    Title IX prohibits sex discrimination against employees of universities that receive federal funding—its protections are not limited to students. Employees, as well as students, have a private right of action under Title IX. *Doe v. Mercy Catholic Medical Center*, 850 F.3d 545, 562 (3d Cir. 2017).

357.    Retaliation against a person who complains of sex discrimination constitutes intentional sex discrimination that is actionable under Title IX. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167 (2005); *Mercy Catholic*, 850 F. 3d at 564.

358.    After Plaintiff was erroneously found responsible for sexual harassment, and placed on probation, Ms. Im—dissatisfied with what she perceived as a lax punishment—waged a public campaign to destroy Plaintiff's reputation and career. As part of this campaign, Ms. Im: released altered recordings and confidential Title IX documents to the press; threatened third parties, including E.S., in a failed attempt to coerce damaging information from them; falsely labeled Plaintiff as responsible for sex crimes; called for Plaintiff's removal from conferences and professional organizations; falsely reported the Title IX sanction as requiring only a few hours of counseling; and created a campus wide movement against Plaintiff calling for his termination.

359.    Ms. Im's actions violated not only the Sexual Misconduct Policy, which prohibits retaliation against participants in Title IX proceedings, but the terms of the mutual no contact order in effect at the time which prohibited retaliation, harassment and intimidating behavior towards Plaintiff. Ms. Im also breached the confidentiality requirement of the Title IX proceedings.

360.     At the same time, the University barred Plaintiff from disclosing any evidence, including emails, pertaining to the Title IX proceedings, rendering him unable to defend himself against the baseless and very public smear campaign.

361.     On November 30, 2017, Plaintiff reported to the Acting Chair of the Electrical Engineering Department, Gmachl, that he was suffering physically and emotionally due to the public campaign Ms. Im had waged against him, which was publicly embraced by Gmachl and other colleagues within the Department. Plaintiff told Gmachl that he was experiencing a hostile environment.

362.     In response, Gmachl told Plaintiff that she contributed to that hostile environment as a signatory to a Department petition decrying Plaintiff's alleged misconduct. She then asked Plaintiff to step down as co-director of an upcoming conference. Upon information and belief, Gmachl notified the Office of the Dean of the Faculty and/or the Provost which took no action to address Plaintiff's complaint. Ms. Im's campaign to ruin Plaintiff continued.

363.     On December 11, 2017, Ms. Im petitioned for Dr. Verdú's removal from the same conference.

364.     On December 21, 2017, Plaintiff's counsel notified Princeton's General Counsel that the one-sided vicious publicity campaign concerning the Title IX finding against Plaintiff, including in University publications, created a hostile work environment for Plaintiff. The communication noted that the University made no effort to ameliorate the environment by defending or even explaining the Title IX sanctions imposed on Plaintiff.

365.     On January 10, 2018, *Princeton Alumni Weekly* published an article about Ms. Im's allegations and Princeton's plan to revise its sexual misconduct policies. The article quoted Vice Provost Minter as stating "All across the country, everyone is looking at what [the] norms were

and saying, 'Those norms are not acceptable anymore.'" Minter further stated that there have been cases "where faculty members are separated from the University based on a single [sexual misconduct] case."

366.    On January 23, 2018, Prentice placed Dr. Verdú on administrative leave. The administrative leave precluded Dr. Verdú from teaching, and participating in any conferences, including the conference mentioned to Dr. Verdú by Gmachl. Later, he was even barred from attending the 2018 Commencement ceremony even though no final decision had been made with respect to his employment.

367.    There were no grounds for placing Dr. Verdú on administrative leave at that time as he had complied with the terms of the mutual no communication order with Ms. Im, taught classes during the Fall 2017 semester, with stellar student evaluations, and abided by the onerous confidentiality restrictions placed on him by the administration. While there was an unauthorized and unwarranted investigation into the E.S. allegations pending at the time, those allegations concerned a consensual relationship which took place years prior—no sexual misconduct was alleged.

368.    The University publicly announced Dr. Verdú's administrative leave and it was reported in *The Daily Princetonian*. When Prentice placed Dr. Verdú on leave she told him that the information would be disclosed only to his Department Chair and Acting Chair and the Dean of the Engineering School. He was not informed that the administrative leave would be made public.

369.    Upon information and belief, in or around January 2018, Prentice and/or Crotty provided Ms. Im with details concerning the outcome of the investigation into the E.S. allegations.

Ms. Im then publicized these details in an editorial in *The Daily Princetonian* which was published in February 2018.

370.    After the investigation concluded, on March 2, 2018, Prentice issued a recommendation that, even though there was *no evidence of a policy violation* with respect to the Hong Kong photos, Plaintiff should still suffer a two-year suspension or termination—the outcome depended on whether or not Plaintiff gave "a frank and fulsome explanation of his conduct at the ISIT conference in June 2015." There was no policy or rule which supported disciplining a faculty member in the absence of a policy violation.

371.    Because Plaintiff elected to continue telling the truth about his lack of recollection of the bar depicted in the Hong Kong photographs (yet did not deny that the individual looked like him), and when he agreed to be a reader of E.S.'s dissertation (yet did not deny serving as a reader), President Eisgruber decided to further investigate Plaintiff. On April 11, 2018, he ordered Burgess and Okubadejo to search Plaintiff's university email account—going back at least seven years and encompassing deleted emails—which had been placed on a "legal hold" months prior without Plaintiff's knowledge and, upon information and belief, in violation of the technology policy in place at the time. There was no pending litigation at the time.

372.    Through the email search the investigators and Eisgruber trumped up the charges against Plaintiff, though the purported evidence they found did not support a policy violation. The University's counsel then sought Plaintiff's resignation, which he refused.

373.    On May 21, 2018, Eisgruber issued a recommendation for Plaintiff's termination which was grounded in mischaracterizations of the evidence and relevant policies.

374.    On May 29, 2018, Prentice revised Plaintiff's administrative leave, effectively banning him from campus, and preventing him from conducting research, even though the time had not yet run for Plaintiff to submit an appeal to the CCFA.

375.    On September 24, 2018, Plaintiff was officially terminated after an appeal to the CCFA, which was denied, and confirmation of Eisgruber's recommendation by the Board of Trustees.

376.    Upon information and belief, Plaintiff was singled out as the scapegoat for the University's perceived failure to address the sexual harassment of female students at the hands of male faculty members, inflamed by Ms. Im's malevolent publicity campaign calling for Plaintiff's termination in the wake of the rise of the #MeToo movement.

377.    Upon information and belief, when Plaintiff elected to defend himself including by lodging a complaint concerning the hostile work environment he was being subjected to, he was targeted for retaliation. The University failed to act on his complaint. When he continued to defend himself, and obtained counsel, the efforts to find him guilty of wrongdoing—to create a plausible justification to terminate him—were redoubled.

378.    The above stated acts of retaliation against Plaintiff for complaining that he was being subjected to a hostile environment, and defending himself against an unauthorized and unwarranted investigation, constituted unlawful discrimination in violation of Title IX and caused Plaintiff to sustain substantial injury, damage, and loss, including, but not limited to, physical illness, emotional distress, reputational damage, loss of career, economic injuries and other direct and consequential damages.

379.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

380.    Plaintiff is also entitled to injunctive relief directing Princeton to: (i) reverse the decision to terminate Plaintiff; (ii) remove all documents and information concerning Plaintiff's termination from his personnel records; (iii) issue a public apology to Plaintiff; and (iv) reinstate Plaintiff to his position as a tenured member of the Faculty.

**COUNT III**
**Violation of Title IX of the Education Amendments of 1972**
**(Sex Discrimination)**
**(Against The Trustees of Princeton University)**

381.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

382.    Title IX of the Education Amendments of 1972 ("Title IX") provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

383.    Title IX applies to all public and private educational institutions that receive federal funding, which includes Princeton. According to Princeton's Consolidated Financial Statements for the period ending June 30, 2018 and 2017, Princeton received more than $290 million in government grants and contracts. In addition, Princeton receives additional federal assistance in the form of tax breaks, student loans, and Pell grants.

383.    Title IX prohibits sex discrimination against employees of universities that receive federal funding—its protections are not limited to students. Employees, as well as students, have a private right of action under Title IX. *Doe v. Mercy Catholic Medical Center*, 850 F.3d 545, 562 (3d Cir. 2017).

384.    Plaintiff is male and thus a member of a protected class under Title IX.

385.    On September 24, 2018 Princeton terminated Plaintiff for purported violations of the policy of Consensual Relationships with Students and the policy on Dishonesty. As detailed *supra* ¶¶ 226-288, Plaintiff did not violate these policies.

386.    Plaintiff's purported violations were a pretext for his termination. Plaintiff was a male faculty member and Princeton had been heavily criticized for failing to take seriously female students' allegations of sexual harassment by male faculty members.

387.    The University also sought a means to appease campus advocates, including Ms. Im, who called out Princeton's failure to protect female students from sexual harassment within the context of the #MeToo movement. As reported in the Chronicle of Higher Education in November 2017—after Ms. Im's *Huffington Post* article was published—the "fury" of #MeToo "raised the stakes" for universities. Upon information and belief, this fury caused Princeton to take action after action against Plaintiff to find some grounds for termination, despite the fact that he had already been sanctioned, albeit erroneously, through the Title IX process.[36]

388.    In March 2017, Cuff approached the Dean of the Graduate School, Kulkarni, about allegations that Plaintiff had engaged in a consensual relationship with graduate student E.S., who received her Ph.D. from Princeton in Fall 2015.

389.    Kulkarni found no basis for investigating these allegations because E.S. was no longer a student and she, herself, had not made a complaint against Plaintiff.

390.    No sexual misconduct was alleged as to E.S.

---

[36] As noted by the Second Circuit in *Doe v. Columbia*, 831 F.3d 46, n. 11 (2d Cir. 2016), "a fear of negative publicity or of Title IX liability, are not necessarily…lawful motivations distinct from sex bias….A covered university that adopts, even temporarily, a policy of bias favoring one sex over the other in a disciplinary dispute, doing so in order to avoid liability or bad publicity, has practiced sex discrimination."

391.    Neither the *Rules and Procedures of the Faculty* nor the policy on Consensual Relationships with Students authorized *post-hoc* investigations of consensual relationships between professors and graduate students once the graduate student in question left the University.

392.    In or around April 2017, *Ms. Im* resurrected the E.S. allegation to the Title IX administration when making her own report at the urging of Plaintiff's disgruntled colleague, Cuff. However, allegations concerning consensual relationships between faculty and graduate students fell within the purview of the Dean of the Faculty—not Title IX.

393.    Regardless, Crotty took it upon herself to interview E.S. E.S. denied that she had been involved in a romantic relationship with Plaintiff, let alone that he had engaged in any sexual misconduct. E.S. made no request to file a complaint against Plaintiff at this, or any other, time.

394.    The Title IX investigation of Ms. Im's allegations continued and Plaintiff was erroneously found responsible for sexual harassment, for which he received one year of probation, could not take a planned sabbatical and had to participate in mandatory counseling.

395.    Prior to this finding, over the course of his 34 years of teaching at Princeton, Plaintiff had an unblemished disciplinary record. After Ms. Im's allegations were publicized, a number of former students, male and female, as well as a long list of academics around the world, wrote to the University in strong support of Plaintiff.

396.    Ms. Im relentlessly pursued Plaintiff's termination—though she never appealed the Title IX decision despite having the option to do so.

397.    The focus of Ms. Im's attack was E.S., from whom she tried to coerce allegations of sexual misconduct against Plaintiff—to no avail.

398.    Having informed Crotty at the time of the Title IX investigation of the existence of 2015 Hong Kong photographs surreptitiously taken by "her friends," Ms. Im threatened E.S. that

her "friends from Europe" were willing to testify to the University that they had seen her with Plaintiff in Hong Kong. Ms. Im then convinced her friends (whose identities were never disclosed to Plaintiff) to submit the photographs to the University.

399.    Upon receipt of the photographs, Crotty informed Ms. Im that the University was opening a new investigation into an event that pre-dated Ms. Im's attendance at Princeton and purportedly involved a student who had long since moved on from Princeton. At that point, Plaintiff had not even been notified of the new investigation.

400.    Even though Ms. Im was not a party to the alleged events, University administrators, upon information and belief Crotty, later kept Ms. Im apprised of developments in the E.S. investigation, the details of which she later revealed to *The Daily Princetonian* without any ramifications. In contrast, Plaintiff was required to sign a confidentiality agreement that prevented disclosure of any details of the investigation while it was pending.

401.    In Summer 2017, even though no investigation was pending, Kulkarni recused himself from matters concerning Plaintiff. Upon information and belief, this was directed by University counsel. The *Rules and Procedures of the Faculty* provided no grounds for this recusal.

402.    In September 2017, Prentice appointed Turano and Burgess to handle the investigation, in violation of the *Rules and Procedures of the Faculty*. Shortly thereafter, and without explanation, the entire Office of the Dean of the Faculty was recused from investigating the E.S. allegations. Prentice then replaced Turano with an outside attorney, Okubadejo—who had previously worked for OCR and whose investigation techniques were questioned in a pending Title IX lawsuit—to serve as an investigator with Burgess. This was not authorized by the *Rules and Procedures of the Faculty*.

403.    Despite several requests, it was never explained to Plaintiff why, in violation of the *Rules and Procedures of the Faculty*, an outside lawyer was hired and Turano was dropped from the investigation. In her March 2, 2018 recommendation letter, Prentice made a number of misrepresentations concerning Okubadejo's appointment and Kulkarni's recusal. *See supra* ¶¶ 272-273.

404.    During the course of the E.S. investigation, the #MeToo movement took root on campus, with Ms. Im at the helm, causing a campaign of hate against Plaintiff and accusing the University administration of treating him laxly. Evidently, Plaintiff, as a male faculty member, had to be severely punished in order for the University to protect its reputation which was under fire for doling out lax punishments to male faculty members and had been under OCR scrutiny since 2014 for generally failing to protect female students from sexual misconduct by males. In Prentice's March 2, 2018 recommendation letter to Eisgruber she cited the "great cost to the reputation and functioning of the University."

405.    At any point during Ms. Im's campaign, the University could have requested permission from Plaintiff to publicly clarify the sanctions issued to Plaintiff as a result of the Title IX proceeding. University administrators made no effort to do so, instead relying on Minter to make public statements which tacitly supported Ms. Im. *See supra* ¶¶ 207, 208, 217, 221.

406.    Notably, during the investigation Plaintiff did not deny that he was the male in the Hong Kong photos—this was later acknowledged by President Eisgruber in his recommendation that Plaintiff be dismissed from the University.

407.    In March 2018, Prentice issued a recommendation that Plaintiff be suspended for two years—but only if he gave "a frank and fulsome explanation of his conduct at the ISIT conference in June 2015." Otherwise, Prentice recommended termination. Prentice rightfully

concluded that—with respect to the Hong Kong photos—a relationship between E.S. and Plaintiff in Summer 2015 *did not* violate the policy on Consensual Relationships with Students. Rather, Prentice admonished Plaintiff for "talking, flirting and kissing" a "young woman" at a public bar. She recommended termination, in essence, because Plaintiff defended himself against the unwarranted investigation and invasion of his privacy.

408.    Prentice's recommendation letter referenced #MeToo and acknowledged Prentice's habit of taking women "at their word." Prentice proceeded to favor Ms. Im, a third-party accuser, over E.S., who denied the allegations. Prentice also ignored numerous letters of support from Plaintiff's female colleagues.

409.    Prentice claimed that Ms. Im's Title IX allegations had no bearing on the second investigation even though her recommendation pointed to those allegations as a "more concerning example" of "harmful" conduct—yet Prentice had already sanctioned Plaintiff by, among other things, placing him on probation for one year for that alleged conduct.

410.    Subsequent to Prentice's recommendation, without Plaintiff's knowledge, Eisgruber directed Burgess and Okubadejo to search Plaintiff's emails for evidence of a relationship between Plaintiff and E.S. The search went well beyond the scope of the allegations, which pertained to Spring and Summer 2015. Upon information and belief, this violated the technology policy in place at the time. The emails revealed a consensual relationship between E.S. and Plaintiff, which commenced in 2014, and which the investigators then shoehorned into a policy violation even though the relationship did not violate the 2015 policy on Consensual Relationships with Students. In doing so they included emails which post-dated E.S.'s receipt of her Ph.D.

411.    On May 21, 2018, Eisgruber recommended Plaintiff's dismissal from the University. The recommendation contained a number of statements indicating that gender bias

influenced Eisgruber's recommendation: i) Eisgruber's use of the phrase "liaison" to describe Plaintiff and E.S.'s relationship; ii) the factually incorrect assertion that E.S. was harmed by Plaintiff's failure to disclose their relationship because Princeton may have been able to resolve the case without her involvement; iii) Eisgruber's conclusion that Plaintiff was responsible any negative publicity that resulted from the Title IX investigation; iv) Eisgruber's refusal to consider Ms. Im's motive in bringing forth the E.S. allegations; and v) after refusing to read Plaintiff's appeal of the Title IX finding, Eisgruber said it was "shameful for [Plaintiff] to blame his victim." Eisgruber also seemed to rejoice in Ms. Im's retaliatory campaign, acknowledging "[t]here is no doubt that Dr. Cuff and Ms. Im have conducted a vigorous campaign against [Plaintiff]."

412.    Shortly after the recommendation issued, Prentice revised Plaintiff's administrative leave to effectively terminate him before his appeal could be heard by the CCFA.

413.    The CCFA—which had previously rejected Plaintiff's Title IX appeal—abdicated its responsibility, pursuant to the *Rules and Procedures of the Faculty*, to give independent advice to the Board of Trustees. CCFA held a sham hearing and simply ignored the arguments in the Plaintiff's appeal.

414.    A five-member ad-hoc sub-committee of the Board of Trustees took 30 minutes to hear from the CCFA *and* Plaintiff, and asked no questions of Plaintiff.

415.    Unlike Princeton's failure to publicly clarify Plaintiff's Title IX sanction when criticized for issuing a lax punishment, the University issued a public statement concerning Plaintiff's termination which included details about the reasons for his termination.

416.    Princeton's relentless pursuit of an unauthorized and unwarranted investigation at Ms. Im's—not E.S.'s—insistence concerning events that occurred years before, after Princeton

was widely criticized for failing to protect female students from male professors and issuing a lax punishment against Plaintiff, constituted intentional sex discrimination in violation of Title IX.

417.    This unlawful discrimination in violation of Title IX caused Plaintiff to sustain substantial injury, damage, and loss, including, but not limited to, physical illness, emotional distress, reputational damages, loss of his career, economic injuries and other direct and consequential damages.

418.    As a result, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Princeton to: (i) reverse the decision to terminate Plaintiff; (ii) remove all documents and information concerning Plaintiff's termination from his personnel records; (iii) issue a public apology to Plaintiff; and (iv) reinstate Plaintiff to his position as a tenured member of the Faculty.

**COUNT IV**
**Violation of Title VII of the Civil Rights Act of 1964 (42 U.S.C. §2000e *et seq*.)**
**(Against The Trustees of Princeton University)**

419.    All conditions precedent to averring this claim herein have been fulfilled. On March 12, 2019, Plaintiff filed a timely Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"). Plaintiff did not cross-file this charge with the New Jersey Civil Rights Commission, electing instead to pursue his state law claims through the court system. *See* N.J.S.A. 10:5-13. The EEOC charge number is 524-2019-00879. On April 4, 2019, the EEOC issued Plaintiff a Notice of Right to Sue. This action was filed within 90 days of Plaintiff's receipt of the Notice. Annexed hereto as **Exhibit 1** is a copy of the Notice.

420.    Plaintiff repeats and re-alleges each and every allegation above as if fully set forth herein.

112

421.    At all relevant times, Plaintiff was a tenured faculty member and an "employee" of Princeton as that term is defined by Title VII of the Civil Rights Act of 1964 ("Title VII").

422.    At all relevant times, Princeton was Plaintiff's "employer" as that term is defined by Title VII.

423.    Upon information and belief, as a graduate student with a paid research assistantship, Ms. Im was also an "employee" of Princeton as defined by Title VII.

424.    Plaintiff was employed by Princeton for over thirty-four (34) years as a tenured faculty member in the Department of Electrical Engineering. Since 2008 he was the holder of an endowed chair, the Eugene Higgins Professor of Electrical Engineering. During that time, and until June 2017, Plaintiff had an unblemished disciplinary record.

425.    In Spring 2017, as set forth *supra* Paragraphs 92-120, false allegations of sexual harassment were lodged against Plaintiff by Ms. Im and disgruntled employee Cuff.

426.    Even though there was no change in their professional relationship after these events Ms. Im claimed that Plaintiff sexually harassed her and filed a Title IX complaint.

427.    Following Ms. Im's complaint, and after the Panel erroneously found him responsible for sexual harassment under the Sexual Misconduct Policy, on June 9, 2017, Prentice issued Title IX sanctions against Plaintiff pursuant to which he was placed on probation for one year, he could not take a planned sabbatical and he was required to attend counseling. Ms. Im had the right to appeal the Title IX finding but never did so.

428.    Shortly thereafter, the University required Dean of the Faculty, Kulkarni, to recuse himself from any matters concerning Plaintiff. Upon information and belief, this is because Kulkarni believed that Princeton had made a "case out of nothing" with respect to Ms. Im and had

113

previously told Cuff that there was no basis to investigate the E.S. allegations because E.S. had graduated and did not file a complaint.

429.    Dissatisfied with the finding, on June 16, 2017, Ms. Im convened a meeting with Prentice and Crotty and demanded that Plaintiff be terminated.

430.    On the next day, Ms. Im emailed Crotty about allegations made by her unnamed "friends" that Plaintiff was allegedly seen kissing E.S. at a bar in Hong Kong in June 2015.

431.    On September 19, 2017—before Plaintiff was even notified—Crotty arranged a meeting with Ms. Im and told her that Princeton had enough information to proceed with an investigation into the E.S. allegations.

432.    On September 25, 2017, Prentice notified Plaintiff that Princeton was investigating "conduct with a now former graduate student." Prentice appointed Turano—rather than Kulkarni who should have been responsible—and then replaced Turano with outside counsel, Okubadejo, to investigate with Burgess. These actions violated the procedures outlined in the 2017 *Rules and Procedures of the Faculty*.

433.    Subsequently, as set forth *supra* Paragraphs 177-225, Ms. Im continued to engage in a public campaign to discredit Plaintiff, and unjustifiably portray him as a sexual predator, in an effort to force the University to fire Plaintiff. Her baseless allegations gained steam against the backdrop of the #MeToo movement.

434.    Ms. Im's campaign against Plaintiff included, but was not limited to, i) disclosing confidential University Title IX records and altered recordings of University employees to the press; ii) making false claims against Plaintiff in an article published by the *Huffington Post*; iii) encouraging social media posts against Plaintiff within the construct of the #MeToo movement;

iv) filing complaints with professional associations to which Plaintiff belonged; and v) publicly accusing him of sex crimes.

435.    Ms. Im's *Huffington Post* article prompted a firestorm of negative and injurious publicity against Plaintiff among the Princeton community, including the plastering of flyers across campus with Plaintiff's photo, calls for his termination, false accusations and unsubstantiated rumors which Ms. Im fueled by publishing an editorial about Plaintiff in *The Daily Princetonian* newspaper.[37]

436.    During the Title IX proceedings, the University placed Ms. Im on notice that the information obtained through, and disseminated to her during, the Title IX investigation was to remain confidential. Yet after the publication of the *Huffington Post* article, through which Ms. Im disclosed said confidential information, the University took no steps to quell the harassment of Plaintiff, enforce the prohibition against Ms. Im or warn her in any way to refrain from further disclosing confidential information obtained through the Title IX process. As a result, Ms. Im continued to use the confidential documents in her campaign against Plaintiff, including by disclosing them to at least one professional organization to which Plaintiff belonged.

437.    When Ms. Im publicly mischaracterized the sanction imposed on Plaintiff as only a few hours of counseling, the University took no steps to remedy the misstatement, or to clarify that Plaintiff had been placed on probation and prohibited from taking a planned sabbatical. Through this deliberate inaction, the University encouraged and tacitly condoned the harassment against Plaintiff.

---

[37] Plaintiff was also the target of negative and injurious publicity in the local media, which likened him to other prominent public figures who were the subject of the #MeToo Movement.

438.     At the time of Ms. Im's campaign against Plaintiff, the University had already been the subject of more than one OCR investigation for allegedly failing to protect its female students from sexual harassment.

439.     The University was also embroiled in a public sexual harassment scandal concerning male professors in the University's German Department allegedly harassing female students and, in the weeks following the rebirth of the #MeToo movement, was, upon information and belief, more interested in fostering a reputation for protecting females rather than protecting Plaintiff's rights.

440.     All the while, Plaintiff was under a gag order, as the University warned him against disclosing exculpatory email communications with Ms. Im and any other information from the Title IX proceedings.

441.     Upon information and belief, Ms. Im was also subject to such confidentiality orders. Curiously, however, the University chose not to enforce them against *her*. During the relevant time frame, Ms. Im and Plaintiff were also parties to a no communication order which prohibited harassing or intimidating behavior. The University chose not to enforce this against Ms. Im.

442.     Essentially, the University barred Plaintiff from coming to his own defense while simultaneously allowing Ms. Im to unabashedly and publicly attack Plaintiff.

443.     When the University did choose to publicly comment on the matter, it unequivocally commended and supported Ms. Im. *See supra* ¶¶ 207, 208, 217, 224.

444.     Plaintiff—now a victim of Ms. Im's retaliation and campus-wide harassment—was offered no assistance. On the contrary, his requests for assistance were rebuffed.

445.     On November 30, 2017, Plaintiff complained to the Acting Chair of the Engineering Department, Gmachl, that he was suffering from chest pains and high blood pressure

as a result of the hostile work environment he was being subjected to as a result of Ms. Im's actions and the University's lack of response. He pointed to the additional stress caused by the decision of 19 professors in the Department to publish the letter in *The Daily Princetonian*.

446.    Plaintiff told Gmachl that he was being treated unfairly because he was barred from speaking about the Title IX proceedings and defending himself against Ms. Im's mischaracterizations. In contrast, Ms. Im was commended and supported for violating confidentiality.

447.    In response, Gmachl told Plaintiff that she was a signatory to the letter decrying Plaintiff's alleged misconduct and then she asked him to step down as co-chair of an upcoming conference that Plaintiff had organized and which was to take place in Princeton in March 2018. Upon information and belief, Gmachl notified the Office of the Dean of the Faculty and/or the Provost who took no actions to address Plaintiff's complaint. Ms. Im's campaign continued. *See supra* ¶¶ 212-224.

448.    Subsequent to Plaintiff's complaint to Gmachl, Princeton received continuing attention in the national and local media for failing to protect female students from sexual harassment, including. *See supra* ¶¶ 212-224.

449.    On December 21, 2017, Plaintiff's counsel notified Princeton's General Counsel that the one-sided publicity concerning the Title IX finding against Plaintiff, including in University publications, created a hostile work environment for Plaintiff. The communication, which included several attachments documenting the vicious campaign against Plaintiff, noted that the University made no effort to ameliorate the environment by defending or even explaining the sanctions imposed on Plaintiff.

450.     Rather than take steps to publicly clarify Plaintiff's sanctions, the University continued to tacitly support Ms. Im. For instance, on January 10, 2018, *Princeton Alumni Weekly* published an article about Ms. Im's allegations and Princeton's plan to revise its sexual misconduct policies. The article quoted Minter as stating "All across the country, everyone is looking at what [the] norms were and saying, 'Those norms are not acceptable anymore.'" Minter further stated that there have been cases "'where faculty members are separated from the University based on a single [sexual misconduct] case.'"[38]

451.     On January 23, 2018, Prentice met with Plaintiff and required him to sign a confidentiality agreement in order to review the investigation report that was issued over a month prior, on December 20, 2017.

452.     On the same day, Plaintiff was placed on administrative leave and was prohibited from teaching, representing Princeton or participating in any conferences. There was no basis to place Plaintiff on leave because he was fully compliant with the terms of his probation and had received stellar evaluations for classes taught during the Fall 2017 semester. He also abided by the onerous confidentiality restrictions placed on him by the administration. The second investigation, concerning the E.S. allegations, was ongoing and Prentice had not yet issued her recommendation to Eisgruber.

453.     The University publicly announced that Plaintiff was placed on administrative leave and it was reported in *The Daily Princetonian*. When Prentice placed Dr. Verdú on leave she told him that the information would be disclosed only to his Department Chair and Acting Chair and the Dean of the Engineering School. He was not informed that the administrative leave would be made public.

---

[38] https://paw.princeton.edu/article/sexual-harassment-case-complaint-citing-faculty-adviser-sparks-outcry-campus.

454.    On February 25, 2018, *The Daily Princetonian* published a Letter to the Editor by Ms. Im (upon information and belief Cuff drafted or assisted Ms. Im), asking "What is consensual?" In the letter, Ms. Im publicly revealed the confidential details of the second investigation—to which Ms. Im was neither a party nor a complainant—as well as more confidential information discussed with Ms. Im during the Title IX investigation.

455.    On March 2, 2018, Prentice ultimately found that there was not enough evidence to find Plaintiff responsible for violating the University's policy on Consensual Relationships with Students, or establish that E.S. was the woman in the photo from Hong Kong. Yet she still recommended to Eisgruber that Plaintiff be terminated unless he provided a "frank and fulsome" explanation in Hong Kong, in which case Prentice recommended that Plaintiff be suspended for a period of two years. There was no support for the recommended discipline—nor did Prentice cite any University rules that would support it.

456.    Per Prentice's written recommendation, in Prentice's judgment, Plaintiff should not have been seen "sitting with a young woman 'talking, flirting and kissing' at a public bar.'"

457.    With respect to E.S., Prentice took her word over the alleged eyewitnesses in Hong Kong (whose identities were never disclosed to Plaintiff) because, according to Prentice, "[i]f the #MeToo movement has emphasized anything, it is the importance of *taking women at their word* when it comes to their interactions and relationships with men in positions of power." (emphasis added).

458.    Though Prentice took E.S. at "her word," which supported that *no policy violation* occurred, she found that, regarding the same allegations, Plaintiff was not credible and forced him to choose between admitting wrongdoing (which had not occurred) or face termination. Indeed, Prentice was infuriated that Plaintiff did not admit that he had a consensual relationship with E.S.,

ignoring that the University was invading Plaintiff's and E.S.'s privacy by conducting an unauthorized, *post hoc* investigation into their relationship.

459.    Prentice's reasoning also showed that when faced with an infuriated, and public, #MeToo accuser over a female supporter of a male accused, that she believed the accuser even where, as here, Ms. Im was a third-party with no personal knowledge of whether Plaintiff and E.S. engaged in a consensual relationship. In this respect, it is also noteworthy that Prentice had received letters supportive of Plaintiff from various women who had worked under his supervision over the years.

460.    Dissatisfied with Prentice's decision that the penalties and conclusions arrived at by the attorney investigators were not supported by the evidence, Eisgruber ordered the investigators to search Plaintiff's computer and University email account for evidence of a relationship between E.S. and Plaintiff. *See supra* ¶¶ 289-303.

461.    The investigators reviewed emails dating back to October 2011 and through May 2017. Notably, E.S. graduated from the University in November 2015. The email communications showed that Plaintiff and E.S. had been involved in a consensual relationship, which the investigators concluded began "sometime in April 2014."

462.    Based on the ill-gotten emails, the investigators stretched the evidence and definitions in the policy on Consensual Relationships with Students to find that Plaintiff violated the policy. On May 8, 2018, the investigators issued a report of their erroneous findings. *See supra* ¶¶ 289-303.

463.    In their May 2018 report, the investigators referenced Ms. Im's Title IX proceedings. Upon information and belief, like Prentice they intentionally left out the source of

the E.S. allegations—Ms. Im and Cuff. This information had been included in the investigators earlier report, in December 2017.

464.    On May 21, 2018, Eisgruber issued a recommendation that Plaintiff be dismissed from the University. This recommendation was subsequently presented to the Board of Trustees. *See supra* ¶¶ 304-307, 318. Eisgruber's recommendation memorandum contained a number of statements that were indicative of sex discrimination against Plaintiff including: i) Eisgruber's reference to Plaintiff's relationship with E.S. as a "romantic liaison;" ii) Eisgruber's statement that E.S. was harmed by Plaintiff's failure to disclose their relationship, when Crotty interviewed E.S. during the Title IX investigation—before Plaintiff was interviewed—and Eisgruber was in possession of a letter from E.S. that squarely placed the blame for any resulting harm to her on the administration; iii) Eisgruber likened Plaintiff to a criminal in need of "rehabilitation," even though consensual relationships are not criminal and do not require rehabilitation; iv) after refusing to read Plaintiff's Title IX appeal, Eisgruber falsely accused Plaintiff of "victim blaming" though there was clear evidence that Ms. Im coordinated with Cuff to bring false allegations against Dr. Verdú; v) Eisgruber rejoiced in Ms. Im's negative publicity campaign against Plaintiff and blamed him for bringing such publicity upon himself—rather than recognizing that Ms. Im violated confidentiality and the no contact order.

465.    On May 29, 2018, Prentice "revised" Plaintiff's administrative leave *during the pendency of* his right to appeal to the CCFA, effectively banning him from campus. This action was taken before Plaintiff's appeal was heard by the CCFA and before the Board of Trustees made any decision concerning whether or not Plaintiff should be terminated.

466.    On June 29, 2018, Plaintiff appealed Eisgruber's recommendation to the CCFA.

467.   The CCFA met with Plaintiff on August 28, 2018. The purported "hearing" before the CCFA panel consisted of a 45-minute meeting before a panel of faculty members (one of whom was not physically present) at which Plaintiff provided an brief, oral summary of his arguments on appeal. Not one member of the panel asked him a question. None of Dr. Verdú's accusers were present, nor was Eisgruber available for questioning by Plaintiff.

468.   On September 7, 2018 the CCFA submitted a two-page report to the Board of Trustees which affirmed Eisgruber's recommendation and suggested that Plaintiff's appeal was a mere sham process. Upon information and belief, the "report" was written by the University's General Counsel. It overlooked, and did not address, a total of eighteen (18) misstatements made by Eisgruber in his recommendation and that were pointed out by Plaintiff. It also contained a number of misstatements and incorrect conclusions about the evidence—or lack thereof—against Plaintiff. *See supra* ¶¶ 308-319. The CCFA did not consider that the investigation into Plaintiff's relationship with E.S. was not authorized by any policy and resulted from Ms. Im's continuous and relentless pressure on the University to terminate Plaintiff.

469.   On September 20, 2018, Plaintiff met with an ad-hoc committee of the University's Board of Trustees (one member of which was absent) which asked no questions of Plaintiff.

470.   Plaintiff was terminated and immediately dismissed from the University as of September 24, 2018. As a result, Plaintiff's access to his email and to library resources were abruptly terminated on that date, even though University policy is to allow former students, scholars and faculty members (including Cuff) continued access to their accounts for an orderly transition of their ongoing work. Plaintiff has been unable to collect unemployment benefits. The University also ordered Plaintiff to pay $376,985.50 in reimbursement for the University's share

of equity in his residence, or otherwise sell the home, where he and his family have lived since 1990. He made the payment five weeks after his termination.

471.    In stark contrast to its earlier refusal to provide details concerning the manner in which Plaintiff was disciplined as a result of the Title IX investigation, after Plaintiff's termination, the University made a public statement detailing the reasons for its decision.

472.    Ms. Im—who again was not a party to the E.S. investigation—gave a public statement that the University finally made a "decent decision" in regard to Plaintiff.

473.    Based on the foregoing, Princeton discriminated against Plaintiff on the basis of his sex, subjected Plaintiff to a hostile work environment on the basis of his sex and terminated Plaintiff on the basis of his sex, in violation of Title VII.

474.    Based on the foregoing, Princeton retaliated against Plaintiff, subjected Plaintiff to a hostile work environment and terminated Plaintiff because of his opposition to discriminatory practices, in violation of Title VII.

475.    This unlawful discrimination in violation of Title VII caused Plaintiff to sustain substantial injury, damage, and loss, including, but not limited to, physical illness, emotional distress, reputational damages, loss of his career, economic injuries and other direct and consequential damages.

476.    As a result, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Princeton to: (i) reverse the decision to terminate Plaintiff; (ii) remove all documents and information concerning Plaintiff's termination from his personnel records; (iii) issue a public apology to Plaintiff; and (iv) reinstate Plaintiff to his position as a tenured member of the Faculty.

**COUNT V**
**(State Law Employment Discrimination Pursuant to N.J.S.A. 10:5-1 et seq.[39])**
**(Hostile Work Environment, N.J.S.A. 10:5-12(a))**
**(Against The Trustees of Princeton University)**

477.     Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

478.     Plaintiff was an employee as defined by New Jersey's Law Against Discrimination.

479.     Upon information and belief, as a graduate research assistant, Ms. Im is also an employee.

480.     Princeton is an employer as defined by New Jersey's Law Against Discrimination.

481.     Following the investigation of Ms. Im's Title IX complaint, on June 9, 2017, Plaintiff was placed on probation for one year, could not take a planned sabbatical and was required to attend counseling after he was erroneously found responsible for sexual harassment under the Sexual Misconduct Policy.

482.     Dissatisfied with the fact that Plaintiff was not terminated, in mid-June 2017 Ms. Im convened a meeting with Prentice and demanded that Princeton terminate him.

483.     Ms. Im had the right to appeal the Title IX finding but never did so.

484.     Instead, Ms. Im engaged in a public campaign to discredit Plaintiff and unjustifiably portray him as a sexual predator in an effort to force the University to terminate Plaintiff.

485.     Her baseless allegations gained steam against the backdrop of the #MeToo movement. In *The Daily Princetonian's* "Notable Moments From the 2017-2018 Year" the publication noted:

> With the backdrop of the MeToo movement this past year, the 'Prince' revealed allegations against a professor in the German department, as well as the department's alleged culture of gender discrimination. In the Department of

---

[39] This Court may exercise supplemental jurisdiction over these claims. *See Schneider v. Shah*, 507 Fed. Appx. 132, 138 (3d Cir. 2012); *Butler v. Sherman Silverstein & Kohl, P.C.*, 755 F. Supp. 1259, 1266 & n. 9 (D.N.J. 1990)

Electrical Engineering, the 'Prince' also reported on the Title IX investigation into Professor Sergio Verdú, who was eventually found responsible for sexual harassment.

486.     In mid-October 2017, the #MeToo movement re-emerged nationwide as a women's movement against sexual harassment and sexual violence, the primary purpose of which was not only to vocalize women's experiences but to publicly identify alleged male perpetrators to be dealt with in the court of public opinion. The #MeToo movement caused the public downfall of a number of men in high profile jobs and positions of power—sometimes without due process or a process of any kind. The public outcry of the movement does not always include a sense of proportionality with respect to the punishments called for against alleged male perpetrators, making no distinction between acts considered offensive or improper versus violent assaults.

487.     One year after the emergence of #MeToo *The New York Times* reported "at least 200 prominent men have lost their jobs after public allegations of sexual harassment. A few… face criminal charges…. And nearly half of the men who have been replaced were succeeded by women."

488.     On November 13, 2017, the *Chronicle of Higher Education* published an article about the impact of the #MeToo movement on higher education:

> The galvanizing momentum of the #metoo campaign has forced many industries to confront widespread sexual harassment and assault in their midsts. Academe is no exception. Propelled by admiration for those who have spoken out, fear that what happened to them could happen to others, and anger at how long abusers have gone unpunished, women have come forward in droves to report instances of sexual assault….Campus officials have struggled to determine how to punish abusive employees….But the new wave of revelations and accusations has raised the stakes, and the fury of the #metoo movement has tapped into could have a longstanding impact on higher education.

489.     Ms. Im's #MeToo campaign against Plaintiff was grounded in mischaracterizations as to what occurred. Ms. Im's actions included: (i) disclosing confidential University Title IX records and deliberately altered recordings of University employees to the press; (ii) making false

125

and unsubstantiated comments against Plaintiff in an article published by the *Huffington Post*; (iii) encouraging social media posts against Plaintiff within the construct of the #MeToo movement; (iv) filing complaints with professional associations to which Plaintiff belonged; and (v) publicly accusing Plaintiff of sex crimes.

490.    Ms. Im's harassing and intimidating behavior violated the terms of the mutual no communication order in effect at the time, as well as Princeton's Sexual Misconduct Policy.

491.    Ms. Im's *Huffington Post* article prompted a firestorm of negative publicity at the University, leading to the plastering of flyers across campus with Plaintiff's photo, calls for his termination, false accusations and unsubstantiated rumors which Ms. Im fueled by publishing an editorial about Plaintiff in *The Daily Princetonian* newspaper.

492.    The University took no steps to quell the harassment of Plaintiff or prohibit Ms. Im from revealing confidential information obtained through the Title IX process.

493.    When Ms. Im publicly mischaracterized the sanction imposed on Plaintiff as only a few hours of counseling, the University took no steps to remedy the misstatement. Through this deliberate inaction, the University encouraged and tacitly condoned the harassment against Plaintiff by choosing to remain silent.

494.    At the time of Ms. Im's campaign against Plaintiff, the University had already been the subject of more than one OCR investigation for failing to protect its female students from sexual misconduct by males.

495.    The University was also embroiled in a public sexual harassment scandal concerning male professors in the University's German Department harassing female students and, in the weeks following the rebirth of the #MeToo movement, was, upon information and belief, more interested in fostering a reputation for protecting females than assisting Plaintiff.

496.     All the while, Plaintiff was under a gag order, as the University warned him against disclosing confidential information from the Title IX proceedings.

497.     Upon information and belief, Ms. Im was also subject to such confidentiality orders. Curiously, however, the University chose not to enforce them against her.

498.     Essentially, the University barred Plaintiff from coming to his own defense while simultaneously allowing Ms. Im to unabashedly and publicly attack Plaintiff.

499.     As a result, Plaintiff was unable to properly defend himself against Ms. Im's accusations and the unsubstantiated rumors that were the subject of campus discourse, including nearly a dozen articles in *The Daily Princetonian* attacking his character.

500.     When the University did choose to comment on the matter, it unequivocally supported Ms. Im.

501.     Plaintiff—now a victim of Ms. Im's retaliation and campus-wide harassment—was offered no assistance.

502.     For example, in late November 2017, a petition was presented to President Eisgruber which urged the University to "deliver a punishment that is proportionate to the damage [Plaintiff's] victim [Ms. Im] has endured." In response, Vice Provost Minter published a letter in *The Daily Princetonian* which began "I am responding on behalf of all the recipients. Like the signatories to the petition, the University recognizes the power imbalance inherent in the relationship between faculty and students and is committed to providing an environment free from discrimination."

503.     On November 27, 2017, the University held a "town hall" meeting "in response to widespread outrage at the actions of…[Plaintiff]." Ms. Im attended the meeting and asked the

speaker panel, including Minter, "what kind of behavior, if not that of [Plaintiff's] hypothetical counterpart, merited suspension or termination or other, visible punishments."

504.    On November 30, 2017, Plaintiff complained to the Acting Chair of the Electrical Engineering Department, Gmachl, that he was suffering from chest pains and high blood pressure as a result of the hostile work environment he was being subjected to as a consequence of Ms. Im's actions and the University's lack of response. He pointed to the additional stress caused by the decision of 19 professors in the Department to publish a letter in *The Daily Princetonian* which condemned him.

505.    Plaintiff told Gmachl that he was being treated unfairly because he was barred from speaking about the Title IX proceedings and defending himself against Ms. Im's mischaracterizations. In contrast, University administrators publicly commended Ms. Im for violating confidentiality.

506.    Upon information and belief, Gmachl notified the Office of the Dean of the Faculty and/or the Provost which took no action to address Plaintiff's complaint. Ms. Im's smear campaign continued.

507.    In response, Gmachl told Plaintiff that she was a signatory to the letter decrying Plaintiff's alleged misconduct and then she asked Plaintiff to step down as co-chair of an upcoming conference he had already organized.

508.    On December 11, 2017, Ms. Im emailed 205 graduate students and postdoctoral fellows asking them to sign a petition to remove Dr. Verdú as the co-director of the *2018 Conference on Information Sciences and Systems*. This was the same conference from which Gmachl had asked Dr. Verdú to step down.

128

509.    On December 21, 2017, Plaintiff's counsel notified Princeton's General Counsel that the one-sided publicity concerning the Title IX finding against Plaintiff, including in University publications, created a hostile working environment for Plaintiff. The communication noted that the University took no efforts to ameliorate the environment by defending or even explaining the sanctions imposed on Plaintiff.

510.    On January 10, 2018, *Princeton Alumni Weekly* published an article about Ms. Im's allegations and Princeton's plan to revise its sexual misconduct policies. The article quoted Minter as stating "All across the country, everyone is looking at what [the] norms were and saying, 'Those norms are not acceptable anymore.'" Minter further stated that there have been cases "'where faculty members are separated from the University based on a single [sexual misconduct] case.'"

511.    Shortly thereafter, on January 23, 2018, Plaintiff was placed on administrative leave and was prohibited from teaching, and participating in any conferences. There was no basis for this as Plaintiff had fully complied with the terms of his probation, and the no contact order, and had received stellar evaluations from the students he taught during the Fall 2017 semester. Plaintiff also complied with the onerous confidentiality restrictions placed on him by the administration. The University publicized Plaintiff's administrative leave and it was reported in *The Daily Princetonian*. Plaintiff was not informed that this information would be made public.

512.    Not only did the University encourage Ms. Im's harassment of Plaintiff, Prentice opened a second, unwarranted investigation into allegations originally lodged by *Ms. Im* and Cuff concerning Plaintiff's consensual relationship with E.S.

513.    E.S. never made a report or complaint about Plaintiff to the University.

514.    Ms. Im and Cuff first raised the issue of a consensual relationship between Plaintiff and E.S. in Spring 2017. At that time, Dean Kulkarni determined that since there had been no formal complaint made, and E.S. had graduated, an investigation was unwarranted.

515.    The University's policy on Consensual Relationships with Students did not provide for *post hoc* investigations concerning students who had already graduated.

516.    E.S. was not sexually harassed by Plaintiff, nor was any sexual misconduct alleged with respect to E.S.

517.    Regardless, University administrators attempted to coerce E.S. into admitting that Plaintiff had an improper relationship with her that violated University policies. This was simply not the case.

518.    Despite a complete lack of evidence that any sexual misconduct occurred with respect to E.S., the University pressed on, seeking a means to more harshly punish Plaintiff to appease Ms. Im and her followers.

519.    After opening the second investigation, Prentice hired an outside attorney to serve as investigator, thereby violating the procedures outlined in the University's 2017 *Rules and Procedures of the Faculty*. The attorney, Okubadejo, along with Burgess, focused the investigation on photographs produced by friends of *Ms. Im* which they claimed showed E.S. and Plaintiff kissing at a bar in Hong Kong during a conference that took place two years earlier, in Summer 2015. The conference was not sponsored by Princeton.

520.    On February 25, 2018, *The Daily Princetonian* published a Letter to the Editor by Ms. Im (upon information and belief, Cuff drafted or assisted Ms. Im with the letter) asking "What is consensual?" In the letter, Ms. Im publicly revealed the confidential details of the second investigation—to which Ms. Im was neither a party nor a complainant—as well as more

confidential information discussed with Ms. Im during the Title IX investigation. In contrast, Plaintiff had been forced to sign a confidentiality agreement.

521.     On March 2, 2018, Prentice ultimately found that there was not enough evidence to find Plaintiff responsible for violating the University's policy on Consensual Relationships with Students, or establish that E.S. was the woman in the photo from Hong Kong. Yet she still recommended to Eisgruber that Plaintiff either be terminated or, at least, suspended for a period of two years.

522.     Prentice's recommendation was based in part on her judgment that Plaintiff should not have been seen "kissing, and flirting with," a younger woman in Hong Kong.

523.     Prentice was also infuriated that Plaintiff did not admit that he had a consensual relationship with E.S., ignoring that the University was invading Plaintiff's and E.S.'s privacy by conducting an unauthorized, *post hoc* investigation into their relationship.

524.     Prentice's recommendation acknowledged that she made it a habit of taking women "at their word." Yet Prentice elected to favor Ms. Im's account of what happened over E.S.'s, denial, even though Ms. Im was a third party, evidencing a bias in favor of believing female *accusers*.

525.     Dissatisfied with Prentice's uncertainty, Eisgruber directed investigators to retrieve and review the email communications stored in Plaintiff's University account which, curiously, had been copied and then placed on a legal hold months' prior. Upon information and belief, the secret legal hold and email search violated the technology policy that was in place at the time.

526.     The investigators reviewed emails dating back to October 2011 and through May 2017. Notably, E.S. graduated from the University in November 2015. The email communications

showed that Plaintiff and E.S. had been involved in a consensual relationship, which the investigators concluded began "sometime in April 2014."

527.    Based on the ill-gotten emails, the investigators stretched the evidence and definitions in the policy on Consensual Relationships with Students to find that Plaintiff violated the policy.

528.    On May 21, 2018, Eisgruber recommended Plaintiff's dismissal from the University. The recommendation contained a number of statements indicating that gender bias influenced Eisgruber's recommendation: i) Eisgruber's use of the phrase "liaison" to describe Plaintiff and E.S.'s relationship; ii) the factually incorrect assertion that E.S. was harmed by Plaintiff's failure to disclose their relationship because Princeton may have been able to resolve the case without her involvement; iii) Eisgruber's conclusion that Plaintiff was responsible any negative publicity that resulted from the Title IX investigation; iv) Eisgruber's refusal to consider Ms. Im's motive in bringing forth the E.S. allegations; and v) refusing to read Plaintiff's Title IX appeal, Eisgruber stated that is was "shameful for [Plaintiff] to blame his victim." Eisgruber seemed to rejoice in the negative publicity against Plaintiff, stating "[t]here is no doubt that Dr. Cuff and Ms. Im have conducted a vigorous campaign against [Plaintiff]."

529.    Shortly after the recommendation issued, Prentice revised Plaintiff's administrative leave to effectively terminate him before his appeal could be heard by the CCFA.

530.    The CCFA abdicated its responsibility holding a sham hearing and ignoring the arguments in the Plaintiff's appeal. The CCFA failed to conduct the independent evaluation of Plaintiff's appeal that was required by the *Rules and Procedures of the Faculty*.

531.    A five-member ad-hoc sub-committee of the Board of Trustees took 30 minutes to hear from the CCFA *and* Plaintiff, and asked no questions of Plaintiff.

532.    Unlike Princeton's failure to publicly clarify Plaintiff's Title IX sanction when criticized for issuing a lax punishment, the University issued a public statement concerning Plaintiff's termination which included details about the reasons for his termination.

533.    On September 28, 2018 Ms. Im—who, again, was not a party to the E.S. investigation—made a public statement regarding Dr. Verdú's termination that the University wrote "finally made a decent decision on Verdu's case . . . thanks to students' courageous voices."

534.    This unlawful discrimination in violation of New Jersey's Law Against Discrimination caused Plaintiff to sustain substantial injury, damage, and loss, including but not limited to physical illness, emotional distress, reputational damages, loss of his career, economic injuries and other direct and consequential damages.

535.    As a result, Plaintiff is entitled to damages in an amount to be determined at trial, including punitive damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Princeton to: (i) reverse the decision to terminate Plaintiff; (ii) remove all documents and information concerning Plaintiff's termination from his personnel records; (iii) issue a public apology to Plaintiff; and (iv) reinstate Plaintiff to his position as a tenured member of the Faculty.

**COUNT VI**
**(State Law Employment Discrimination Pursuant to New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 et seq.)**
**(Aiding and Abetting Hostile Work Environment, N.J.S.A. 10:5-12(e))**
**(Against Eisgruber, Prentice, Crotty, Minter and Gmachl)**

536.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

537.    Eisgruber, Prentice, Crotty, Minter and Gmachl are Princeton employees as defined under New Jersey's Law Against Discrimination.

538.   Eisgruber aided and abetted the University in discriminating against Plaintiff, and creating a hostile environment, when he failed to direct University employees to enforce the confidentiality restrictions of the Title IX proceedings against Ms. Im; failed to direct employees to enforce the anti-harassment and anti-intimidation provisions of the mutual no contact order against Ms. Im; failed to direct University employees to publicly clarify the sanction that was imposed on Plaintiff as a result of the Title IX proceedings; participated in a public response to the petition to terminate Plaintiff that supported the petition; turned a blind eye to Plaintiff's Title IX appeal; and supported Ms. Im's "vigorous campaign" against Plaintiff in his recommendation.

539.   Prentice aided and abetted the University in discriminating against Plaintiff, and creating a hostile environment, when she: failed to enforce the confidentiality restrictions of the Title IX proceedings against Ms. Im yet imposed restrictions on Plaintiff so that he could not defend himself; failed to enforce the anti-harassment and anti-intimidation provisions of the mutual no contact order against Ms. Im; failed to publicly clarify the sanction that was imposed on Plaintiff after Ms. Im publicly misstated, and minimized, the sanction; participated in a public response to the petition to terminate Plaintiff that supported the petition; and failed to take any action when Plaintiff complained about the hostile environment that he faced.

540.   Crotty aided and abetted the University in discriminating against Plaintiff, and creating a hostile environment, when she failed to enforce the confidentiality restrictions of the Title IX proceedings against Ms. Im yet imposed restrictions on Plaintiff so that he could not defend himself; failed to enforce the anti-harassment and anti-intimidation provisions of the mutual no contact order against Ms. Im; failed to publicly clarify the sanction imposed on Plaintiff after Ms. Im publicly misstated, and minimized, the sanction; and participated in a town hall meeting about Plaintiff at which Ms. Im called for a more severe punishment for Plaintiff.

541.    Minter aided and abetted the University in discriminating against Plaintiff, and creating a hostile environment, when she failed to notify Ms. Im that Plaintiff was placed on probation as a result of the Title IX proceedings; failed to publicly clarify the sanction imposed on Plaintiff after Ms. Im publicly misstated the terms of the sanction; participated in a town hall meeting about Plaintiff at which Ms. Im called for a more severe punishment for Plaintiff; publicly supported the petition to terminate Plaintiff and made public statements that tacitly supported Ms. Im.

542.    Gmachl aided and abetted the University in discriminating against Plaintiff, and creating a hostile environment, when she ignored Plaintiff's complaint that he was suffering physical and emotional distress as a result of Ms. Im's campaign of harassment and, instead, told Plaintiff that she supported Ms. Im's petition by signing a letter against Plaintiff. Gmachl also aided and abetted the hostile work environment by signing the letter and asking Plaintiff to step down from an upcoming conference.

543.    This unlawful discrimination in violation of New Jersey's Law Against Discrimination caused Plaintiff to sustain substantial injury, damage, and loss, including but not limited to physical illness, emotional distress, reputational damages, loss of his career, economic injuries and other direct and consequential damages.

544.    As a result, Plaintiff is entitled to damages in an amount to be determined at trial, including punitive damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## COUNT VII
**(State Law Employment Discrimination Pursuant to N.J.S.A. 10:5-1 et seq.)**
**(Retaliation, N.J.S.A. 10:5-12(d)-Against The Trustees of Princeton University,**
**Eisgruber, Gmachl, Minter and Prentice)**

545.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

546.    Plaintiff was a Princeton employee as defined by New Jersey's Law Against Discrimination.

547.    Upon information and belief, as a graduate research assistant Ms. Im is also a Princeton employee.

548.    Princeton is an employer as defined by New Jersey's Law Against Discrimination.

549.    After Plaintiff was erroneously found responsible for sexual harassment, and placed on probation, Ms. Im—dissatisfied that Plaintiff was not terminated—waged a public campaign to destroy Plaintiff's reputation and career. As part of this campaign, Ms. Im released altered recordings and confidential Title IX documents to the press, threatened third parties, including E.S., in order to coerce damaging information from them (there was none), falsely labeled Plaintiff as responsible for sex crimes, called for Plaintiff's removal from conferences and professional organizations, falsely reported the Title IX sanction as requiring only a few hours of counseling and created a campus wide movement against Plaintiff calling for his termination.

550.    Ms. Im's actions violated not only the Sexual Misconduct Policy, which prohibits retaliation against participants in Title IX proceedings, but the terms of the mutual no contact order in effect at the time which prohibited retaliation, harassment and intimidating behavior. Ms. Im also breached the confidentiality requirement of the Title IX proceedings.

551.    At the same time, the University barred Plaintiff from disclosing any evidence, including emails, pertaining to the Title IX proceedings or defending himself against the baseless campaign.

552.    On November 30, 2017, Plaintiff reported to Gmachl that he was suffering physically and emotionally due to the public campaign Ms. Im had waged against him, which was then publicly embraced by the Electrical Engineering Department. Plaintiff told Gmachl that he was experiencing a hostile environment.

553.    In response, Gmachl told Plaintiff that she was a signatory to a Department letter decrying Plaintiff's alleged misconduct and then she asked Plaintiff to step down as co-director of an upcoming conference. Upon information and belief, Gmachl notified the Office of the Dean of the Faculty and/or the Provost who took no actions to address Plaintiff's complaint. Ms. Im's campaign continued.

554.    On December 11, 2017, Ms. Im petitioned for Plaintiff's removal from the same conference.

555.    On December 21, 2017, Plaintiff's counsel notified Princeton's General Counsel that the one-sided publicity concerning the Title IX finding against Plaintiff, including in University publications, created a hostile working environment for Plaintiff. The communication noted that the University made no effort to ameliorate the environment by defending or even explain the sanctions imposed on Plaintiff.

556.    On January 10, 2018, *Princeton Alumni Weekly* published an article about Ms. Im's allegations and Princeton's plan to revise its sexual misconduct policies. The article quoted Vice Provost Michelle Minter as stating "All across the country, everyone is looking at what [the] norms were and saying, 'Those norms are not acceptable anymore.'" Minter further stated that there have

been cases "where faculty members are separated from the University based on a single [sexual misconduct] case."

557.   On January 23, 2018, Prentice placed Plaintiff on administrative leave. The administrative leave precluded Plaintiff from teaching, participating in any conferences, including the conference mentioned to Plaintiff by Gmachl. The University publicly announced this information and it was reported in *The Daily Princetonian*. When Prentice placed Dr. Verdú on leave she told him that the information would be disclosed only to his Department Chair and Acting Chair and the Dean of the Engineering School. He was not informed that the administrative leave would be made public.

558.   There were no grounds to place Plaintiff on administrative leave at that time as he had complied with the terms of the mutual no communication order with Ms. Im, taught classes during the Fall 2017 semester without incident, and received stellar student evaluations, and abided by the onerous confidentiality restrictions placed on him by the administration. While there was an unauthorized and unwarranted investigation into the E.S. allegations pending at the time, those allegations concerned a *consensual* relationship which took place years prior—no sexual misconduct was alleged.

559.   Upon information and belief, in or around January 2018, Prentice and/or Crotty provided Ms. Im with details concerning the outcome of the investigation into the E.S. allegations. Ms. Im then publicized these details in an editorial in *The Daily Princetonian* which was published in February 2018.

560.   After the investigation concluded, on March 2, 2018, Prentice issued a recommendation that, even though there was no evidence of a policy violation with respect to the Hong Kong photos, Plaintiff should still suffer a two-year suspension or termination—the outcome

depended on whether or not Plaintiff elected to give "a frank and fulsome explanation of his conduct at the ISIT conference in June 2015."

561.     Because Plaintiff elected to continue telling the truth about his lack of recollection of the bar depicted in the pictures and the date he became a reader of E.S.'s dissertation, Eisgruber decided to further investigate Plaintiff by having outside attorneys search Plaintiff's university email account—which had been placed on a "legal hold" months prior.

562.     Through the email search the investigators and Eisgruber trumped up the charges against Plaintiff, though the purported evidence they found did not support a policy violation.

563.     On May 21, 2018, Eisgruber issued a recommendation for Plaintiff's termination which was grounded in mischaracterizations of the evidence.

564.     On September 24, 2018 Plaintiff was officially terminated after an appeal to the CCFA, which was denied, and confirmation of Eisgruber's recommendation by the Board of Trustees.

565.     Upon information and belief, Plaintiff was singled out as the scapegoat for the University's perceived failure to the address sexual harassment of female students at the hands of male faculty members, inflamed by Ms. Im's negative publicity campaign and the #MeToo movement.

566.     When Plaintiff elected to defend himself including by obtaining counsel and lodging complaints concerning the hostile work environment he was being subjected to, he was retaliated against. When he continued to defend himself, the efforts to find him guilty of wrongdoing and to terminate him were redoubled.

567.     The above stated acts of retaliation against Plaintiff for complaining that he was being subjected to a hostile environment, and defending himself against an unauthorized and

unwarranted investigation, constituted unlawful discrimination in violation of New Jersey's Law Against Discrimination and caused Plaintiff to sustain substantial injury, damage, and loss, including, but not limited to, physical illness, emotional distress, reputational damage, loss of career, economic injuries and other direct and consequential damages.

568.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## COUNT VIII
### State Law-Breach of Contract
### (Against The Trustees of Princeton University)

569.    Plaintiff repeats and re-alleges each and every allegation above as if fully set forth herein.

570.    The University's *Rules and Procedures of the Faculty* comprise an express or implied contract containing the core rules and policies with which tenured faculty are expected to comply in order to maintain their teaching status at, and remain employed by, the University.

571.    The University's Sexual Misconduct Policy is incorporated by reference into the *Rules and Procedures of the Faculty*. The Sexual Misconduct Policy set forth an express set of rules applicable to cases in which a Title IX complaint is alleged against a faculty member.

572.    During the course of the Title IX investigation into Ms. Im's sexual harassment allegations, the University breached the Sexual Misconduct Policy by:

a.    Failing to take action when Ms. Im violated the terms of the mutual no communication order by acting in a retaliatory, harassing and intimidating manner against Plaintiff. Sections 1.3.1 and 1.3.5.2.

b.    Failing to evaluate the evidence presented to the Panel under the totality of the circumstances, including the context in which it occurred. Section 1.3.1.

140

c. Conducting a biased investigation in which the credibility of the complainant was never disputed, despite evident indications of contradictions, progressive embellishments and falsehoods in her statements to the Title IX Panel, her unusual efforts to establish a close relationship with her advisor, her destruction of evidence, and her connivance with Cuff. Section 1.3.10.

d. Misapplying the definition of "sexual harassment" because the conduct alleged was not "sufficiently severe and or pervasive," was not directed at Ms. Im on the basis of her sex, and was not "especially serious" because there was no quid pro quo alleged. Section 1.3.3.2.

e. Failing to provide Plaintiff with written notice of Ms. Im's full allegations until after he had been interviewed twice. Section 1.3.13.1. Moreover, the charge letter incorrectly stated that a majority—rather than unanimous—decision was sufficient to find Plaintiff responsible. *Id.*

f. Conducting a second interview of Plaintiff with only two of three Panel members present. *Id.*

g. Crotty's meeting with Ms. Im in the absence of the other Panel members, and without Plaintiff's knowledge. *Id.*

h. Failing to provide Plaintiff with a rigorous, unbiased and impartial process, despite the obvious dangers to his career and reputation. Sections 1.3.10, 1.3.13.1.

i. Redacting relevant information from the case filed presented to Plaintiff, not just "personally identifiable information." Section 1.3.13.1.

j. Withholding evidence from Plaintiff, including Ms. Im's secret recording of their conversation, her simultaneous accusation of a relationship with E.S, information concerning Cuff's report to the Title IX office and its timing, and the various meetings between Crotty, Ms. Im and other University administrators. *Id.*

k. Misapplying the preponderance of the evidence standard. Section 1.3.13.1.

l. When determining the sanction, failing to consider Plaintiff's unblemished disciplinary record over 34 years and the seriousness of the misconduct as to like cases in the past. Section 1.3.13.2.

m. Failing to notify Ms. Im that Plaintiff was placed on probation for one year. *Id.*

n. Advising Plaintiff to write a letter for his personnel file rather than submitting an appeal. Section 1.3.13.3.

o.   Failing to adequately train CCFA members. *Id.*

p.   With respect to Plaintiff's Title IX appeal, the CCFA, failed to follow the apply the appropriate standards, as set forth in the Sexual Misconduct Policy.

573.   As a result of the direct, proximate, and foreseeable consequences of the foregoing breaches, Plaintiff was erroneously found responsible for sexual harassment and erroneously sanctioned. Plaintiff was then subjected to a campaign of retaliation against him by Ms. Im and members of the faculty and student body. He was then the subjected to an unauthorized and unwarranted second investigation into allegations concerning his consensual relationship with E.S. and, ultimately, terminated because the erroneous Title IX finding was used as leverage against Plaintiff.

574.   As a result of the direct, proximate, and foreseeable consequence of the foregoing breaches, Plaintiff sustained substantial injury, damage, and loss, including, but not limited to, physical illness, emotional distress, reputational damage, loss of employment, loss of his career, and other direct and consequential damages.

575.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest.

**COUNT IX**
**State Law-Breach of Contract**
**(Against The Trustees of Princeton University)**

576.   Plaintiff repeats and re-alleges each and every allegation above as if fully set forth herein.

577.   The University's *Rules and Procedures of the Faculty* comprise an express or implied contract containing the core rules and policies with which tenured faculty are expected to comply in order to maintain their status at, and remain employed by, the University.

578.    The University's *Rules and Procedures of the Faculty*, in effect when Princeton conducted an investigation of the E.S. allegations, expressly set forth the procedures to be followed when a violation of the *Rules and Procedures* has been alleged against a faculty member.

579.    In the case of the University's investigation into the allegation that Plaintiff violated the 2015 policy on Consensual Relationships with Students, the University violated Section N of the applicable *Rules and Procedures of the Faculty* by:

a.   Deciding to investigate the E.S. allegations—which involved a student who had already left the University and who did not make a report or complaint against Plaintiff—when the *Rules and Procedures of the Faculty* made no provision for *post hoc* investigations.

b.   Forcing Kulkarni to recuse himself from the investigation though the *Rules and Procedures of the Faculty* made no provision for such recusal and required the Dean of the Faculty to conduct the investigation.

c.   Appointing Turano to conduct the investigation and then forcing the recusal of the entire Office of the Dean of the Faculty.

d.   Replacing Turano without an outside attorney, without notice and without explaining the reason despite repeated inquiries.

e.   Permitting Crotty, Title IX Administrator, to interview E.S. during the second investigation though there were no pending Title IX allegations and her participation was not provided for in the *Rules and Procedures of the Faculty*.

f.   Hiring a potentially biased outside attorney, Okubadejo, and firm, Ballard Spahr, to conduct the investigation when the *Rules and Procedures of the Faculty* made no provision for the use of outside investigators.

g.   Electing to apply the preponderance of the evidence standard—the lowest burden of proof—even though Plaintiff's tenure was at stake and the applicable *Rules and Procedures of the Faculty* did not require that this standard be applied.

h.   The investigators' finding that Plaintiff violated the 2015 policy on Consensual Relationships with Students even though the evidence did not support such a violation.

i.   Prentice concluding that no policy violation occurred and then recommending either a two-year suspension or Plaintiff's dismissal.

j.   Violating the technology policy in place at the time by placing Plaintiff's emails on legal hold and subsequently having Okubadejo and Burgess conduct a broad search of his email account for information concerning E.S.

k.   Failing to adhere to the stated policy of upholding the security of academic tenure.

l.   Prentice and Eisgruber recommending Plaintiff's dismissal, which was not "commensurate with the nature of the offense," particularly since the evidence did not support a violation of the 2015 policy on Consensual Relationships with Students, Eisgruber admitted that Plaintiff had *not been* dishonest with respect to the Hong Kong photos and Eisgruber withheld information from the Board of Trustees. Prior to Ms. Im and Cuff bringing forth the Title IX complaint *and* the E.S. allegation, Plaintiff had an unblemished disciplinary record for over 34 years. Eisgruber pointed to no similar cases which justified the severity of his recommendation of dismissal. Rather, Eisgruber unilaterally determined what constituted a "substantial and material misrepresentation" for purposes of the *Rules and Procedures of the Faculty* to wrongfully conclude that dismissal was warranted. Eisgruber's misrepresentations to the Board of Trustees led the Board to terminate Plaintiff, depriving him of his livelihood and tenure.

m.   With respect to Plaintiff's Title IX appeal, the CCFA, failed to follow its own guidelines by conducting the requisite hearing, or issuing a report. Instead, denying the appeal in a one sentence email to Plaintiff.

n.   The CCFA abdicated its responsibility to the Faculty, and Plaintiff, by failing to conduct an independent inquiry to determine the fairness of the procedures followed, the appropriateness of the criteria used and the reasonableness of the decision reached. Upon information and belief, Princeton's General Counsel wrote the CCFA's two-page report.

o.   CCFA improperly relied upon portions of the 2017 policy on Consensual Relationships with Students in an effort to find that Plaintiff's relationship with E.S. violated University policy, ignoring that E.S. received her Ph.D. in 2015. Even if that policy applied, there was no policy violation.

p.   The ad hoc committee of the Board of Trustees excluded Plaintiff from hearing the testimony of the CCFA members brought before the committee though the *Rules and Procedures of the Faculty* provided that "a committee of the Board shall meet with the CCFA to discuss [its] report at which meeting the Faculty member shall have a right to appear and be heard."

580.     As a result of the direct, proximate, and foreseeable consequence of the foregoing breaches, Plaintiff sustained substantial injury, damage, and loss, including, but not limited to, physical illness, emotional distress, reputational damage, loss of employment, loss of his career, and other direct and consequential damages.

581.     As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest.

### COUNT X
### State Law Breach of Implied Covenant of Good Faith and Fair Dealing
### (Against The Trustees of Princeton University)

582.     Plaintiff repeats and re-alleges each and every allegation above as if fully set forth herein.

583.     At all relevant times herein, a contractual relationship existed between Plaintiff and Princeton, the terms of which were dictated by the *Rules and Procedures of the Faculty*, including the Sexual Misconduct Policy which was incorporated therein by reference.

584.     Included in these contractual agreements is the covenant of good faith and fair dealing implied in all contracts. *See Palisades Properties, Inc. v. Brunetti*, 44 N.J. 117, 130 (1965).

585.     A party may be held liable for breach of the covenant of good faith and fair dealing even when there is no substantive breach of an express contractual term. *See Hills v. Bank of Am.*, CIV.A. 13-4960 ES, 2015 WL 1205007, at *4 (D.N.J. Mar. 17, 2015) (citing *Wilson v. Amerada Hess Corp.*, 168 N.J. at 236, 236 (2001)); *Seidenberg v. Summit Bank*, 348 N.J. Super. 243, 257 (App. Div. 2002)).

145

586.    With respect to Plaintiff, Princeton breached the covenant of good faith and fair

dealing implied in the *Rules and Procedures of the Faculty* and the Sexual Misconduct Policy.

Examples of such breaches include, but are not limited to:

a.  Withholding crucial evidence from Plaintiff during the Title IX investigation which prevented Plaintiff from defending himself.

b.  Failing to pursue evidence from Ms. Im concerning her association, complicity and connivance with Cuff, despite the obvious indications of their collusion, his grudge against Plaintiff and his tenure denial, which were known to University administrators.

c.  Failing to explore Plaintiff's report that he believed he was being set up because Ms. Im's complaint had no basis in fact and she had made continuous efforts to befriend him in the immediate past.

d.  Investigating Ms. Im's allegations in a gender-biased manner which overlooked evidence demonstrating that not only did Ms. Im voluntarily participate in social activities with Plaintiff, but encouraged them.

e.  Concluding that the actions of Plaintiff "were sufficiently severe to have the effect of unreasonably interfering with [Ms. Im's] educational experience by creating a hostile or offensive environment," when in fact the email record demonstrated beyond doubt that that was not the case and that her professional relationship with Plaintiff had gone smoothly before and after she watched the two movies at Plaintiff's home.

f.  Advising Plaintiff to write a letter for his personnel file rather than filing a Title IX appeal.

g.  Meeting with Ms. Im and disclosing information about Plaintiff that was unrelated to Ms. Im's Title IX proceeding.

h.  Opening a second, unauthorized and unwarranted investigation against Plaintiff in order to secure his termination because of Ms. Im's and Cuff's campaign to vilify the Administration for not dismissing Plaintiff.

i.  Implementing a set of investigative procedures that were not contemplated by the *Rules and Procedures of the Faculty* and which contradicted, without explanation, the procedure communicated to the Plaintiff

j.  After the Provost issued her recommendations as to discipline in the second investigation, conducting further investigation by searching Plaintiff's email account. Said email search far exceeded the scope of the E.S. allegation, concerning a conference in June 2015, and the investigators—

146

and later Eisgruber—relied upon communications which post-dated the conferral of E.S.'s Ph.D. to assert that a policy violation occurred.

k.  Conducting sham CCFA reviews of both of the appeals filed by Plaintiff.

l.  Leveraging the erroneous Title IX finding to terminate Plaintiff on the false basis that he violated the terms of his probation.

m.  Eisgruber relentlessly pursued grounds for Plaintiff's dismissal, even though Prentice found no policy violation occurred with respect to the Hong Kong conference, withheld information from the Board of Trustees, unilaterally determined the meaning of "substantial and material misrepresentations" and seemed to rejoice in Ms. Im's campaign of retaliation against Plaintiff rather than considering her, and Cuff's, motivation in engaging in such a campaign despite Plaintiff's repeated assertions that he was being set up.

587.  The above referenced acts demonstrate that Princeton acted in bad faith by subjecting Plaintiff to a set of unwritten procedures of which Plaintiff had no notice, and in doing so deprived Plaintiff of a fundamentally fair process even though his livelihood, employment and tenure was at stake. This occurred despite Plaintiff's unblemished disciplinary record.

588.  As a result of the direct, proximate, and foreseeable consequence of the foregoing breaches, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest.

## COUNT XI
### (State Law-Wrongful Discipline)
### (Against The Trustees of Princeton University and The Board of Trustees of Princeton University)

589.   Plaintiff repeats and re-alleges each and every allegation above as if fully set forth herein.

590.   New Jersey courts recognize a cause of action against private associations for the wrongful discipline of their members. *Brounstein v. American Cat Fanciers Ass'n*, 839 F. Supp. 1100, 1110-1111 (D.N.J. 1993). Members in private associations often have significant interests at stake and, regardless of whether a member receives tangible, economic benefits from membership, the loss of reputation or status resulting from expulsion may warrant judicial review. *Levin v. Bd. of Trustees of Ocean County Business Ass'n*, 2013 WL 764685, at *1 (N.J. Sup. Ct. App. Div. 2013).

591.   Private universities are generally considered to be private associations. *Hernandez v. Don Boscoe Preparatory School*, 730 A.2d 365, 374 (N.J. Sup. Ct. App. Div. 1999). When determining whether a private school improperly exercised its disciplinary policies, a court will examine whether the school failed to follow its own procedures or failed to follow a procedure that was fundamentally fair. *H.K. v. Noor-Ul-Iman School*, 2016 WL 4145921 at *6 (N.J. Sup. Ct. App. Div. 2016). When a private school fails to adhere to its own procedures, courts will balance the organization's interest in autonomy with the magnitude of the interference in the member's interest in the organization. *Id.* Whether a private school's procedures are fundamentally fair depends on the circumstances.

592.   Plaintiff was a tenured faculty member at Princeton and highly esteemed in his field of Electrical Engineering, more specifically, Information Theory. The University was his only employer for over 34 years. He therefore had a significant interest at stake.

148

593.    With respect to the University's investigation into the allegations that he violated the 2015 policy on Consensual Relationships with Students, the procedures to be followed were outlined in the *Rules and Procedures of the Faculty*. Princeton departed from these procedures by:

a.    Investigating the E.S. allegations at Ms. Im's insistence—which involved a student who had already obtained her Ph.D. and left the University two years prior to the investigation and who did not make a report or complaint against Plaintiff—when the *Rules and Procedures of the Faculty* made no provision for *post hoc* investigations.

b.    Forcing Kulkarni to recuse himself from the investigation though the *Rules and Procedures of the Faculty* made no provision for such recusal and required the Dean of the Faculty to conduct the investigation.

c.    Appointing Turano and Burgess to oversee the investigation after the Dean of the Faculty had recused himself.

d.    Hiring an outside law firm to assist with the investigation when the made no provision for the use of outside investigators.

e.    Electing to apply the preponderance of the evidence standard—the lowest burden of proof—even though Plaintiff's tenure was at stake.

f.    Recommending that Plaintiff be dismissed or suspended even though Prentice found that, even if Plaintiff had been romantically involved with E.S. in June 2015, the relationship did not violate the 2015 policy on Consensual Relationships with Students.

g.    Violating the technology policy in place at the time by placing Plaintiff's emails on legal hold and subsequently having attorneys conduct a broad search of his email account for information concerning E.S.—after Prentice had already determined that no policy violation had occurred.

h.    Requesting Plaintiff's dismissal, which was not "commensurate with the nature of the offense," particularly since the evidence did not support a violation of the 2015 policy on Consensual Relationships with Students, Eisgruber admitted that Plaintiff had *not been* dishonest with respect to the Hong Kong photos and Eisgruber withheld information from the Board of Trustees. Prior to Ms. Im and Cuff bringing forth the Title IX complaint *and* the E.S. allegation, Plaintiff had an unblemished disciplinary record for over 34 years. Eisgruber pointed to no similar cases which justified the severity of his recommendation of dismissal. Rather, in a blatant abuse of power, Eisgruber unilaterally determined what constituted a "substantial and material misrepresentation" for purposes of the *Rules and Procedures of the Faculty* to wrongfully conclude that dismissal was warranted.

Eisgruber's misrepresentations to the Board of Trustees led the Board to terminate Plaintiff, depriving him of his livelihood and tenure.

i.       The CCFA abdicating its responsibility to the Faculty, and Plaintiff, by failing to conduct an independent inquiry to determine the fairness of the procedures followed, the appropriateness of the criteria used and the reasonableness of the decision reached. Upon information and belief, Princeton's General Counsel wrote the CCFA's two-page report.

j.       Failing to adhere to the policy of upholding the security of academic tenure.

594.     Though Plaintiff asked Prentice why the University was diverting from its procedures, he was never provided with an explanation of why this occurred.

595.     The above-stated deviations also deprived Plaintiff of a fundamentally fair process. Plaintiff was further deprived of a fundamentally fair process because:

a.       He received only vague notice that he "may have engaged in conduct with a now former graduate student that violated University policy."

b.       The University elected to pursue allegations that Kulkarni, as Dean of the Graduate School, had already determined should not be investigated because E.S. had already graduated and had not, herself, made any complaint.

c.       Plaintiff had no right to a hearing, including the right to confront and cross-examine his accusers. Rather an investigation was conducted by attorney investigators who refused to provide him with the names of his accusers, including that Ms. Im and Cuff were responsible for the allegations against him, the identities of the person(s) who took the photographs in Hong Kong, the identities of Ms. Im's friends who supplied the photographs to the University, and the identity of the person who purportedly saw Plaintiff with E.S. at Penn Station.

d.       Prentice withheld the investigation report for nearly a month before presenting it to Plaintiff.

e.       In order to see the investigation report Plaintiff was required to sign a confidentiality agreement.

f.       Plaintiff was placed on administrative leave even though there was no basis for doing so.

g.       Plaintiff was placed on revised administrative leave, effectively banning him from campus, before his CCFA appeal was submitted or heard. Again, there was no basis for doing so.

h.      Plaintiff was deprived of his right to have his attorney present during questioning by the University's attorney investigators or at meetings with Prentice or Eisgruber.

i.      Plaintiff was deprived of his right to have his attorney present during meetings with the Chair of the CCFA or when he appeared in front of the CCFA.

j.      Plaintiff was deprived of his right to have his attorney present when he met with the ad-hoc committee of the Board of Trustees.

k.      Plaintiff was precluded from discussing Ms. Im's Title IX allegations or arguing against the Title IX finding when appearing before the CCFA and ad-hoc committee of the Board of Trustees, even though Prentice and Eisgruber used that erroneous finding as leverage to call for Plaintiff's termination.

l.      During the meeting with the ad-hoc committee of the Board of Trustees, Plaintiff was excluded from hearing the questions and responses of the CCFA members, only three of which attended the hearing.

m.      Eisgruber was not required to be present for questioning by Plaintiff at either the CCFA meeting or the Board of Trustees meeting.

596.    Upon information and belief, Plaintiff was subjected to the unauthorized and unwarranted investigation, which diverged from Princeton's *Rules and Procedures of the Faculty* and was fundamentally unfair because Princeton was under pressure to make an example out of him due to negative publicity on campus. Rather than take steps to quell the furor created by Ms. Im, and protect its tenured professor, the University elected to strip Plaintiff of his right to a fair process in order to achieve one goal—his termination.

597.    Princeton's wrongful discipline of Plaintiff caused him to sustain substantial injury, damage, and loss, including but not limited to physical illness, emotional distress, reputational damages, loss of his career, economic injuries and other direct and consequential damages.

598.    As a result, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Princeton to: i) reverse the decision to terminate Plaintiff; ii) remove all documents

and information concerning Plaintiff's termination from his personnel records; iii) issue a public apology to Plaintiff; and iv) reinstate Plaintiff as a tenured faculty member.

## COUNT XII
### (State Law-Gross Negligence)
### (Against Crotty, Turano, Schreyer, Prentice, Minter)

599.    Plaintiff repeats and re-alleges each and every allegation above as if fully set forth herein.

600.    To state a negligence claim under New Jersey law, a plaintiff must show that the defendant owed the plaintiff a duty; that the defendant breached that duty; and that the breach was the proximate cause of the plaintiff's injury. The difference between "ordinary" and "gross" negligence is one of degree rather than quality. "Gross negligence refers to behavior which constitutes indifference to consequences." *Smith v. Kroesen*, 9 F. Supp. 3d 439, 442 (D.N.J. 2014).

601.    Defendants Crotty, Turano, Schreyer, Prentice and Minter are each employed by Princeton and each participated in the Title IX disciplinary proceedings concerning Plaintiff. Each owed Plaintiff a duty to act with due care and with the diligence, reasonableness and fairness that would be expected when a tenured faculty member is potentially facing serious sanctions as the result of a Title IX proceeding.

602.    Defendants Crotty, Turano and Schreyer comprised the Panel tasked with investigating Ms. Im's allegations of sexual harassment. These Defendants each owed Plaintiff, as an employee of the University and tenured faculty member facing serious sanctions, a duty to conduct the investigation with due care, to perform an investigation free from bias or conflict and to reach a finding of responsibility supported by a preponderance of the evidence. This they did not do.

603.    Crotty breached her duties by, among other things, withholding evidence from Plaintiff that was crucial to his defense; holding meetings with Ms. Im and University administrators without Plaintiff's—or the other Panel members'—knowledge; failing to inform Plaintiff during his second interview that Cuff was behind Ms. Im's Title IX allegation; failing to notify Plaintiff of the precise charges against him until after he had been interviewed twice; redacting favorable references about Plaintiff in a text exchange contained in the evidence file; and failing to redact information about Cuff's tenure from the evidence file which, upon information and belief, was provided to Ms. Im. Crotty further applied the standard for student cases (*i.e.* "majority" decision) in Plaintiff's case.

604.    Crotty, Turano and Schreyer breached their duties to Plaintiff by, among other things, failing to question, or obtain evidence from Cuff; declining to ask Ms. Im for email correspondence and other evidence concerning Ms. Im's contact with Cuff; failing to question Ms. Im's credibility; relying on irrelevant and questionable source material to determine the nature of *The Handmaiden*; overlooking exculpatory evidence such as the email communications produced by Plaintiff; and making biased assumptions about Plaintiff. Turano and Schreyer also declined to watch *The Handmaiden* yet concluded it was an "explicit" film.

605.    Crotty, Turano and Schreyer further breached their duties to Plaintiff by, among other things, using sharply different standards to assess the credibility of the parties; challenging Plaintiff's credibility on spurious grounds; drawing conclusions about *The Handmaiden* even though Turano and Schreyer declined to watch the film; determining that Plaintiff misled the Panel about the film when he provided a DVD copy to the Panel; failing to question any witnesses identified by Ms. Im; and misapplying the preponderance of the evidence standard.

606.    As a result of the above-stated negligent acts and omissions, the Panel found Plaintiff responsible for sexual harassment even though this finding was unwarranted.

607.    Consequently, Prentice issued an unwarranted sanction against Plaintiff. In doing so, she merely accepted the validity of the Panel's report, overlooked Plaintiff's unblemished disciplinary record and issued an unduly severe sanction.

608.    Minter was responsible for notifying Ms. Im. In an utter failure to consider the consequences of her actions, Minter notified Ms. Im only that Plaintiff would "continue in his current capacity" at the University. She did not specify that Plaintiff was placed on probation for one year, or prohibited from taking a planned sabbatical.

609.    Upon information and belief, Crotty, Prentice and Minter chose not to tell Ms. Im the precise details of Plaintiff's sanction, resulting in Ms. Im's outrage over the University's perceived laxity and her relentless pursuit of Plaintiff's dismissal from the University through a campaign of malicious and injurious publicity, as set forth *supra* ¶¶ 177-225.

610.    In light of the above-stated deliberate, bad faith failure to conduct an unbiased, adequate investigation, failure to provide Plaintiff with evidence that would aid in his defense, lack of consideration for Plaintiff's unblemished disciplinary record, and ignorance of the impact that the paucity of information provided to Ms. Im could have on Plaintiff, the above-named Defendants were grossly negligent.

611.    Plaintiff's reputation and career were significantly injured, as the firestorm of negative publicity caused the University to open an unauthorized, unwarranted, *post-hoc* investigation into Plaintiff's consensual relationship with E.S. years earlier. As a result, Plaintiff was ultimately dismissed from the University, as the Title IX finding and sanction of probation were improperly invoked by Eisgruber and the CCFA to create an illusion of severity and

seriousness with respect to Plaintiff's alleged "misrepresentations" and justify Plaintiff's dismissal (though this was, upon information and belief, a pretext for appeasing Ms. Im).

612.    Defendants Crotty, Turano, Schreyer, Prentice and Minter were grossly negligent because they acted willfully and wantonly, and were indifferent to the consequences of their actions on Plaintiff's well-being, reputation, employment and career, as evidenced by their failure to stop Ms. Im from breaching Title IX confidentiality or embarking on her malicious publicity campaign and failure to clarify the details of Plaintiff's sanction with her. Minter and Crotty further encouraged Ms. Im's negative campaign by organizing a town hall meeting to address the Title IX proceedings against Plaintiff. Minter also made public statements in campus publications that tacitly supported Ms. Im and suggested that Plaintiff deserved a more severe sanction. *See supra* ¶¶ 207-208, 217, 221.

613.    As a direct and proximate result of the above conduct, Plaintiff suffered physical injury, including high blood pressure and chest pains, emotional distress, reputational harm, loss of his career, economic injuries and other direct and consequential damages.

614.    Thus, Plaintiff is entitled to damages in an amount to be determined at trial, and punitive damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## COUNT XIII
### (State Law-Negligence)
### (Against Defendants Crotty, Turano, Schreyer, Prentice, Minter)

615.    Plaintiff repeats and re-alleges each and every allegation above as if fully set forth herein.

616.    To state a negligence claim under New Jersey law, a plaintiff must show that the defendant owed the plaintiff a duty; that the defendant breached that duty; and that the breach was the proximate cause of the plaintiff's injury.

617.    Defendants Crotty, Turano, Schreyer, Prentice and Minter are each employed by Princeton and each participated in the Title IX disciplinary proceedings concerning Plaintiff. Each owed Plaintiff a duty to act with due care and with the diligence, reasonableness and fairness that would be expected when a tenured faculty member is potentially facing serious sanctions as the result of a Title IX proceeding.

618.    Defendants Crotty, Turano and Schreyer comprised the Panel tasked with investigating Ms. Im's allegations of sexual harassment. These Defendants each owed Plaintiff, as an employee of the University and tenured faculty member facing serious sanctions, a duty to conduct the investigation with due care, to perform an investigation free from bias or conflict and to reach a finding of responsibility supported by a preponderance of the evidence. This they did not do.

619.    Crotty breached her duties by, among other things, withholding evidence from Plaintiff that was crucial to his defense; holding meetings with Ms. Im and University administrators without Plaintiff's—or the other Panel members'—knowledge; failing to inform Plaintiff during his second interview that Cuff was behind Ms. Im's Title IX allegation; failing to notify Plaintiff of the precise charges against him until after he had been interviewed twice; redacting favorable references about Plaintiff in a text exchange contained in the evidence file; and failing to redact information about Cuff's tenure from the evidence file which, upon information and belief, was provided to Ms. Im. Crotty further applied the standard for student cases (*i.e.* "majority" decision) in Plaintiff's case.

620.    Crotty, Turano and Schreyer breached their duties to Plaintiff by, among other things, failing to question, or obtain evidence from, Cuff; declining to ask Ms. Im for email correspondence and other evidence concerning Cuff; failing to question Ms. Im's credibility;

relying on irrelevant and questionable source material, to determine the nature of *The Handmaiden*; overlooking exculpatory evidence such as the email communications produced by Plaintiff; and making gender-biased assumptions about Plaintiff. Turano and Schreyer also declined to watch *The Handmaiden* yet concluded it was an "explicit" film.

621.    Crotty, Turano and Schreyer further breached their duties to Plaintiff by, among other things, using sharply different standards to assess the credibility of the parties; challenging Plaintiff's credibility on spurious grounds; drawing conclusions about *The Handmaiden* even though Turano and Schreyer declined to watch the film; determining that Plaintiff misled the Panel about the film when he provided a DVD copy to the Panel; failing to question any witnesses identified by Ms. Im; and misapplying the preponderance of the evidence standard.

622.    As a result of the above-stated negligent acts and omissions, the Panel found Plaintiff responsible for sexual harassment even though this finding was unwarranted.

623.    Consequently, Prentice issued an unwarranted sanction against Plaintiff. In doing so, she merely accepted the validity of the Panel's report, overlooked Plaintiff's unblemished disciplinary record and issued an unduly severe sanction.

624.    Minter was responsible for notifying Ms. Im. In an utter failure to consider the consequences of her actions, Minter notified Ms. Im only that Plaintiff would "continue in his current capacity" at the University. She did not specify that Plaintiff was placed on probation for one year, or prohibited from taking a planned sabbatical.

625.    Upon information and belief, Crotty, Prentice and Minter chose not to tell Ms. Im the precise details of Plaintiff's sanction, resulting in Ms. Im's outrage over the University's perceived laxity and her relentless pursuit of Plaintiff's dismissal from the University through a campaign of malicious and injurious publicity, as set forth *supra* Paragraphs 177-225.

626.     As a result of the above stated breaches of duties owed to Plaintiff, his reputation and career were irreparably injured, as the firestorm of negative publicity caused the University to open an unauthorized, unwarranted, *post-hoc* investigation into Plaintiff's consensual relationship with E.S. years prior. As a result, Plaintiff was ultimately dismissed from the University, as the Title IX finding and sanction of probation were improperly relied upon by Eisgruber and CCFA to create an illusion of severity and seriousness with respect to Plaintiff's alleged "misrepresentations" and justify Plaintiff's dismissal (though this was, upon information and belief, a pretext for appeasing Ms. Im).

627.     As a direct and proximate result of the above conduct, Plaintiff suffered physical injury, including high blood pressure and chest pains, emotional distress, reputational harm, loss of his career, economic injuries and other direct and consequential damages.

628.     Thus, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## COUNT XIV
### (State Law-Gross Negligence)
### (Against Prentice, Burgess, Eisgruber, Enquist, Fiske, Mangone, Rosen and Small)

629.     Plaintiff repeats and re-alleges each and every allegation above as if fully set forth herein.

630.     To state a negligence claim under New Jersey law, a plaintiff must show that the defendant owed the plaintiff a duty; that the defendant breached such a duty; and that the breach was the proximate cause of the injury. The difference between "ordinary" and "gross" negligence is one of degree rather than quality. "Gross negligence refers to behavior which constitutes indifference to consequences." *Smith v. Kroesen*, 9 F. Supp. 3d 439, 442 (D.N.J. 2014).

631.    Defendants Prentice, Burgess and Eisgruber are each employed by Princeton and each participated in the process in which the allegations concerning E.S. were investigated and through which Plaintiff was dismissed from the University. Each owed Plaintiff a duty to act with due care and with the diligence, reasonableness and fairness that would be expected when a tenured faculty member is potentially facing serious discipline.

632.    Prentice breached this duty when, in September 2017, she initiated an investigation into allegations raised by *Ms. Im* and *Cuff* that Plaintiff and E.S. had been seen kissing at a bar in Hong Kong in *Summer 2015*. Upon information and belief, Prentice initiated the investigation into the allegations to appease Ms. Im, who had been vocal about the University's refusal to terminate Plaintiff. The *Rules and Procedures of the Faculty* provided no grounds upon which to investigate the allegations when: i) E.S.'s degree had been conferred, and she had left Princeton two years prior; ii) E.S. had made no complaint against Plaintiff; and iii) the incident allegedly occurred at a bar that was located somewhere in Hong Kong, during the timeframe in which Plaintiff attended a conference that was not sponsored by Princeton. In Spring 2017, Kulkarni told Cuff that the allegations were unworthy of investigation because *E.S.* had not brought a formal complaint.

633.    Prentice also breached her duty to Plaintiff by informing him that Turano and Burgess would conduct an inquiry into the E.S. allegations and then, without explanation, replacing Turano with outside investigator, Okubadejo, to assist Burgess. Upon information and belief, Prentice failed to research or consider Okubadejo's potential bias as an investigator due to her prior employment with OCR and involvement in pending Title IX litigation. Alternatively, upon information and belief, Prentice chose Okubadejo because of her involvement with OCR and expectation that Okubadejo would assist the University in finding some basis to terminate Plaintiff, thereby appeasing Ms. Im. Prentice's March 23, 2018 recommendation letter made a number of

misrepresentations concerning Okubadejo's appointment and Kulkarni's recusal. *See supra* ¶¶ 272-273.

634.    Burgess breached her duty to Plaintiff by: agreeing to conduct an investigation that was not authorized by the *Rules and Procedures of the Faculty*; failing to conduct a thorough, impartial investigation of the E.S. allegations; exceeding the scope of the investigation and recommending to Prentice that additional policy violations occurred; and electing to apply the lowest possible burden of proof—preponderance of the evidence—even though the allegations did not concern violations of Title IX.

635.    Burgess further breached her duty to Plaintiff by withholding evidence from Plaintiff—including the very identities of the individuals who took the Hong Kong photos. Burgess failed to question why these individuals suddenly grew concerned about events that occurred years earlier, or that Ms. Im referred to them as her friends. Burgess also tried to mislead Plaintiff by claiming that investigations of this sort fell under the purview of her office. She further wrote a report whose main conclusions were easily debunked by Prentice and exceeded her investigative charge by proposing that Plaintiff be terminated.

636.    In March 2018, Prentice further breached her duties to Plaintiff by finding that Plaintiff did not violate the policy on Consensual Relationships with Students yet recommending to Eisgruber that Plaintiff be dismissed or receive a two-year suspension if he agreed to provide a "frank and fulsome explanation of his conduct" at the Hong Kong conference. Prentice's recommendation letter also contained a number of misrepresentations. *See* ¶¶ 271-288. Upon information and belief, despite the lack of evidence of a policy violation, and the abundant evidence that the allegations and campaign by Ms. Im and Cuff were a hoax, Prentice elected to

recommend harsh discipline because she had been publicly vilified by Ms. Im and Cuff for not terminating Plaintiff.

637.    Dissatisfied with Prentice's conclusions about the lack of evidence against Plaintiff, in April 2018, Eisgruber breached his duties to Plaintiff by ordering Burgess and Okubadejo to conduct an unauthorized search of Plaintiff's email account to find more "evidence" that Plaintiff and E.S. were involved in a romantic relationship. While Eisgruber misrepresented the search as "narrow," the date range far exceeded the scope of the allegations—dating back to 2011 and post-dating E.S.'s departure from the University.

638.    Among other things, Burgess relied on at least one email which post-dated E.S.'s departure from the University to assert that Plaintiff violated the 2015 policy on Consensual Relationships with Students. Burgess also used an email from early 2015 to determine that Plaintiff was dishonest about when he became a reader of E.S.'s dissertation—even though he did not deny serving as a reader of E.S.'s dissertation. Burgess further misinterpreted the policy on Consensual Relationships with Students to include prohibitions on serving as a reader and writing emails in support of graduate students (which she interpreted to be "written recommendations" and willfully mischaracterized as evidence of favoritism). Burgess further mischaracterized E.S. and Plaintiff as having a teacher/student relationship in 2015, even though E.S. had not taken a class with Plaintiff since 2011.

639.    Eisgruber further breached his duties to Plaintiff when, in May 2018, he recommended Plaintiff's dismissal from the University despite acknowledging in his memorandum—which would later be presented to the Board of Trustees—that Plaintiff did not deny that he was the individual in the Hong Kong photos that were the true subject of the second investigation. As set forth in detail *supra* Paragraph 304, Eisgruber instead embraced the facts that

161

Burgess deliberately mischaracterized, and her misinterpretations of the policies at issue, to justify his recommendation of dismissal. Eisgruber further relied upon Plaintiff's Title IX sanction of probation, at the same time asserting that the underlying facts were irrelevant, to mischaracterize Plaintiff's conduct as more serious and demand Plaintiff's termination. Eisgruber also omitted the source of the E.S. allegations—Ms. Im and Cuff—from his recommendation memorandum.

640.    Eisgruber further breached his duties to Plaintiff when over three months later he forwarded to the Board of Trustees the same memorandum requesting Plaintiff's termination, despite the numerous misstatements and factual errors that were listed by Plaintiff in his appeal. Even though Eisgruber relied on the Title IX finding to request Plaintiff's termination, he admitted to Plaintiff that he did so without even reading his Title IX appeal.

641.    In light of the above-stated deliberate, bad faith actions in electing to pursue an unauthorized investigation, bolstering of inconsequential or irrelevant facts to find a policy violation, failure to conduct an unbiased investigation, failure to provide Plaintiff with evidence that would aid in his defense, and persistent search to find "evidence" to warrant Plaintiff's dismissal, Defendants Prentice, Burgess and Eisgruber were grossly negligent. These Defendants acted willfully and wantonly, and were indifferent to the consequences of their actions on Plaintiff's well-being, reputation, employment and career. Indeed, Eisgruber in particular appeared to rejoice in Ms. Im's and Cuff's negative publicity campaign against Plaintiff, even blaming him for bringing it upon himself.

642.    Defendants Enquist, Fiske, Mangone, Rosen and Small, each employed by Princeton, were the CCFA members that were tasked in evaluating Plaintiff's Title IX appeal. In that role, they each owed Plaintiff a duty to protect his right to a fundamentally fair process, and to safeguard against the unfair treatment of Plaintiff by University administrators.

643.     With respect to Plaintiff's Title IX appeal, Defendants Enquist, Fiske, Mangone, Rosen and Small breached their duties by failing to conduct an adequate review of the appeal, which provided an analysis of the many inconsistencies in Ms. Im's statements, and a detailed list of errors, due process violations and indicators of bias throughout the investigation. They also breached their duties by declining to accept Plaintiff's appeal, and applying the incorrect standard of review to Plaintiff's appeal, looking only at whether there was "improper procedure" rather than procedural unfairness.

644.     Defendants Enquist, Fiske, Mangone, Rosen and Small also evaluated Plaintiff's appeal of Eisgruber's recommendation. In that role, they each owed Plaintiff a duty to protect his right to a fundamentally fair process, and to safeguard against the unfair treatment of Plaintiff by University administrators.

645.     Defendants Enquist, Fiske, Mangone, Rosen and Small breached their duties to Plaintiff by conducting a sham process, in which they abdicated their responsibilities to conduct an independent review of the evidence and issue a report concerning the outcome of that review. These Defendants also breached their duties to Plaintiff by overlooking the numerous misrepresentations and mischaracterizations contained in Eisgruber's recommendation, as enumerated in Plaintiff's appeal. Enquist, Fiske, Mangone, Rosen and Small also overlooked the impropriety of the investigation, unauthorized by the *Rules and Procedures of the Faculty*, the lack of fundamental fairness in the manner in which the investigation was conducted (including the withholding of evidence and Plaintiff's inability to confront his accusers), and Burgess' election of a low burden of proof. These Defendants further breached their duties to Plaintiff by, upon information and belief, allowing the University's General Counsel to draft the two-page "report" that confirmed Eisgruber's recommendation of dismissal.

646.   In light of the above-stated deliberate, bad faith actions in electing to overlook, or deliberately ignore, the unfairness of the procedures followed, the inappropriateness of the standard of proof and the unreasonableness of Eisgruber's recommendation—which was not supported by evidence—Enquist, Fiske, Mangone, Rosen and Small were grossly negligent. These Defendants acted willfully and wantonly, and were indifferent to the consequences of their actions on Plaintiff's well-being, reputation, employment and career.

647.   As a result of the above conduct, Eisgruber's recommendation memorandum was presented to the Board of Trustees and Plaintiff was terminated on September 24, 2018.

648.   As a direct and proximate result of the above conduct, Plaintiff suffered physical injury, including high blood pressure and chest pains, emotional distress, reputational harm, loss of his career, economic injuries and other direct and consequential damages.

649.   Thus, Plaintiff is entitled to damages in an amount to be determined at trial, and punitive damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## COUNT XV
### (State Law- Negligence)
### (Against Prentice, Burgess, Eisgruber, Enquist, Fiske, Mangone, Rosen and Small)

650.   Plaintiff repeats and re-alleges each and every allegation above as if fully set forth herein.

651.   To state a negligence claim under New Jersey law, a plaintiff must show that the defendant owed the plaintiff a duty; that the defendant breached such a duty; and that the breach was the proximate cause of the injury.

652.   Defendants Prentice, Burgess and Eisgruber are each employed by Princeton and each participated in the process in which the allegations concerning E.S. were investigated and through which Plaintiff was dismissed from the University. Each owed Plaintiff a duty to act with

164

due care and with the diligence, reasonableness and fairness that would be expected when a tenured faculty member is potentially facing serious discipline.

653.    Prentice breached this duty when, in September 2017, she initiated an investigation into allegations raised by *Ms. Im* and *Cuff* that Plaintiff and E.S. had been seen kissing at a bar in Hong Kong in *Summer 2015*. Upon information and belief, Prentice initiated the investigation into the allegations to appease Ms. Im, who had been vocal about the University's refusal to terminate Plaintiff. The *Rules and Procedures of the Faculty* provided no grounds upon which to investigate the allegations when: i) E.S.'s degree had been conferred, and she had left Princeton two years prior; ii) E.S. had made no complaint against Plaintiff; and iii) the incident allegedly occurred at a bar that was located somewhere in Hong Kong, during the timeframe in which Plaintiff attended a conference that was not sponsored by Princeton. In Spring 2017, Kulkarni told Cuff that the allegations were unworthy of investigation because *E.S.* had not brought a formal complaint.

654.    Prentice also breached her duty to Plaintiff by informing him that Turano and Burgess would conduct an inquiry into the E.S. allegations and then, without explanation, replacing Turano with outside investigator, Okubadejo, to assist Burgess. Upon information and belief, Prentice failed to research or consider Okubadejo's potential bias as an investigator due to her prior employment with OCR and involvement in pending Title IX litigation. Alternatively, upon information and belief, Prentice chose Okubadejo because of her involvement with OCR and expectation that Okubadejo would assist the University in finding some basis to terminate Plaintiff, thereby appeasing Ms. Im. Prentice's March 23, 2018 recommendation letter made a number of misrepresentations concerning Okubadejo's appointment and Kulkarni's recusal. *See supra* ¶¶ 272-273.

655.    Burgess breached her duty to Plaintiff by: agreeing to conduct an investigation that was not authorized by the *Rules and Procedures of the Faculty*; failing to conduct a thorough, impartial investigation of the E.S. allegations; exceeding the scope of the investigation and recommending to Prentice that additional policy violations occurred; and electing to apply the lowest possible burden of proof—preponderance of the evidence—even though the allegations did not concern violations of Title IX.

656.    Burgess further breached her duty to Plaintiff by withholding evidence from Plaintiff—including the very identities of the individuals who took the Hong Kong photos. Burgess failed to question why these individuals suddenly grew concerned about events that occurred years earlier, or that Ms. Im referred to them as her friends. Burgess also tried to mislead Plaintiff by claiming that investigations of this sort fell under the purview of her office. She further wrote a report whose main conclusions were easily debunked by Prentice and exceeded her investigative charge by proposing that Plaintiff be terminated.

657.    In March 2018, Prentice further breached her duties to Plaintiff by finding that Plaintiff did not violate the policy on Consensual Relationships with Students yet recommending to Eisgruber that Plaintiff be dismissed or receive a two-year suspension if he agreed to provide a "frank and fulsome explanation of his conduct" at the Hong Kong conference. Prentice's recommendation letter also contained a number of misrepresentations. *See* ¶¶ 272-273. Upon information and belief, despite the lack of evidence of a policy violation, and the abundant evidence that the allegations and campaign by Ms. Im and Cuff were a hoax, Prentice elected to recommend harsh discipline because she had been publicly vilified by Ms. Im and Cuff for not terminating Plaintiff.

658.    Dissatisfied with Prentice's conclusions about the lack of evidence against Plaintiff, in April 2018, Eisgruber breached his duties to Plaintiff by ordering Burgess and Okubadejo to conduct an unauthorized search of Plaintiff's email account to find more "evidence" that Plaintiff and E.S. were involved in a romantic relationship. While Eisgruber misrepresented the search as "narrow," the date range far exceeded the scope of the allegations—dating back to 2011 and post-dating E.S.'s departure from the University.

659.    Among other things, Burgess relied on at least one email which post-dated E.S.'s departure from the University to assert that Plaintiff violated the 2015 policy on Consensual Relationships with Students. Burgess also used an email from early 2015 to determine that Plaintiff was dishonest about when he became a reader of E.S.'s dissertation—even though he did not deny serving as a reader of E.S.'s dissertation. Burgess further misinterpreted the policy on Consensual Relationships with Students to include prohibitions on serving as a reader and writing emails in support of graduate students (which she interpreted to be "written recommendations" and willfully mischaracterized as evidence of favoritism). Burgess further mischaracterized E.S. and Plaintiff as having a teacher/student relationship in 2015, even though E.S. had not taken a class with Plaintiff since 2011.

660.    Eisgruber further breached his duties to Plaintiff when, in May 2018, he recommended Plaintiff's dismissal from the University despite acknowledging in his memorandum—which would later be presented to the Board of Trustees—that Plaintiff did not deny that he was the individual in the Hong Kong photos that were the true subject of the second investigation. As set forth in detail *supra* Paragraph 304, Eisgruber instead embraced the facts that Burgess deliberately mischaracterized, and her misinterpretations of the policies at issue, to justify his recommendation of dismissal. Eisgruber further relied upon Plaintiff's Title IX sanction of

167

probation, at the same time asserting that the underlying facts were irrelevant, to mischaracterize Plaintiff's conduct as more serious and demand Plaintiff's termination. Eisgruber also omitted the source of the E.S. allegations—Ms. Im and Cuff—from his recommendation memorandum.

661.    Eisgruber further breached his duties to Plaintiff when over three months later he forwarded to the Board of Trustees the same memorandum requesting the termination of Plaintiff, despite the numerous misstatements and factual errors that were listed by Plaintiff in his appeal. Even though Eisgruber relied on the Title IX finding to request Plaintiff's termination, he admitted to Plaintiff that he did so without even reading his Title IX appeal.

662.    Defendants Enquist, Fiske, Mangone, Rosen and Small, each employed by Princeton, were the CCFA members that were tasked in evaluating Plaintiff's Title IX appeal. In that role, they each owed Plaintiff a duty to protect his right to a fundamentally fair process, and to safeguard against the unfair treatment of Plaintiff by University administrators.

663.    With respect to Plaintiff's Title IX appeal, Defendants Enquist, Fiske, Mangone, Rosen and Small breached their duties by failing to conduct an adequate review of the appeal, which provided an analysis of the many inconsistencies in Ms. Im's statements, and a detailed list of errors, due process violations and indicators of bias throughout the investigation. They also breached their duties by declining to accept Plaintiff's appeal, and applying the incorrect standard of review to Plaintiff's appeal, looking only at whether there was "improper procedure" rather than procedural unfairness.

664.    Defendants Enquist, Fiske, Mangone, Rosen and Small also evaluated Plaintiff's appeal of Eisgruber's recommendation. In that role, they each owed Plaintiff a duty to protect his right to a fundamentally fair process, and to safeguard against the unfair treatment of Plaintiff by University administrators.

665.     Defendants Enquist, Fiske, Mangone, Rosen and Small breached their duties to Plaintiff by conducting a sham process, in which they abdicated their responsibilities to conduct an independent review of the evidence and issue a report concerning the outcome of that review. These Defendants also breached their duties to Plaintiff by overlooking the numerous misrepresentations and mischaracterizations contained in Eisgruber's recommendation, as enumerated in Plaintiff's appeal. Enquist, Fiske, Mangone, Rosen and Small also overlooked the impropriety of the investigation, unauthorized by the *Rules and Procedures of the Faculty*, the lack of fundamental fairness in the manner in which the investigation was conducted (including the withholding of evidence and Plaintiff's inability to confront his accusers), and Burgess' election of a low burden of proof. These Defendants further breached their duties to Plaintiff by, upon information and belief, allowing the University's General Counsel to draft the two-page "report" that confirmed Eisgruber's recommendation of dismissal.

666.     As a result of the above conduct, Eisgruber's recommendation memorandum was presented to the Board of Trustees and Plaintiff was officially terminated on September 24, 2018.

667.     As a direct and proximate result of the above conduct, Plaintiff suffered physical injury, including high blood pressure and chest pains, emotional distress, reputational harm, loss of his career, economic injuries and other direct and consequential damages.

668.     Thus, Plaintiff is entitled to damages in an amount to be determined at trial, and punitive damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## COUNT XVI
### Respondeat Superior
### (Against The Trustees of Princeton University)

669.    Plaintiff repeats and re-alleges each and every allegation above as if fully set forth herein.

670.    As the employer of Defendants Crotty, Turano, Schreyer, Prentice, Burgess, Eisgruber, Enquist, Fiske, Mangone, Rosen and Small, Princeton is vicariously liable for the negligent acts of its employees committed during the course of their employment.

671.    As detailed above, at Paragraphs 599-649, Defendants Crotty, Turano, Schreyer, Prentice, Burgess, Eisgruber, Enquist, Fiske, Mangone, Rosen and Small breached their duties of care to Plaintiff in the course of their employment and ordinary duties at Princeton, subjecting Plaintiff to a biased, partial, defective, deficient, arbitrary and fundamentally unfair disciplinary process.

672.    As detailed above, at Paragraphs 650-668, the foreseeable, direct and proximate result of Defendants Crotty, Turano, Schreyer, Prentice, Burgess, Eisgruber, Enquist, Fiske, Mangone, Rosen and Small intentional, reckless, grossly negligent and/or negligent conduct was Plaintiff's termination, and other substantial injuries including without limitation, physical ailments, emotional distress, loss of career, reputational injuries, economic injuries and other direct and consequential damages.

673.    Thus, Plaintiff is entitled to damages in an amount to be determined at trial, and punitive damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiff demands judgment against Defendants as follows:

(i)     As to Count I against Defendant The Trustees of Princeton University for violations of Title IX of the Education Amendments of 1972, erroneous outcome/selective enforcement, damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and an injunction directing this Defendant to: (a) reverse the outcome and finding regarding Ms. Im's Title IX complaint; (b) remove all documents and information concerning the Title IX investigation from Plaintiff's personnel records; (c) issue a public apology to Plaintiff for the University's negligent mishandling of the Title IX proceedings and failing to protect the confidentiality of the Title IX Panel report; and (d) reinstate Plaintiff to his position as a tenured member of the faculty.

(ii)     As to Count II against Defendant The Trustees of Princeton University for violations of Title IX of the Education Amendments of 1972, Sex Discrimination-Retaliation, damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and an injunction directing this Defendant to: (a) reverse the decision to terminate Plaintiff; (b) remove all documents and information concerning Plaintiff's termination from his personnel records; (c) issue a public apology to Plaintiff; and (d) reinstate Plaintiff to his position as a tenured member of the Faculty.

(iii)     As to Count III against Defendant The Trustees of Princeton University for violations of Title IX of the Education Amendments of 1972, Sex Discrimination, damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing this Defendant to: (a) reverse the decision to terminate Plaintiff; (b) remove all documents and information concerning Plaintiff's termination from his personnel records; (c) issue a public apology to Plaintiff; and (d) reinstate Plaintiff to his position as a tenured member of the Faculty.

(iv)     As to Count IV against Defendant The Trustees of Princeton University for violations of Title VII of the Civil Rights Act of 1964, damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing this Defendant to: (a) reverse the decision to terminate Plaintiff; (b) remove all documents and information concerning Plaintiff's termination from his personnel records; (c) issue a public apology to Plaintiff; and (d) reinstate Plaintiff to his position as a tenured member of the Faculty.

(v)     As to Count V against Defendant The Trustees of Princeton University for violations of New Jersey's Law Against Discrimination, N.J.S.A. 10:5-1 et seq., Hostile Work Environment As a result, Plaintiff is entitled to damages in an amount to be determined at trial, including punitive damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing this Defendant to: (a) reverse the

decision to terminate Plaintiff; (b) remove all documents and information concerning Plaintiff's termination from his personnel records; (c) issue a public apology to Plaintiff; and (d) reinstate Plaintiff to his position as a tenured member of the Faculty.

(vi)     As to Count VI against Defendants Eisgruber, Prentice, Crotty, Minter and Gmachl for aiding and abetting violations of New Jersey's Law Against Discrimination, N.J.S.A. 10:5-1 et seq., Aiding and Abetting Hostile Work Environment, damages in an amount to be determined at trial, including punitive damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

(vii)    As to Count VII against Defendants The Trustees of Princeton University, Eisgruber, Gmachl, Minter and Prentice for violations of New Jersey's Law Against Discrimination, N.J.S.A. 10:5-1 et seq., Retaliation, damages in an amount to be determined at trial, including punitive damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

(viii)   As to Count VIII against Defendant The Trustees of Princeton University for state law breach of contract, damages in an amount to be determined at trial, plus prejudgment interest.

(ix)     As to Count IX against Defendant The Trustees of Princeton University for state law breach of contract, damages in an amount to be determined at trial, plus prejudgment interest.

(x)      As to Count X against Defendant The Trustees of Princeton University under state law for breach of the implied covenant of good faith and fair dealing, damages in an amount to be determined at trial, plus prejudgment interest.

(xi)     As to Count XI against Defendants The Trustees of Princeton University and the Board of Trustees of Princeton University, under state law, for wrongful discipline, damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Princeton to: (a) reverse the decision to terminate Plaintiff; (b) remove all documents and information concerning Plaintiff's termination from his personnel records; (c) issue a public apology to Plaintiff; and (d) reinstate Plaintiff to his position as a tenured faculty member.

(xii)    As to Count XII against Defendants Crotty, Turano, Schreyer, Prentice and Minter, under state law, for gross negligence, Plaintiff is entitled to damages in an amount to be determined at trial, and punitive damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

(xiii)   As to Count XIII against Defendants Crotty, Turano, Schreyer, Prentice and Minter, under state law, for negligence, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

(xiv)   As to Count XIV against Defendants Prentice, Burgess, Eisgruber, Enquist, Fiske, Mangone, Rosen and Small, under state law, for gross negligence, Plaintiff is entitled to damages, and punitive damages, in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

(xv)    As to Count XV against Defendants Prentice, Burgess, Eisgruber, Enquist, Fiske, Mangone, Rosen and Small, under state law, for negligence, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

(xvi)   As to Count XVI against Defendant The Trustees of Princeton University, under state law, for respondeat superior, Plaintiff is entitled to damages in an amount to be determined at trial, and punitive damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

(xvii)  Issuing an injunction directing Defendant The Trustee of Princeton University to: (a) reverse the outcome and finding regarding Ms. Im's Title IX complaint; (b) remove all documents and information concerning the Title IX investigation from Plaintiff's personnel records; (c) reverse the decision to terminate Plaintiff; (d) remove all documents and information concerning Plaintiff's termination from his personnel records; (e) issue a public apology to Plaintiff; and (f) reinstate Plaintiff to his position as a tenured faculty member.

(xviii) Awarding punitive damages.

(xix)   Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff herein demands a trial by jury of all triable issues in the present matter.

Dated: May 13, 2019

Respectfully Submitted,

NESENOFF & MILTENBERG, LLP

By: ___/s/ Adrienne Levy_____
        Adrienne Levy
Andrew T. Miltenberg (*pro hac vice* admission pending)
Kara L. Gorycki (*pro hac vice* admission pending)
363 Seventh Avenue, Fifth Floor
New York, New York 10001
(212) 736-4500
amiltenberg@nmllplaw.com
kgorycki@nmllplaw.com
alevy@nmllplaw.com