SERGIO VERDU,

*Plaintiff*,

v.

THE TRUSTEES OF
PRINCETON UNIVERSITY, *et al.*,

*Defendants*.

Civ. Action No. 19-12484 (FLW)

**OPINION**

## I.   <u>INTRODUCTION</u>

Plaintiff Sergio Verdu ("Plaintiff"), a former professor in the Department of Electrical Engineering at Princeton University (the "University"), was terminated from his employment with the University in September 2018.  His termination followed two separate investigations by the University, which concluded that Plaintiff had violated the University's rules and policies governing sexual misconduct, prohibiting certain relationships between teachers and students, and requiring faculty members to be honest during interviews with investigators.  In this action, Plaintiff sues the University, the University's Board of Trustees, and certain administrators of the University who were involved in the investigations (collectively, "Defendants"),[1] claiming, among other things, that the University's proceedings were tainted with gender bias against him.  The Complaint asserts claims for violations of Title IX of the Education Amendments of 1972

---

[1]      The Complaint names the following administrators of the University as defendants: Christopher L. Eisgruber, Deborah A. Prentice, Regan Crotty, Toni Marlene Turano, Lisa Michelle Schreyer, Michele Minter, Claire Gmachl, Cheri Burgess, Lynn William Enquist, Susan Tufts Fiske, Carolina Mangone, Harvey S. Rosen and Irene Small.

(Counts I thru III) and of Title VII of the Civil Rights Act of 1964 (Count IV). The Complaint also asserts a host of state statutory and common law claims (Counts V thru XIV).

Presently before the Court is Defendants' motion to dismiss the Complaint pursuant Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons set forth below, Defendants' motion is **GRANTED IN PART** and **DENIED IN PART**. Plaintiff's federal claims (Counts I thru IV) are dismissed for failure to state a claim, and the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims (Counts V thru XVI) at this time. Plaintiff is given leave to file an amended complaint to replead his federal claims, in a manner consistent with this Opinion, within forty-five (45) days. In lieu of filing an amended complaint, Plaintiff may pursue his state law claims in state court.

## II.     <u>BACKGROUND</u>[2]

Plaintiff taught at the University as a professor for nearly 35 years without incident until 2017. (Compl. ¶¶ 2, 49-50.) In April 2017, a twenty-five-year-old female graduate student, Yeohee Im ("Im"), reported to the University's Title IX Office that Plaintiff had sexually harassed her. (*Id.* ¶¶ 118-119.) The University convened a Title IX panel ("Panel") to conduct an investigation pursuant to its Sexual Misconduct Policy (the "First Investigation"). (*Id.* ¶¶ 76-91, 125.) The Panel ultimately found Plaintiff responsible for sexual harassment. (*Id.* ¶¶ 11, 164.) On June 9, 2017, the Dean of the Faculty disciplined Plaintiff for violating the Sexual Misconduct Policy by, among other things, placing him on a one-year probation. (*Id.* ¶¶ 165, 167.)

Plaintiff alleges that, following the conclusion of the First Investigation, Im believed that the sanction Plaintiff received was inadequate and, as a result, waged a public campaign against

---

[2]      In this Background section, I provide a brief overview of the facts that are pertinent to this motion. In the Discussion section, *infra*, I set forth a more detailed recitation of the relevant facts that are alleged by Plaintiff in support of each of his claims.

him and the University. (*Id*. ¶¶ 177-208.) In the course of Im's campaign, Plaintiff alleges that Im committed numerous violations of the University's policies. For example, Plaintiff alleges that Im disclosed confidential records to news outlets, commented on the case to journalists who published articles about it, encouraged social media posts against Plaintiff, and filed complaints with professional associations to which Plaintiff belonged. (*Id*. ¶¶ 12, 177-226.) Plaintiff alleges that these efforts ultimately led to calls for his termination. (*Id*. ¶ 13.) Plaintiff further alleges that the University refused to address Im's violations of the University's Title IX policies or remedy the increasingly aggressive harassment and hostile environment caused by Im's activities. (*Id*. ¶¶ 209-211, 215.)

In September 2017, officials at the University told Plaintiff that it was commencing a second investigation into reports that Plaintiff may have had a romantic relationship with a different graduate student (the "Second Investigation"). (*Id*. ¶ 239.) The student, E.S., had been a student in two of Plaintiff's classes in 2011, and Plaintiff had served as a reader on her dissertation committee in Fall 2015. (*Id*. ¶¶ 235-236.) Witnesses reported that they had seen Plaintiff and E.S. kissing at a bar in Hong Kong during a conference, and photographs emerged of a man and woman kissing who appeared to be Plaintiff and E.S. (*Id*. ¶ 227.) Plaintiff alleges that Im unearthed this evidence because she was dissatisfied with the outcome of the First Investigation. (*Id*. ¶ 226.)

The University's *Rules and Procedures of the Faculty*, at the time, prohibited "sexual or romantic relationship[s] involv[ing] individuals in a teacher-student relationship (e.g. being directly or indirectly taught, supervised or evaluated)." (*Id*. ¶ 229.) Plaintiff and E.S. both denied that any relationship had occurred during interviews with investigators. (*Id*. ¶¶ 124, 250, 299.) Notwithstanding those denials, the investigators ultimately concluded that Plaintiff and E.S. had

engaged in a romantic relationship during the time when he evaluated her dissertation. (*Id*. ¶ 261.) Plaintiff now admits in the Complaint that he and E.S. commenced a relationship in Spring 2014. (Compl. ¶ 235.) That relationship was ongoing during the period when Plaintiff evaluated E.S.'s dissertation. (*Id*. ¶ 298(h).)

On May 21, 2018, the University's President issued a memo to the University's Board of Trustees recommending that Plaintiff be dismissed. (*Id*. 304.)[3] The memo concluded that Plaintiff lied during the Second Investigation; his lies were substantial and material under the University's rules and policies; the lies justified dismissal; Plaintiff also violated the University's policies on consensual relations; and neither Im nor Cuff (a former Assistant Professor who allegedly blamed his failure to obtain tenure on Plaintiff, *see* Compl. ¶ 4) influenced the proceedings in a manner that could excuse Plaintiff's conduct. (*See* Recommendation Memo, ECF 20-3.) On September 24, 2018, Plaintiff was notified that the University had terminated his employment effective immediately. (Compl. ¶ 324.)

Plaintiff alleges that, in the course of the Second Investigation, the University and its administrators violated numerous provisions of the University's *Rules and Procedures of the Faculty* and expanded the investigation to include baseless claims against him. (*Id*. ¶¶ 238-331.) Plaintiff further alleges that the University and other defendants relied on gender stereotypes,

---

[3]     Defendants attach this recommendation memo as an exhibit to their motion papers. (*See* Exhibit 1 to Declaration of Christine E. Gage, ECF 20-3 ("Recommendation Memo").) Because the Complaint quotes extensively from the recommendation memo and relies on it as the basis for multiple claims, this Court may consider the memo for the purposes of this motion to dismiss. *See Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) ("In evaluating a motion to dismiss, we may consider documents . . . and any 'matters incorporated by reference or integral to the claim[.]'" *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) (citing 5B Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1357 (3d ed. 2004)); *see also Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) (holding "that a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.")

distorted the evidence and the applicable standards, and improperly relied upon Plaintiff's probation as a basis for his termination. (*Id.*) Plaintiff asserts that the University and other defendants were motivated by external pressure and the need to repair the University's tarnished reputation, which resulted from: (i) numerous investigations by the Department of Education's Office of Civil Rights for the University's alleged failure to properly respond to female students' claims of sexual assault and harassment (*id.* ¶¶ 66-73); (ii) public criticism over the alleged sexual harassment of a number of female students in the University's German Department (*id.* ¶ 75); (iii) criticism of the University by Im and Cuff for the results of the First Investigation (*id.* ¶¶ 180-187, 191-201, 208, 216-220); and (iv) the rebirth of the #MeToo movement, which had gained momentum during the timeframe of the Second Investigation and contributed to further criticism of the University and public calls for Plaintiff's termination (*id.* ¶¶ 188-190, 202-207, 212-214, 221-225).

## III.   <u>LEGAL STANDARD</u>

Rule 12(b)(6) authorizes a defendant to move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This "plausibility standard" requires that the plaintiff allege "more than a sheer possibility that a defendant has acted unlawfully," but it "is not akin to a 'probability requirement.'" *Id.* (citing *Twombly*, 550 U.S. at 556). Although the court must accept the allegations in the complaint as true, it is not compelled to accept "unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation," *Morrow v. Balaski*,

719 F.3d 160, 165 (3d Cir. 2013) (citation omitted).  "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.  In deciding a Rule 12(b)(6) motion, although "a district court . . . may not consider matters extraneous to the pleadings," the court may consider documents that are "*integral to or explicitly relied* upon in the complaint."  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (citation omitted) (emphasis in original).

## IV.    DISCUSSION

### A.    Title IX Claims

Counts I, II, and III of the Complaint assert that the University violated Title IX of the Education Amendments of 1972 by discriminating against Plaintiff on the basis of his gender. (*See* Compl. ¶¶ 332-352 (Count I), ¶¶ 353-380 (Count II), ¶¶ 381-418 (Count III).)[4]  Title IX states that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  Among other things, it "bars the imposition of university discipline where gender is a motivating factor," and it "is enforceable through an implied private right of action . . . for monetary damages as well as injunctive relief."  *Yusuf v. Vassar Coll.*, 35 F.3d 709, 714-15 (2d Cir. 1994) (citations omitted).  In most Title IX cases, a plaintiff advances a claim under one of two theories: (1) an "erroneous outcome" theory; or (2) a "selective enforcement" theory.  *Doe v. The Trustees of the Univ. of Pennsylvania*, 270 F. Supp. 3d 799, 822 (E.D. Pa. 2017) (citation omitted); *see also Yusuf*, 35 F.3d at 714-16 (dividing Title

---

[4]      Count I alleges a violation of Title IX with respect to the First Investigation.  Counts II and III allege violations of Title IX with respect to the Second Investigation.

IX claims involving university disciplinary proceedings into two categories based on erroneous outcome and selective enforcement theories).[5]  Occasionally, a plaintiff will also assert a Title IX claim under a theory of "retaliation" for complaining of gender discrimination.  *Doe v. Mercy Catholic Med. Ctr.*, 850 F.3d 545, 563-64 (3d Cir. 2017); *see also Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173-74 (2005) (stating that "[r]etaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action").  Plaintiff proceeds under all three theories. (*See* Pl.'s Opp. at 7-20, 25-28.)

### (1)  Erroneous Outcome

Under an "erroneous outcome" theory, a plaintiff asserts that he or she was "innocent and wrongly found to have committed an offense."  *Yusuf*., 35 F.3d at 715.  An erroneous outcome challenge to university disciplinary proceedings requires a plaintiff to plead (1) "particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding," and (2) "particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding."  *Id*.  A complaint meets the first prong if it alleges "particular evidentiary weaknesses behind the finding of an offense such as a motive to lie on the part of a complainant or witnesses, particularized strengths of the defense, or other reason to doubt the veracity of the charge."  *Id*.  It may also allege procedural flaws affecting the evidence.  *Id*.  "[T]he

---

[5]    Although a Second Circuit case, *Yusuf* has been cited by numerous courts in the Third Circuit as setting the standard for Title IX erroneous outcome/selective enforcement claims.  *See, e.g.*, *Doe v. Trustees of Princeton Univ.*, 2020 WL 967860, at *2-3 (D.N.J. Feb. 28, 2020); *Doe v. Rider Univ.*, 2020 WL 634172, at *7 (D.N.J. Feb. 4, 2020); *Doe v. The Trustees of the Univ. of Pennsylvania*, 270 F. Supp. 3d 799, 822 (E.D. Pa. 2017); *Saravanan v. Drexel Univ.*, 2017 WL 5659821, at *4-6 (E.D. Pa. Nov. 24, 2017); *see also Doe v. Princeton Univ.*, 790 F. App'x 379, 383-84 (3d Cir. 2019) (affirming a decision of the district court that applied the *Yusuf* standard to a Title IX claim that was advanced under a selective enforcement theory). As such, I apply the standard from *Yusuf* in this case.

pleading burden in this regard is not heavy." *Id*. However, "[i]f no such doubt exists based on the record before the disciplinary tribunal, the claim must fail." *Id*.

Once doubt has been cast on the accuracy of the proceedings, the plaintiff must present "particularized allegation[s] relating to a causal connection between the flawed outcome and gender bias." *Id*. "[A]llegations of a procedurally or otherwise flawed proceeding that has led to an adverse and erroneous outcome combined with a conclusory allegation of gender discrimination is not sufficient to survive a motion to dismiss." *Id*. The allegations must "go well beyond the surmises of the plaintiff as to what was in the minds of others and involve provable events that in the aggregate would allow a trier of fact to find that gender affected the outcome of the disciplinary proceeding." *Id*. at 716. Allegations that may support gender bias include "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Id*. at 715.[6]

In this case, Plaintiff contends that the allegations in the Complaint support claims under an erroneous outcome theory with respect to both the First Investigation and the Second

---

[6]     In his opposition papers, Plaintiff asserts that "[t]he second prong—gender bias as a motivating factor—can be met by pleading 'specific facts that support a *minimal plausible* inference of [gender] discrimination" (Defs.' Opp. at 11 (quoting *Doe v. Columbia Univ.*, 831 F.3d 46, 56 (2d Cir. 2016).) I note that at least one circuit has rejected this modified pleading standard. *See Doe v. Miami Univ.*, 882 F.3d 579, 5889 (6th Cir. 2018) (stating that the Second Circuit's "modified pleading standard . . . lacks support from our precedent . . . [and] [a]ccordingly, in this Circuit, [the plaintiff] must meet the requirements of *Twombly* and *Iqbal* for each of his claims"). The Third Circuit has not yet addressed this issue, but its precedent suggests that it would follow the Sixth Circuit in rejecting the *Columbia* decision. As the Sixth Circuit explained in *Miami Univ.*, the *Columbia* decision was partially premised on the Second Circuit's decision in *Littlejohn v. City of New York,* 795 F.3d 297 (2d Cir. 2015). In *Littlejohn*, the Second Circuit reconciled *Twombly* and *Iqbal* with the Supreme Court's holding in *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002). While *Swierkiewicz* remains good law in some circuits, the Third Circuit has explicitly held that the pleading standard set forth in *Swierkiewicz* is incompatible with *Twombly* and *Iqbal*. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009) (claiming that *Swierkiewicz* "has been specifically repudiated by both *Twombly* and *Iqbal*"). As such, based on the Third Circuit's repudiation of *Swierkiewicz*, I adopt the Sixth Circuit's approach by applying the general *Twombly/Iqbal* pleading standard.

Investigation.  I address the sufficiency of the allegations as they relate to each of the two investigations, in turn, below.

   ***First Investigation (Count I)***.  Defendants contend that Plaintiff has failed to allege a Title IX claim based on an erroneous outcome theory as to the First Investigation, because,  "even assuming the outcome was flawed" (*i.e.*, the first prong), Plaintiff does not allege that the erroneous outcome was causally connected to gender bias (*i.e.*, the second prong).  (Defs.' Br. at 11-13.)  In response, Plaintiff contends that "the Complaint properly alleges that [the University] exhibited gender bias because the infantilization of women plays into archaic gender stereotypes about women as chaste, sexually innocent, naive, lacking sexual autonomy, and needing protection from men, who are considered the sexual aggressors."  (Pl.'s Opp. at 11-12 (citing Compl. ¶¶ 151, 343).)  Plaintiff also contends that the Complaint "alleges a considerable connection between the Im investigation and the specific pressure placed on the University to prosecute male professors and protect and believe female graduate students in the time period leading up to Ms. Im's complaint against Plaintiff."  (*Id*. at 12.)  In support of the latter contention, Plaintiff cites to allegations in the Complaint, which allege that, "in addition to [the University]'s history of complaints and issues with the [Department of Education's] Office for Civil Rights for purportedly failing to sufficiently respond to allegations of sexual misconduct by female students, [the University] faced considerable pressure from its student body to remedy a perceived atmosphere of gender bias specifically against female graduate students, like Im, by male faculty, like Plaintiff."  (*Id*. at 12 (citing Compl. ¶¶ 66-75, 344).)  Plaintiff also cites to allegations that, during the 2016-2017 academic year, three female graduate students in the German Department left the University abruptly, prompting a town hall meeting to address systematic and long-term sexual harassment within the Department.  (*Id*. at 15 (citing Compl. ¶ 75).)  Plaintiff avers that the town hall meeting

took place in May 2017, which was the same timeframe when the University's Title IX office was deciding Im's case against Plaintiff.  (*Id.*)

Having considered Plaintiff's allegations, I cannot find that the Complaint supports a plausible inference that, *because of his gender*, Plaintiff was found to have violated the University's Sexual Misconduct Policy.[7]  As an initial matter, I note that Plaintiff has neither alleged any statements by officials showing gender bias in his disciplinary proceedings, nor has he alleged any pattern or practice designed to produce gender-specific outcomes.  Instead, Plaintiff relies on allegations that the University infantilized Im during the First Investigation, for instance by faulting Plaintiff for offering Im alcohol even though she was of legal drinking age, or by faulting Plaintiff for inviting Im to his home to watch movies featuring sexual assault and full frontal nudity even though she praised these films.  (*See* Pl.'s Opp. at 11-12 (citing Compl. ¶¶ 151, 343).  However, Plaintiff fails to explain how "infantilizing" an accuser amounts to bias against men.  These allegations do not reference gender, let alone suggest that gender was a motivating factor in the University's decision.  At most, these allegations show that the University exhibited bias in favor of a younger student vis-a-vis an older professor, an inference having nothing to do with gender.

Plaintiff's allegations about pressure allegedly faced by the University from the Office of Civil Rights and students in the German Department also do not support an inference of bias *against men*.  Although the Third Circuit has not had occasion to address this specific issue, other courts have recognized that external pressure from campus organizations and government agencies

---

[7]     Although Defendants do not contest the first prong of the analysis in the present motion, I note that Plaintiff alleges facts "sufficient to cast some articulable doubt on the accuracy of the outcome" of the First Investigation. *Yusuf.*, 35 F.3d at 715.  Specifically, the Complaint describes numerous instances where, during the course of the First Investigation, the University's Title IX office allegedly withheld evidence from Plaintiff, ignored exculpatory evidence, accepted altered evidence submitted by Im, or failed to question Im's credibility or narrative. (*See* Compl. ¶¶ 229-160.)

such as the Office of Civil Rights may "provide[] a backdrop that, when combined with other circumstantial evidence of bias in [the plaintiff's] specific proceeding, gives rise to a plausible [Title IX] claim." *Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018) (citing *Twombly*, 550 U.S. at 570). However, external pressure alone is not enough. Rather, "[i]n the cases where public pressure was found to support claims of erroneous outcome, that public pressure targeted the *specific* disciplinary action being challenged." *Doe v. Univ. of Cincinnati*, 2018 WL 1521631, at *6 (S.D. Ohio Mar. 28, 2018) (emphasis added); *see also Doe v. Univ. of St. Thomas*, 240 F. Supp. 3d 984, 992 (D. Minn. 2017) ("[T]his Court joins the majority of federal courts in finding a general reference to federal pressure, by itself, is insufficient to show gender bias."); *Doe v. Univ. of Colo.*, 255 F. Supp. 3d 1064, 1078 (D. Colo. 2017) (same); *Doe v. Lynn Univ., Inc.*, 224 F. Supp. 3d 1288, 1294 (S.D. Fla. 2016) (same). In this case, Plaintiff does not point to any public pressure directed at any single individual involved in his specific case, and the allegations in the Complaint pertain to investigations and incidents that are unconnected to the First Investigation. Indeed, these allegations are anything but specific to Plaintiff's case: they concern federal investigations by Office of Civil Rights into the University's handling of sexual misconduct accusations by students; and criticism focused on the German Department (to which Plaintiff did not belong). Without any allegations specifically connecting the external pressure on the University to Plaintiff's specific case, there is simply no basis to plausibly infer that the outcome of the First Investigation was motivated by his gender.

**Second Investigation (Count III)**. Defendants contend that Plaintiff cannot sustain a claim as to the Second Investigation based on an erroneous outcome theory because "he *admits* he lied to University officials about his relationship" with E.S. (Defs.' Br. at 14 (emphasis in original).) Defendants further argue that, "[e]ven if [Plaintiff] disputes that his affair violated University

policy . . . , the admission that he violated the policy on Honesty and Cooperation in University Matters is enough to prevent him from alleging his innocence, a required element of an erroneous outcome claim." (*Id*. (citing *Doe v. Rider Univ.*, 2018 WL 466225, at *8 (D.N.J. Jan. 17, 2018)).) In his opposition brief, Plaintiff does not directly address Defendants' argument that his claim must fail based on the admission that he lied. Instead, Plaintiff points to allegations in the Complaint that show that the Second Investigation suffered from extensive procedural irregularities and was infected by gender bias. (*See* Pl.'s Opp. at 16-20.)

I find that, regardless of the presence of any procedural irregularities or alleged gender bias during the Second Investigation, Plaintiff's claim under an erroneous outcome theory fails for the simple reason that he has not sufficiently alleged his innocence. *See Yusuf.*, 35 F.3d at 715 (stating that, under an erroneous outcome theory, the "claim is that the plaintiff was innocent and wrongly found to have committed an offense"). Indeed, rather than affirmatively alleging that Plaintiff is innocent, the allegations in the Complaint support the opposite inference: that Plaintiff was *guilty* of the charges for which he was ultimately terminated. Plaintiff alleges in the Complaint that he and E.S. commenced a relationship in Spring 2014 (*see* Compl. ¶ 235), that the relationship was ongoing during the period when Plaintiff evaluated E.S.'s dissertation (*see id*. ¶ 298(h)), and that the University's rules at the time prohibited "sexual or romantic relationship[s] involve[ing] individuals in a teacher-student relationship (e.g. being directly or indirectly taught, supervised or evaluated)" (*id*. ¶ 229). Moreover, Plaintiff admits that he lied during the investigation about his relationship with E.S. (*See* Compl. ¶ 124 (stating that "Plaintiff . . . denied the relationship [with E.S.] when interviewed" by a member of the Title IX panel).) It was for this very conduct— engaging in a prohibited teacher-student relationship and lying to investigators—that the University terminated Plaintiff's employment. (*See* Recommendation Memo, ECF 20-3.)

Because the undisputed facts, as alleged by Plaintiff, negate any inference that he was innocent, Plaintiff has failed to state a claim as to the Second Investigation based on an erroneous outcome theory.

### (2) Selective Enforcement

Under a selective enforcement theory, a plaintiff "asserts that, regardless of the student's [or faculty member's] guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's [or faculty member's] gender." *Yusuf*, 35 F.3d at 715. Under a selective enforcement theory, a male plaintiff must allege that "a female was in circumstances sufficiently similar to his own and was treated more favorably by the [educational institution]." *Tafuto v. N.J. Inst. of Tech.*, 2011 WL 3163240, at *2 (D.N.J. July 26, 2011) (alteration in original). Thus, when a male professor claims that a university selectively enforced a policy against him, he must identify a female professor who received better treatment even though she "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the [school's] treatment of them for it." *Saravanan v. Drexel Univ.*, 2017 WL 5659821, at *6 (E.D. Pa. Nov. 24, 2017). I address the sufficiency of the allegations as they relate to each of the two investigations, in turn, below.

***First Investigation (Count I)***. Defendants assert that Plaintiff has failed to allege selective enforcement as to the First Investigation because he has not identified any specific female who was accused of similar conduct and treated more favorably by the University. (Defs.' Br. at 9-11.) In response, Plaintiff cites to allegations in the Complaint that state, on information and belief, female respondents and faculty members are formally investigated at a lower rate and are punished less severely than similarly accused male respondents and faculty members. (Pl.'s Opp. at 8 (citing Compl. ¶¶ 161-163, 346, 348).) Plaintiff also cites to allegations in the Complaint which allege that the University treated Plaintiff differently than Im, his female accuser, during the course of

the First Investigation. (Pl.'s Opp. at 9 (citing Compl. ¶¶ 15, 192, 146-150, 157, 207, 210, 215, 243, 255, 265, 304, 359-360, 400, 436, 441, 454).) Plaintiff contends that his female accuser is a sufficient comparator for the purposes of pleading his claim based on selective enforcement. (*Id.*)

I do not agree with Plaintiff that Im is a sufficient comparator. A selective enforcement claim requires a comparison between two similarly situated individuals—in the instant case, a male and female professor accused of similar conduct. *See, e.g.*, *Tafuto*, 2011 WL 3163240, at *2-3; *Saravanan*, 2017 WL 5659821, at *6; *Rider Univ.*, 2020 WL 634172, at *12. Im—the student complainant against Plaintiff during the First Investigation—"is not a counterpart for the purposes of a selective enforcement claim." *Doe v. Case W. Reserve* Univ., 2015 WL 5522001, at *6 (N.D. Ohio Sept. 16, 2015). Im was a student and Plaintiff was a professor; the University's obligations and relationship to each were fundamentally different. Further, Plaintiff's claim that the University treated Plaintiff differently during the course of the investigation is very different from Im's claim that Plaintiff sexually harassed her. "To consider a student similarly situated, 'the individuals with whom a plaintiff seeks to be compared must have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the [school's] treatment of them for it.'" *See Saravanan*, 2017 WL 5659821, at *6 (emphasis and alteration in original) (citation omitted). There is no suggestion that Im engaged in sexual harassment, sounding the death knell for Plaintiff's claim that Im is an appropriate comparator. Moreover, Plaintiff's allegations that female respondents are formally investigated at a lower rate and are punished less severely than male faculty respondents is far too general to constitute an example of "a female [who] was in circumstances sufficiently similar to his own and [who] was treated more favorably." *Tafuto*, 2011 WL 3163240, at *2. Because Plaintiff has failed to allege a single

example of a similarly situated female who was treated differently, I find that his claim fails under a selective enforcement theory as to the First Investigation.

*Second Investigation (Count III)*.  Defendants contend that Plaintiff has also failed to allege that a female professor "was in circumstances sufficiently similar to his own and was treated more favorably" with respect to the Second Investigation.  (Defs.' Br. at 14 (quoting *Tafuto*, 2011 WL 3163240, at *2).)  In response, Plaintiff argues he has sufficiently alleged that the decision to initiate the Second Investigation and the severity of the resulting punishment were influenced by gender bias.  (Pl.'s Opp. at 16-17.)  Specifically, Plaintiff cites to allegations that suggest that the Second Investigation and decision to terminate Plaintiff were prompted by Im's campus-wide pressure campaign and by public pressure from the #MeToo movement, which had gained momentum during the timeframe of the Second Investigation.  (*Id*. (citing Compl. ¶¶ 188-208, 217, 222-224, 226-288, 304, 385-395, 408.)

As I found with respect to the First Investigation, I find that, regardless of whether gender bias influenced the Second Investigation, Plaintiff has failed to sufficiently allege a single comparator between two similarly situated individuals, which is required to sustain his claim under a selective enforcement theory.  *See*, *e.g.*, *Tafuto*, 2011 WL 3163240, at *2-3; *Saravanan*, 2017 WL 5659821, at *6; *Rider Univ.*, 2020 WL 634172, at *12.   Plaintiff does not identify, for example, any female professor who was accused of engaging in a prohibited teacher-student relationship or of being dishonest during disciplinary proceedings, and who received different treatment.  Accordingly, the Complaint fails to allege a claim under a selective enforcement theory as to the Second Investigation.

### (3)  Retaliation

Count II of the Complaint asserts a violation of Title IX under a theory of retaliation.  To plead a case of "retaliation" under Title IX, a plaintiff must allege that (i) he "engaged in activity

protected by Title IX," (ii) he "suffered an adverse action," and (iii) "there was a causal connection between the two." *Doe v. Mercy Catholic Med. Ctr.*, 850 F.3d 545, 564 (3d Cir. 2017) (citing *Moore v. City of Philadelphia*, 461 F.3d 331, 340–42 (3d Cir. 2006)). If a plaintiff fails to plead any one of the required elements, the retaliation claim must be dismissed. *See Doe v. Princeton Univ.*, 2018 WL 2396685, at *7. In this case, although I find that the allegations in the Complaint are insufficient to meet either the first or the third element, I nevertheless address each of the three elements, in turn, below.

*Protected Activity*. Under Title IX, "protected activity" includes reporting or opposing discrimination prohibited by the statute. *Jackson v. Birmingham Board of Ed.*, 544 U.S. 167, 173 ("Retaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action."). A plaintiff alleging retaliation "need not prove the merits of the underlying discrimination complaint, but only that 'he was acting under a good faith, reasonable belief that a violation existed.'" *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1085 (3d Cir. 1996) (quoting *Griffiths v. CIGNA Corp.*, 988 F.2d 457, 468 (3d Cir.1993)). However, "[g]eneral complaints about unfair treatment are not considered protected activity," and so do not suffice. *Borowski v. Premier Orthopaedic & Sports Med. Ass'n, Ltd.*, 2014 WL 3700342, at *5 (E.D. Pa. July 24, 2014). Instead, this element requires allegations that that the complaint was "about conduct prohibited by" the statute. *Davis v. City of Newark*, 417 F. App'x 201, 203 (3d Cir. 2011).

In this case, Plaintiff alleges that he reported to the Acting Chair of Plaintiff's Department and to the University's counsel that he was being subjected to a "hostile work environment" as a result of Im's public campaign against him. (*See* Compl. ¶¶ 209, 215, 361, 364.) However, Plaintiff does not aver that when he made his complaints to the Acting Chair or the University's

counsel, he also conveyed to them that his complaints related to a claim about sex discrimination or gender bias.  The only conduct prohibited by Title IX is discrimination on the basis of sex. Plaintiff's mere use of the phrase "hostile work environment" in his complaints does not convert those complaints into "protected activity."  Accordingly, I find that Plaintiff has not satisfied the first prong by alleging that he engaged in any activity that is protected by Title IX.

*Adverse Action.*  The second element requires Plaintiff to "point to an employment action that is 'harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination.'"  *Clarkson v. SEPTA*, 700 F. App'x 111, 115 (3d Cir. 2017) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)).  Only actions that "effect a material change in the terms or conditions of . . . employment" are sufficient.  *Deans v. Kennedy House*, Inc., 587 F. App'x 731, 734 (3d Cir. 2014).  In this case, Plaintiff alleges that, in response to his complaint to the Acting Chair of Plaintiff's Department, Plaintiff was *asked* to step down as a co-director of an upcoming conference.  (Compl. ¶ 362.)  Plaintiff also alleges that, after he complained to the University's counsel about the hostile environment, the University (i) *asked* Plaintiff to tender his resignation, (ii) placed him on administrative leave, (iii) publicly announced Plaintiff's administrative leave, and (iv) improperly pursued and extended the Second Investigation into Plaintiff's relationship with E.S., despite the University having initially concluded that there was insufficient evidence of a policy violation.   (Compl. ¶¶ 364-377.) Plaintiff asserts, in his opposition, that "[a]ll of the above actions served to prevent Plaintiff from performing his ordinary employment duties and further served to humiliate and denigrate him, which would also discourage reporting by a reasonable employee."  (Defs.' Opp. at 27.)

I find that the Acting Chair's mere request that Plaintiff step-down from an upcoming conference (which Plaintiff apparently declined), and the University's mere pursuit of the Second

Investigation, both fall short of a material change in the terms or conditions of his employment, which is necessary to constitute an adverse action. However, Plaintiff's placement on administrative leave, which was taken against Plaintiff after he complained to the University's counsel, is more akin to the type of action that constitutes a material change in employment. Based on that action, I find that Plaintiff has *arguably* satisfied the second element.[8] Therefore, I will turn to the issue of whether Plaintiff has sufficiently pled a causal connection between those actions and his complaints to the University's Counsel.

*Causal Connection.* "[A] plaintiff may demonstrate causation in a retaliation claim by showing: (1) a close temporal relationship between the protected activity and the adverse action, or (2) that 'the proffered evidence, looked at as a whole, . . . raise[s] the inference [of causation].'" *Nuness v. Simon & Schuster, Inc.*, 325 F. Supp. 3d 535, 563 (D.N.J. 2018) (alteration in original) (citation omitted). However, "the mere fact that adverse employment action occurs after a complaint will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events." *Groeber v. Friedman & Schuman, P.C.*, 555 F. App'x 133, 136 (3d Cir. 2014) (citation and internal quotation marks omitted). Any "causal connection may be severed by the passage of a significant amount of time, or by some legitimate intervening event." *Wiest v. Tyco Elecs. Corp.*, 812 F.3d 319, 330 (3d Cir. 2016); *cf. Hernandez v. Temple Univ. Hosp.*, 2019 WL 130508, at *9 (E.D. Pa. Jan. 8, 2019) ("[M]isconduct occurring between the dates of the

---

[8]     Defendants cite to two cases for the proposition that placement on administrative leave does not rise to the level of a material adverse action. (See Defs.' Br. at 20 (citing *Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 326 (3d Cir. 2015) (stating that "[a] paid suspension pending an investigation of an employee's alleged wrongdoing does not fall under any of the forms of adverse action mentioned by Title VII's substantive provision.") and *Doe v. Princeton University*, 2018 WL 2396685, at *7 (D.N.J. May 24, 2018) (finding that "thoroughly investigating the charges [against the plaintiff], and offering a leave of absence" did not constitute retaliation). Because I find that Plaintiff has clearly not satisfied the first and third element of his retaliation claim, I need not address whether the particular circumstances of his administrative leave rose to the level of a material adverse action.

protected activity and adverse employment action is the type of intervening event that can destroy what otherwise would be an inference of retaliation.") (citation omitted).

In this case, I find that the allegations in the Complaint, when taken together, negate any plausible inference that a causal connection can be drawn between Plaintiff's complaint to the University's counsel and his subsequent placement on administrative leave. The Complaint alleges that Plaintiff notified the University's counsel of his complaint about a hostile work environment on December 21, 2017, and was placed on administrative leave approximately one month later, on January 23, 2018. (Compl. ¶¶ 364, 366.) Despite the temporal proximity between these events, however, it is significant that, during this same time period, on December 20, 2017, the Complaint alleges that the University received an investigative report, which detailed Plaintiff's relationship with E.S. and found that Plaintiff had violated the University's policy on Consensual Relationships with Students. (*Id.* ¶¶ 255, 261.) Although the issuance of this report was not technically an "intervening event" (because it occurred one day before Plaintiff complained to the University's counsel), it provides an "obvious alternative explanation" for why Plaintiff was placed on administrative leave. Given this obvious alternative explanation, there is nothing "unduly suggestive" about the fact he was placed on administrative leave just one month later. *See George v. Rehiel*, 738 F.3d 562, 586 (3d Cir. 2013) (stating that "an obvious alternative explanation . . . negates any inference of retaliation"). Therefore, I find that any inference that the University's decision to place him on administrative leave was caused by Plaintiff's complaint is simply not plausible in light of the contemporaneous report finding that he had violated the University's policies.

In sum, I find that, although Plaintiff's placement on administrative leave arguably constituted an adverse action, he has failed to allege a causal connection between any protected

activity and that adverse action. Accordingly, Plaintiff has failed to allege a Title IX claim under a retaliation theory.

**B.** **Title VII Claims**

Count IV of the Complaint asserts that the University violated Title VII of the Civil Rights Act of 1964. (*See* Compl. ¶¶ 419-476). Title VII states, in relevant part, that "[i]t shall be an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because of such individual's* race, color, religion, *sex*, or national origin." 42 U.S.C. § 2000e–2(a) (emphasis added). Plaintiff contends in his opposition that the Complaint sufficiently alleges a violation of Title IX under two separate theories of liability. *First*, he contends that "he was subjected to adverse employment actions, including probation, administrative leave, and termination . . . under circumstances that could give rise to an inference of gender bias." (Pl.'s Opp. at 22.) *Second*, he contends that "[t]he actions of [the] University in knowingly ignoring, and even permitting and encouraging, numerous actions . . . by Ms. Im directed at impugning Plaintiff's reputation and specifically at ending his career, constituted and comprised a hostile environment." (Pl.'s Opp. at 24.) I address the sufficiency of the allegations in the Complaint as they relate to each of those theories, in turn, below.

**(1)** **Disparate Treatment**

Courts analyze claims under Title VII that an employee was treated differently because of his or her gender under the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, a plaintiff must establish a *prima facie* case of discrimination by alleging the following: "(1) s/he is a member of a protected class; (2) s/he was qualified for the position s/he sought to attain or retain; (3) s/he suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of

intentional discrimination." *Semple v. Donahoe*, 2014 WL 4798727, at *7 (D.N.J. Sept. 25, 2014) (citing *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008)).  At the motion to dismiss stage, a Title VII plaintiff does not prove a *prima facie* case of discrimination, because the *McDonnell Douglas* standard "is an evidentiary standard, not a pleading standard." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002).  However, the plaintiff must still allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. 570).

The Third Circuit has stated that the "central focus of the *prima facie* [Title VII] case 'is always whether the employer is treating some people less favorably than others because of their race, color, religion, sex, or national origin." *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 798 (3d Cir.2003) (internal quotation marks omitted).  "The facts necessary to establish a *prima facie* case of discrimination under Title VII vary depending on the particular circumstances of each case." *Id.* at 797 n. 7 (citation omitted).  However, "[t]he evidence most often used to establish this nexus is that of disparate treatment, whereby a plaintiff shows that [he] was treated less favorably than similarly situated employees who are not in plaintiff's protected class." *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 366 (3d Cir. 2008); *see also Ewell v. NBA Properties, Inc.*, 94 F. Supp. 3d 612, 624 (D.N.J. 2015) ("An inference of discrimination may arise if similarly situated employees of a different race received more lenient treatment than that afforded plaintiff.") (citing *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 645 (3d Cir.1998)). "A determination of whether employees are similarly situated takes into account factors such as the employees' job responsibilities, the supervisors and decision-makers, and the nature of the misconduct engaged in." *Wilcher v. Postmaster Gen.*, 441 F. App'x 879, 882 (3d Cir. 2011).

In this case, Plaintiff has not alleged any facts that tend to show that Plaintiff, based on his sex, was treated differently than any similarly situated female employee of the University. The allegations in the Complaint of Plaintiff's differential treatment vis-a-vis another female employee are all directed towards the University's treatment of Im. (*See* Compl. ¶¶ 436-438, 441-444, 450-451.) However, Im—a graduate student and the accuser—was not similarly situated in any relevant respects to Plaintiff—a faculty member and the accused. Although Plaintiff "is not required to show that he is identical to [his alleged] comparator," he must still show "substantial similarity." *See Houston v. Easton Area Sch. Dist.*, 355 F. App'x 651, 654-55 (3d Cir. 2009) (stating that "[t]o make a comparison of the plaintiff's treatment to that of an employee outside the plaintiff's protected class for purposes of a Title VII claim, the plaintiff must show that he and the employee are similarly situated in all relevant respects") (citations omitted). Plaintiff has not alleged that he is similar in *any* relevant respect to Im. He also has not identified any other similarly situated female employees (professors or otherwise) who were treated differently than him in similar circumstances. Accordingly, I find that Plaintiff has not sufficiently pled facts from which it can be inferred that Plaintiff was treated differently by his employer, the University, because of his gender.[9]

### (2)     Hostile Work Environment

To state a claim for hostile work environment under Title VII, the plaintiff must allege that: "(1) he suffered intentional discrimination because of his membership in a protected class; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected the plaintiff;

---

[9]     In his opposition, Plaintiff contends that his claim for disparate treatment under Title VII may be alleged even absent an allegation that a similarly situated individual was treated more favorably than Plaintiff. (Pl.'s Opp. at 21-22.) Even if that were true, Plaintiff has still not alleged any other facts from which to infer a connection between his gender and the University's treatment of him, other than his conclusory accusation.

(4) the discrimination would detrimentally affect a reasonable person in like circumstances; and (5) the existence of respondeat superior liability." *Ali v. Woodbridge Twp. Sch. Dist.*, 2019 WL 1930754, at *8 (D.N.J. Apr. 30, 2019) (citing *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013)).   "When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,'" a hostile environment is created. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).   In evaluating whether a plaintiff was subjected to a hostile environment, courts look to "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002).

In support of his hostile work environment claims, Plaintiff points to the following allegations in the Complaint: (i) Plaintiff and Im were both employees of the University (Compl. ¶¶ 478-479); (ii) the University was under considerable scrutiny in 2016-2017 regarding its perceived failure to protect female students from sexual harassment (Compl. ¶¶ 71, 74-75); (iii) following the outcome of the First Investigation, Im embarked on a broad campaign to destroy Plaintiff's reputation, relying heavily on the backdrop of the #MeToo movement and focusing on the University's alleged failure to adequately punish male respondents (Compl. ¶¶ 188-222); (iv) in furtherance of her campaign against Plaintiff, Im publicized numerous Title IX documents and information that the University had marked as confidential (Compl. ¶¶ 193, 200, 219-220); (v) as a result of Im's public campaign, Plaintiff was publicly criticized, mocked, and his courses were protested on campus (Compl. ¶ 207); (vi) Im's campaign impeded Plaintiff's ability to perform his employment duties and caused him anxiety, distress, and high blood pressure (Compl. ¶¶ 209,

215); (vii) Plaintiff reported that Im's actions were creating a "hostile working environment" to the Acting Chair of Plaintiff's department and to the University's counsel (Compl. ¶¶ 215, 219); and (viii) the University took no actions to quell or remedy the hostile environment (Compl. ¶¶ 192, 209-211; 215; 220-221). (*See* Pl.'s Opp. at 23-24.)

I need not exhaustively analyze the sufficiency of Plaintiff's allegations against each of the required elements of a hostile work environment claim, because I find that Plaintiff has not established a basic element of a claim. "[H]arassment, no matter how unpleasant and ill-willed, is simply not prohibited by Title VII if not motivated by the plaintiff's gender (or membership in other protected groups)." *Dalton v. New Jersey*, 2018 WL 305326, at *9 (D.N.J. Jan. 5, 2018) (citation omitted); *see also Ullrich v. U.S. Sec'y of Veterans Affairs*, 457 F. App'x 132, 140 (3d Cir. 2012) ("Many may suffer severe or pervasive harassment at work, but if the reason for that harassment is one that is not proscribed by Title VII, it follows that Title VII provides no relief."). Although, according to Plaintiff, Im's alleged public pressure campaign caused him a great deal of anxiety and distress, I find that there are insufficient allegations from which to infer that Im's public campaign (or the University's failure to quell her campaign) was motivated by gender bias.[10] Indeed, the Complaint ascribes only two to Im, neither having to do with Plaintiff's gender: Im's dissatisfaction with the University's resolution of her report of sexual harassment, and her desire to advance the alleged vendetta of another professor in the Electrical Engineering department against Plaintiff based on departmental politics. (*See* Compl. ¶ 12 (stating that Im "embarked on a vicious, retaliatory campaign" because she was "[d]issatisfied with [Plaintiff]'s sanction"); *id.* ¶¶ 4-7 (attributing Im's report to her "close relationship with Cuff"). Given these

---

[10]     In addition, importantly, I note that Plaintiff does not explain, in his opposition, how Im's conduct in allegedly creating a hostile work environment can be attributed to the University.

motivations, which are alleged by Plaintiff in the Complaint, I cannot sustain Plaintiff's hostile work environment claims without more specific allegations that Im's conduct was motivated by Plaintiff's gender as a male.

### C.     State Law Claims

Counts V thru XVI of the Complaint assert claims under the New Jersey Law Against Discrimination, for breach of contract, for breach of the covenant of good faith and fair dealing, for negligence and gross negligence, and for wrongful discipline.  Because the Court has found that Plaintiff has failed to state any of his federal claims, the only potential basis for this Court's jurisdiction over Plaintiff's state law claims is supplemental jurisdiction pursuant to 28 U.S.C. § 1367.  Under 28 U.S.C. § 1367(c)(3), a district court "may decline to exercise supplemental jurisdiction over a claim . . . [if] the district court has dismissed all claims over which it has original jurisdiction."  The Third Circuit has stated that "where the claim[s] over which the district court has original jurisdiction [are] dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so."  *Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995); *cf. Markowitz v. Ne. Land Co.*, 906 F.2d 100, 106 (3d Cir. 1990) ("[T]he rule within this Circuit is that once all claims with an independent basis of federal jurisdiction have been dismissed the case no longer belongs in federal court.").  In this case, having dismissed all of Plaintiff's federal claims, I find that no considerations justify this Court's exercise of supplemental jurisdiction over the remaining state law claims and, therefore, I decline to exercise jurisdiction over those claims.

## V.     CONCLUSION

In summary, I find that Plaintiff has failed to state his federal claims (Counts I thru IV), and I decline to exercise supplemental jurisdiction over Plaintiff's state law claims (Counts V

thru XVI).  Accordingly, Defendants' motion to dismiss is **GRANTED IN PART** and **DENIED IN PART**.  Plaintiff's federal claims are dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Plaintiff is given leave to file an amended complaint to replead his federal claims, in a manner consistent with this Opinion, within forty-five (45) days of the date of the Order accompanying this Opinion.  If Plaintiff adequately pleads one or more of his federal claims in an amended complaint, the Court may exercise any supplemental jurisdiction at that time.  In lieu of filing an amended complaint, Plaintiff may pursue his state law claims in state court, and the limitations period for each of those claims is tolled, to the extent the limitations period has not already expired, for a period of thirty (30) days, pursuant to 28 U.S.C. § 1367(d).

DATED:  March 30, 2020

/s/ Freda L. Wolfson
Hon. Freda L. Wolfson
U.S. Chief District Judge